DMJ ASSOCIATES, L.L.C.,

                 Plaintiff,

vs.

CARL A. CAPASSO, et al.,

                 Defendants.

EXXON MOBIL CORPORATION and
QUANTA RESOURCES CORPORATION,

                 Defendants/
                 Third-Party Plaintiffs,

vs.

ACE WASTE OIL, INC., et al.,

                 Third-Party Defendants.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CV 97 7285 (DLI) (RML)

ORAL ARGUMENT REQUESTED

---

**BRIEF OF THIRD-PARTY DEFENDANTS CROWN CORK & SEAL COMPANY, INC.,  NOVELIS CORPORATION (f/k/a ALCAN ALUMINUM CORPORATION), REXAM BEVERAGE CAN COMPANY, RIVER TERMINAL DEVELOPMENT, AND WYMAN-GORDON COMPANY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE CLAIM OF DEFENDANT/THIRD-PARTY PLAINTIFF QUANTA RESOURCES CORPORATION FOR CONTRIBUTION UNDER CERCLA SECTION 113(f) IN COUNT II OF THE THIRD AMENDED THIRD-PARTY COMPLAINT**

---

*Of Counsel:*
William S. Hatfield
Camille V. Otero

*On the Brief:*
Paul M. Hauge
Adam C. Arnold

**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102-5310
(973) 596-4500
Attorneys for Third-Party Defendant
Rexam Beverage Can Company

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 5

LEGAL ARGUMENT ......................................................................................................... 7

POINT I        MOVANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ............................................................................................... 7

POINT II      QUANTA CANNOT RECOVER CONTRIBUTION UNDER CERCLA BECAUSE OF ITS INTENTIONAL AND RECKLESS CONDUCT ................................................................................................ 8

A.      Fundamental Principles of the Law of Contribution Prevent Quanta From Recovering in Contribution Under CERCLA Section 113(f) .......... 8

B.      Quanta Cannot Recover in Contribution Under Its Section 113(f) Claim Because It Knew of the Hazardous Conditions at the Site and Did Nothing to Mitigate Those Conditions But Instead Acted Intentionally and Recklessly to Make Them Worse, Abandoned the Site, Created a Public Health Emergency, and Profited From Its Egregious Behavior.............................................................................................. 12

CONCLUSION................................................................................................................. 18

- i -

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Amland Properties Corp. v. Aluminum Co. of America,
808 F. Supp. 1187 (D.N.J. 1992) ........................................................... 10

Appleton Papers Inc. v. George A. Whiting Paper Co.,
No. 08-C-16, 2009 WL 5064049 (E.D. Wisc. Dec. 16, 2009) .................... 14, 15, 16

Avnet, Inc. v. Allied-Signal, Inc.,
825 F. Supp. 1132 (D.R.I. 1992) ........................................................... 10

Bancamerica Commercial Corp. v. Asarco, Inc.,
100 F.3d 792 (10th Cir.), amended, 103 F.3d 80 (10th Cir. 1996) ............. 11

Bedford Affiliates v. Sills,
156 F.3d 416 (2d Cir. 1998) ................................................................. 9

Boeing Co. v. Cascade Corp.,
207 F.3d 1177 (9th Cir. 2000) .............................................................. 11

Browning-Ferris Indus., Inc. v. Ter Maat,
195 F.3d 953 (7th Cir. 1999) ............................................................... 12

Burlington Northern & Santa Fe Ry. Co. v. United States,
556 U.S. 612 (2009) ........................................................................... 10

County Line Investment Co. v. Tinney,
933 F.2d 1508 (10th Cir. 1991) ............................................................ 9

E.I. DuPont de Nemours & Co. v. United States,
297 F. Supp. 2d 740 (D.N.J. 2003) aff'd, 460 F.3d 515 (3d Cir. 2006), rev'd on other grounds,
508 F.3d 126 (3d Cir. 2007) ................................................................. 9

Environmental Transp. Sys., Inc. v. ENSCO, Inc.,
969 F.2d 503 (7th Cir. 1992) ............................................................... 12

Goodrich Corp. v. Town of Middlebury,
311 F.3d 154 (2d Cir. 2002) ................................................................. 11

In re Reading Co.,
115 F.3d 1111 (3d Cir. 1997) ............................................................... 9

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574 (1986) ........................................................................... 7

New Castle County v. Halliburton NUS Corp.,
111 F.3d 1116 (3d Cir. 1997) ............................................................... 8, 9

Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.,
596 F.3d 112 (2d Cir. 2010) ................................................................. 8

- ii -

O'Neil v. Picillo,
  883 F.2d 176 (1st Cir. 1989) ................................................................ 12

Shapiro v. Alexanderson,
  741 F. Supp. 472 (S.D.N.Y. 1990) ....................................................... 12

Town of New Windsor v. Tesa Tuck, Inc.,
  919 F. Supp. 662 (S.D.N.Y. 1996) ......................................................... 9

United States v. Alcan Aluminum Corp.,
  990 F.2d 711 (2d Cir. 1993) .................................................................. 10

United States v. Atlantic Research Corp.,
  551 U.S. 128 (2007) ................................................................................. 9

United States v. Chem-Dyne Corp.,
  572 F. Supp. 802 (S.D. Ohio 1983) ...................................................... 10

United States v. Colorado & Eastern Ry. Co.,
  50 F.3d 1530 (10th Cir. 1995) ................................................................ 9

United States v. Hercules, Inc.,
  247 F.3d 706 (8th Cir. 2001) ................................................................ 10

United States v. NCR Corp.,
  No. 10-C-910, 2013 WL 1858597 (E.D. Wisc. May 1, 2013) .............. 14

United States v. R.W. Meyer, Inc.,
  932 F.2d 568 (6th Cir. 1991) .................................................................. 9

United States v. Ward,
  618 F. Supp. 884 (D.S.C. 1985) ...................................................... 13, 16

United Technologies Corp. v. Browning-Ferris Indus., Inc.,
  33 F.3d 96 (1st Cir. 1994) ....................................................................... 9

Note: Copies of unpublished decisions are annexed hereto.

## STATUTES

42 U.S.C. § 9607(a) ............................................................................................. 8

42 U.S.C. § 9607(b) ............................................................................................. 2

42 U.S.C. § 9607(c)(1) ....................................................................................... 11

42 U.S.C. § 9607(c)(2) ....................................................................................... 11

42 U.S.C. § 9613(f) ................................................................................. 1, 7, 8, 18

42 U.S.C. § 9613(f)(1) ...................................................................................... 8, 11

42 U.S.C. § 9613(f)(3)(B) .................................................................................... 8

## RULES

Fed. R. Civ. P. 56(a) ............................................................................................ 7

## OTHER AUTHORITIES

Restatement (Second) of Torts
   § 886A(3) (1979) ............................................................................................ 10

## PRELIMINARY STATEMENT

Third-Party Defendants Crown Cork & Seal Company, Inc., Novelis Corporation (f/k/a Alcan Aluminum Corporation), Rexam Beverage Can Company, River Terminal Development, and Wyman-Gordon Company (collectively "Movants") move for partial summary judgment as to the claim for contribution asserted by Quanta Resources Corporation ("Quanta") in Count II of the Third Amended Third-Party Complaint.  Quanta seeks contribution under Section 113(f) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9613(f).[1]

CERCLA contribution claims are normally adjudicated via the application of a variety of equitable factors.  After weighing those factors, the court allocates cleanup costs according to the parties' relative responsibility for the contamination that required remediation.  In certain cases, however, even though the contribution claimant can properly plead a claim for contribution, the claimant's behavior is so egregious as to deny the claimant *any* recovery in contribution.  This case involves such egregious behavior.

Movants are entitled to judgment as a matter of law on Quanta's contribution claim under Section 113(f) because Quanta's intentional and reckless conduct in its acquisition, mismanagement, and abandonment of the property located at 37-80 Review Avenue, Long Island City, New York (the "Site") acts to prevent Quanta from recovering in contribution from Movants.  Black-letter principles of the common law, which the United States Supreme Court, the Second Circuit, and other Federal courts have consistently used to determine the meaning

---

[1] By way of a separate motion, Movants herein, along with a number of other third-party defendants against whom Defendant/Third-Party Plaintiff Exxon Mobil Corporation ("Exxon Mobil"), but not Quanta, asserted claims, are moving for partial summary judgment on the claim under CERCLA Section 107(a) asserted by Exxon Mobil and Quanta in Count I of the Third Amended Third-Party Complaint.  As set forth in the brief in support of that motion, as potentially responsible parties (PRP's) that have been sued under Section 107(a) by DMJ and have entered into an administrative order with New York State to resolve their liability, Exxon Mobil and Quanta cannot assert a claim for cost recovery under CERCLA Section 107(a).

and scope of CERCLA contribution rights -- and specifically the Restatement of Torts (Second) Section 886(A)(3) -- deny recovery in contribution to any tortfeasor who caused harm through intentional, reckless, willful, or wanton conduct. As set forth below, although it has pled a claim that procedurally fits under Section 113(f), Quanta is not entitled to recover in contribution under that claim because of its egregious conduct at the Site over the last few decades.

While the relief sought in the instant motion would have the effect of shielding Movants from Quanta's CERCLA contribution claim, Movants do not rely on any implied or expanded defense to CERCLA liability. Movants recognize that CERCLA contains a limited set of affirmative defenses, set forth in Section 107(b), 42 U.S.C. § 9607(b), and that those defenses are narrowly construed so as to give full effect to CERCLA's remedial purposes. However, that is not relevant to this motion. Quanta is unable to recover on its contribution claim, not because Movants assert a defense to liability under Section 107(a), but because Quanta's own intentional and reckless conduct prevents any recovery by Quanta in contribution. The application in this case of Section 886A(3) of the Restatement would do nothing to frustrate any of CERCLA's purposes. It would simply give effect to fundamental and widely accepted principles governing the traditional equitable remedy of contribution -- the very remedy expressly provided in CERCLA Section 113(f) -- which deny recovery in those cases where, as here, the contribution claimant intentionally and recklessly caused the harm.

All relevant facts about Quanta's actions (and failures to act) are undisputed. Quanta acquired the Site in 1980 with full knowledge that the Site's long-time operator, Russell Mahler ("Mahler"), was under investigation for numerous violations of state and federal environmental laws, and that he had entered into a consent judgment and paid fines for some of these violations. Nevertheless, Quanta employed both Mahler and Kenneth Mansfield, who together had operated

the Site and created those conditions. Despite this foreknowledge, Quanta failed to fully inspect the environmental conditions at the facilities that it was purchasing from Mahler, including the Site. By way of example, Quanta did not fully investigate the condition of the numerous storage tanks and associated piping at the Site or the volume or hazardous composition of the contents of the tanks. Quanta chose to proceed at its own risk.

Upon taking ownership and control of the Site, Quanta operated the Site and became aware of the deteriorated conditions of the tanks and oil reprocessing equipment. But Quanta took no steps to correct the hazardous conditions at the Site. Instead, Quanta made matters at the Site much worse by accepting hazardous wastes that even Mahler told Quanta not to accept, and then storing those wastes in leaking and decrepit tanks. When it experienced insufficient customer demand for its reprocessed oil, Quanta stopped all reprocessing operations at the Site, but it continued to collect and store hazardous wastes in its deteriorated tanks, operating the Site solely for profit as an illegal hazardous waste storage and disposal facility rather than an oil reprocessing facility.

Although the bankruptcy trustee's attempt to abandon the Site would not take place until 1982, Quanta had already effectively abandoned the Site in 1981. By that time, only one or two employees remained at the Site and the boiler was shut down, while Quanta indiscriminately took in hazardous waste that leaked from its dilapidated tanks. Indeed, the New York City Department of Environmental Protection ("NYCDEP") found that Quanta was storing and disposing of hazardous waste in an unsafe and illegal manner and in a condition that was dangerous to human health and the environment. Ultimately, Quanta was found to have committed more than eighty (80) violations of the Environmental Conservation Law and the

- 3 -

New York State Department of Environmental Conservation ("DEC") denied its application for a permit to operate in New York State.

As a result of Quanta's illegal operations and failure to control the Site, in 1982 the NYCDEP declared the Site was "a potential NYC health and environmental disaster." Inspectors found over 100 tanks, many of them leaking or overflowing, and hundreds of thousands of gallons of waste oil, PCBs, and other contaminants at the Site. Quanta had recklessly abandoned the Site and failed to do anything to remove or remediate the contamination. A 1982 Report to the Commissioner of the DEC found that storage tanks had holes in them and were leaking on the ground. The fire prevention system was not in operation, and some of the equipment needed by the fire department to suppress a potential fire was missing. The report cautioned that if a fire were to break out at the Site, the fire department would not be able to extinguish it, and the burning PCB-contaminated waste would generate smoke laden with PCBs and other hazardous chemicals, which would threaten the lives of firefighters and New York City residents.

After the NYCDEP conducted an emergency cleanup to address the most acute hazards, Quanta still owned the Site, but it failed to mitigate or control the environmental hazards and contamination that remained there for decades. Quanta sat idly by and did nothing while conditions at the Site deteriorated even further and the contamination spread.

Quanta acted recklessly and wantonly, at a minimum, in its acquisition, operation, and abandonment of the Site. It had knowledge of the hazardous conditions there, but rather than acting on that knowledge to reduce the danger and mitigate the risks, it made those dangerous conditions even worse, reaping profits from its illegal operations of an unpermitted hazardous waste site before abandoning the Site. Because of its intentional, reckless and wanton behavior, Quanta may not recover in contribution from Movants.

## STATEMENT OF FACTS

Movants rely on and incorporate their Statement of Undisputed Material Facts.   The following facts bear particular emphasis:

- Quanta acquired the Site in 1980 when it purchased Portland Holding Corporation and all of its assets from Russell Mahler ("Mahler"), who was the sole owner and President of Portland Holding Corporation.   Statement of Undisputed Material Facts ¶¶ 1, 2.

- Prior to its acquisition of the Site, Quanta was thoroughly familiar with Mahler's legal problems in connection with oil disposal sites in Pittston, Pennsylvania and Syracuse, New York, including a criminal indictment and criminal investigations.   Despite this knowledge, Quanta employed both Mahler and Kenneth Mansfield, who had run the Site with Mahler.   This allowed the continuation of the same operations at the Site.   Id. ¶¶ 3, 7, 8.

- Before acquiring the Site, Quanta did not thoroughly inspect the Site, and overlooked numerous compromised and dilapidated tanks full of hazardous substances.   The same year that Quanta acquired the Site, the New York State Department of Environmental Conservation ("DEC") reported the existence of environmental hazards there.   Id. ¶¶ 4, 6.

- Just prior to Quanta's acquisition of the Site, the New York State Department of Environmental Conservation ("DEC") began to negotiate a Consent Order regarding the Mahler-owned company that operated at the Site.   A New York Senate report states, "Even while the Consent Order was being negotiated with Quanta, the company was violating its terms.   Manifests were falsified, materials it was forbidden to handle were transported and reported dispositions were inaccurate."   Id. ¶ 5.

- Shortly after it acquired the Site, Quanta ceased reprocessing waste oil and instead operated the Site as a waste disposal and transfer facility, taking in oil and liquid waste without even attempting to process or recycle it.   According to Mahler, "all they did was take in waste to that plant with one man there and maybe two men.   They shut down the boiler, they didn't operate the plant, and they just let waste come in there indiscriminately, and filled the tanks up".   Id. ¶ 9.

- In its operation of the Site, Quanta accepted and stored over 70,000 gallons of toxic, PCB-contaminated oil in deteriorating and leaking containers.   Quanta accepted wastes that even Mahler advised it should not accept because of uncertainties about their composition.   Quanta repeatedly violated a DEC Consent Order, and committed more than eighty (80) violations of the Environmental Conservation Law and was subsequently denied a permit to operate in New York State.   Id. ¶¶ 5, 10, 11, 12.

- Quanta had effectively ceased operation and abandoned the Site before it filed for bankruptcy in late 1981.   Quanta's bankruptcy trustee subsequently removed guard security and fire prevention and emergency equipment from the Site.   Id. ¶¶ 8, 15.

- 5 -

- When it ceased operations and abandoned the Site, Quanta left behind over one hundred tanks containing hazardous wastes, many of them leaking or overflowing, spilling their contents onto the ground, and causing contamination of the environment in and near the Site. Id. ¶¶ 14, 17.

- Following Quanta's abandonment of the Site, the NYCDEP found that hazardous material at the Site was being stored and disposed of in an unsafe and illegal manner, and in a condition that was dangerous to human life and health. Site inspections conducted in 1982 revealed dozens of tanks containing well over 500,000 gallons of waste oil and sludge, including at least 100,000 gallons which were contaminated with PCBs and other organic chemicals. The City of New York characterized the Site as an imminent threat that posed "a significant and serious risk of harm to the safety and well-being of the New York City public and environment" and "a potential NYC health and environmental disaster." It concluded that emergency action was needed "to protect the NYC public from [a] potential PCB-contaminated oil fire/explosion capable of creating a poisonous plume over the Metropolitan area." Id. ¶¶ 16, 18, 20, 23.

- To address the dangerous conditions that Quanta left behind when it abandoned the Site, the City had to take what it described as "immediate defensive actions." The City removed over 500,000 gallons of liquids and approximately 900 cubic yards of solids from the Site. Quanta did not assist in this removal work. Id. ¶¶ 24, 25.

- The DEC later determined that most of the contamination at the Site resulted from leaking pipes and improper storage of waste. Id. ¶ 13.

# LEGAL ARGUMENT

## POINT I

### MOVANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW

Summary judgment is appropriate if the evidence demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

All material facts relevant to the instant motion are undisputed. As set forth at length below, and in Movants' Statement of Undisputed Material Facts, Quanta knowingly purchased a hazardous site from a notorious polluter, but failed to take basic steps to understand the conditions there. Instead of improving operations at the Site, it employed the same notorious polluter and his associate, and proceeded to make things even worse by accepting waste that even the prior polluter would not have accepted. Instead of mitigating the dangerous conditions there, it compounded the problems by ceasing all recycling activities and turning the Site into an illegal storage and disposal facility. And instead of doing any cleanup, it abandoned the Site and did nothing for decades while conditions deteriorated and contamination spread.

Fundamental principles of the law of contribution prohibit Quanta from recovering under CERCLA Section 113(f), 42 U.S.C. § 9613(f), in this case. As a party whose intentional and reckless conduct caused the harm at issue, Quanta may not recover in contribution from other parties. Movants are therefore entitled to judgment as a matter of law on the Section 113(f) claim asserted by Quanta.

## POINT II

### QUANTA CANNOT RECOVER CONTRIBUTION UNDER CERCLA BECAUSE OF ITS INTENTIONAL AND RECKLESS CONDUCT

**A.   Fundamental Principles of the Law of Contribution Prevent Quanta From Recovering in Contribution Under CERCLA Section 113(f)**

Quanta seeks contribution under CERCLA Section 113(f), 42 U.S.C. § 9613(f).  Third Amended Third-Party Complaint ¶¶ 30-32.  Section 113(f) was not part of CERCLA as originally enacted but rather was added to CERCLA as part of the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), 100 Stat. 1613.  Specifically, Section 113(f) was added to the statute to confirm and clarify the right of a person who is liable under Section 107(a), 42 U.S.C. § 9607(a), to seek contribution from other liable parties.  S. Rep. No. 99-11, at 44 (1985); H.R. Rep. No. 99-253(I), at 79 (1985); see also Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112, 127 (2d Cir. 2010) ("§ 113(f) was enacted by Congress as part of SARA to amend CERCLA for the purpose of codifying the contribution remedy that most courts had already read into the statute."); New Castle County v. Halliburton NUS Corp., 111 F.3d 1116, 1122 (3d Cir. 1997) ("[S]ection 113(f) does not in itself create any new liabilities; rather, it confirms the right of a potentially responsible person under Section 107 to obtain contribution from other potentially responsible persons.").

Thus, while Section 113(f) specifies particular circumstances under which a person may bring an action for contribution to recover a portion of its CERCLA costs -- when it has been sued under Section 106 or Section 107(a), contribution is available under 42 U.S.C. § 9613(f)(1), and when it has resolved some or all of its CERCLA liability to the government, contribution is available under 42 U.S.C. § 9613(f)(3)(B) -- it creates no new causes of action or remedies.  Rather, the right of contribution under Section 113(f) has the same requirements, and limitations, as the traditional right of contribution.  See United States v. Atlantic Research Corp., 551 U.S.

- 8 -

128, 138 (2007) ("Nothing in § 113(f) suggests that Congress used the term 'contribution' in anything other than [the] traditional sense."); New Castle County, supra, 111 F.3d at 1121 ("the term 'contribution' is a standard legal term"); United Technologies Corp. v. Browning-Ferris Indus., Inc., 33 F.3d 96, 101 (1st Cir. 1994) ("Congress used the word 'contribution' in the conventional sense, and fully intended courts to give the word its customary meaning.").

Both the Supreme Court and the Second Circuit look to the generally accepted common-law principles set forth in Section 886A of the Restatement (Second) of Torts to understand the nature of contribution rights under CERCLA. Atlantic Research, supra, 551 U.S. at 140 (citing Section 886A(2)); Bedford Affiliates v. Sills, 156 F.3d 416, 424 (2d Cir. 1998) (citing Section 886A in discussing the nature of a claim for contribution). Numerous other federal courts have also relied upon Section 886A for guidance in determining the extent and limits of CERCLA contribution rights. See In re Reading Co., 115 F.3d 1111, 1124 (3d Cir. 1997) (citing comment to Section 886A); see also United States v. Colorado & Eastern Ry. Co., 50 F.3d 1530, 1536 (10th Cir. 1995) (citing Section 886A in noting that claim to apportion costs was "the quintessential claim for contribution"); County Line Investment Co. v. Tinney, 933 F.2d 1508, 1536 (10th Cir. 1991) (citing Section 886A while defining right of contribution); United States v. R.W. Meyer, Inc., 932 F.2d 568, 577 (6th Cir. 1991) (Guy, Jr., C.J., concurring) (citing Section 886A while noting that "the principles reflected in the Restatement (Second) of Torts represent[] the correct and uniform rules applicable to CERCLA cases"); E.I. DuPont de Nemours & Co. v. United States, 297 F. Supp. 2d 740, 746 (D.N.J. 2003) (citing Section 886A in defining contribution), aff'd, 460 F.3d 515 (3d Cir. 2006), rev'd on other grounds, 508 F.3d 126 (3d Cir. 2007); Town of New Windsor v. Tesa Tuck, Inc., 919 F. Supp. 662, 684 (S.D.N.Y. 1996) ("[C]ourts determining liability in [CERCLA contribution] cases have applied the Restatement

- 9 -

(Second) of Torts."); <u>Avnet, Inc. v. Allied-Signal, Inc.</u>, 825 F. Supp. 1132, 1138 n.43 (D.R.I. 1992) (citing Section 886A in defining contribution); <u>Amland Properties Corp. v. Aluminum Co. of America</u>, 808 F. Supp. 1187, 1198 (D.N.J. 1992) (citing Section 886A).[2]

Section 886A, entitled "Contribution Among Tortfeasors," recognizes a right of contribution among tortfeasors who share a liability to the same person for the same harm. Restatement (Second) of Torts § 886A(1) (1979).  It also sets forth several exceptions to this general right of contribution among tortfeasors.  Of particular relevance here is Subsection 886A(3):

> There is *no right of contribution* in favor of any tortfeasor who has intentionally caused the harm.

<u>Id.</u> § 886A(3) (emphasis added).  The rule extends to those whose conduct was reckless, willful, or wanton:

> The same rule has been applied to conduct that is not intended to do harm but is reckless, or as it is sometimes called, "wilful" or "wanton." . . . This conduct usually approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it.

<u>Id.</u> cmt. k.  Such conduct is not merely weighed along with other equitable factors; it acts to deny *any* recovery in contribution by a tortfeasor who has acted intentionally, recklessly, willfully, or wantonly.  Thus, even where a party would otherwise be able to state a claim for contribution

---

[2] The use of Section 886A as a guidepost for understanding the contours of a CERCLA contribution action is consistent with the courts' reliance on the Restatement, practically from the time of CERCLA's enactment, to determine when CERCLA imposes joint and several liability.  <u>See</u> <u>Burlington Northern & Santa Fe Ry. Co. v. United States</u>, 556 U.S. 612, 613 (2009) ("Congress intended the scope of liability [under CERCLA] 'to be determined from traditional and evolving principles of common law'") (quoting <u>United States v. Chem-Dyne Corp.</u>, 572 F. Supp. 802, 808 (S.D. Ohio 1983)).  Since <u>Chem-Dyne</u>, federal appellate courts, including the Second Circuit, have acknowledged that "[t]he universal starting point for divisibility of harm analyses in CERCLA cases is the Restatement (Second) of Torts." <u>United States v. Hercules, Inc.</u>, 247 F.3d 706, 717 (8th Cir. 2001); <u>see also</u> <u>United States v. Alcan Aluminum Corp.</u>, 990 F.2d 711, 721-22 (2d Cir. 1993); <u>and see</u> <u>Burlington</u>, <u>supra</u>, 556 U.S. at 613 (collecting cases).

against other tortfeasors because they share liability to the same person for the same harm, that party has no right to recover in contribution if its conduct was intentional, reckless, willful, or wanton. It is, in short, stuck with the consequences of its own egregious behavior, without any equitable recourse against other parties that may have unintentionally contributed to the same harm.[3]

The rule set forth in Restatement Section 886A(3) for contribution claimants who acted intentionally or recklessly is consistent with the general framework for adjudicating CERCLA contribution claims, where "the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). In egregious cases, such as this, the claimant's blameworthy conduct trumps all other equitable factors as to that claimant's ability to recovery amounts, if any, that it paid in excess of its equitable share. As such, it represents a specific application, in specific circumstances, of the general equitable principles that govern contribution, rather than a departure from those principles. Even in a traditional CERCLA allocation, the court has broad discretion to choose only those factors it considers the most important or most appropriate, whether it is many factors, only a few, or even just one. See, e.g., Goodrich Corp. v. Town of Middlebury, 311 F.3d 154, 176 (2d Cir. 2002) (court is not limited to any particular set of factors); Boeing Co. v. Cascade Corp., 207 F.3d 1177, 1187-88 (9th Cir. 2000) (affirming district court's use of one factor as "exclusive basis for allocation"); Bancamerica Commercial Corp. v. Asarco, Inc., 100 F.3d 792, 802-03 (10th Cir.) (court could properly consider only two factors), amended, 103 F.3d 80 (10th

---

[3] The notion of attaching serious financial consequences to willfully bad behavior was not foreign to the drafters of CERCLA. Section 107(c) limits the liability of PRPs in connection with releases from vessels, vehicles, aircraft, pipelines, or rolling stock. 42 U.S.C. § 9607(c)(1). However, those limitations do not apply, and a PRP will be liable for "the full and total costs of response and damages," if, inter alia, the release was "the result of willful misconduct or willful negligence within the privity or knowledge of such person." 42 U.S.C. § 9607(c)(2).

Cir. 1996); Environmental Transp. Sys., Inc. v. ENSCO, Inc., 969 F.2d 503, 509 (7th Cir. 1992) (affirming use of "only one determining factor").

Indeed, even after a trial on the appropriate allocation of cleanup costs, Movants submit that the same facts about Quanta's bad conduct would result in a ruling that Quanta must bear an even greater percentage of the cleanup costs than it is already paying.  Cf. Browning-Ferris Indus., Inc. v. Ter Maat, 195 F.3d 953, 957 (7th Cir. 1999) (acknowledging possibility of cases where equitable considerations would force one party to pay 100% of cleanup costs caused by that party and other party); O'Neil v. Picillo, 883 F.2d 176, 183 (1st Cir. 1989) (in light of reduced burden in contribution action following affirmance of appellants' liability under Section 107, "there might be no reason for the district court to place any burden on appellants"); Shapiro v. Alexanderson, 741 F. Supp. 472, 479 (S.D.N.Y. 1990) (in contribution action that would go forward following court's decision, "if [plaintiff] is found culpable and the other covered persons are found not to be responsible for the damage, then contribution from the other covered persons is not warranted").  However, this Court need not hold a trial as to whether Quanta can recover in contribution, for under the undisputed facts of record regarding its intentional and reckless conduct, it may not recover in contribution under the principles reflected in Restatement Section 886A(3).[4]

**B.**      **Quanta Cannot Recover in Contribution Under Its Section 113(f) Claim Because It Knew of the Hazardous Conditions at the Site and Did Nothing to Mitigate Those Conditions But Instead Acted Intentionally and Recklessly to Make Them Worse, Abandoned the Site, Created a Public Health Emergency, and Profited From Its Egregious Behavior.**

The rule set forth in Restatement (Second) of Torts, Section 886A(3), applies in cases where, as here, the contribution claimant knew of the hazard presented, was in the best position

---

[4] Quanta's egregious conduct does not merely prevent Quanta from recovering any amounts that it has expended or will expend, but also prevents Quanta from recovering under any contribution claims that the Settling Defendants may have assigned to Quanta. See Third Amended Third-Party Complaint ¶ 6.

to mitigate the danger, and did nothing to improve conditions, but instead acted recklessly to make those conditions worse. CERCLA opinions from two district courts illustrate the reach of, and need for, Section 886A(3).

Section 886A(3) was first invoked to prevent any contribution recovery by a CERCLA defendant only a few years after the statute's enactment. In United States v. Ward, 618 F. Supp. 884 (D.S.C. 1985), the defendant, who was in the business of purchasing, rebuilding, and selling electrical equipment, had arranged for the disposal of PCB-laden transformer oil by an acquaintance and business associate. He continued that arrangement even after learning that the other party was disposing of the oil by simply spraying it from his truck onto roadsides. The illegal disposal took place over several months, and involved hundreds of miles of highway in over a dozen counties. Id. at 890-91.

The defendant was eventually convicted of knowingly and willfully causing the illegal PCB disposal, and was later the subject of an EPA cost recovery action under CERCLA Section 107 stemming from the cleanup of the PCBs. Id. at 892. He sought contribution from several companies whose transformers he had accepted, but the court, citing Section 886A(3), granted summary judgment to the third-party defendants on his contribution claim. As a result of his criminal conviction, the defendant was estopped from denying his knowing participation in the PCB dumping, and "as a consequence" of that knowing participation, he could not recover in contribution from the third-party defendants for the cleanup costs "as he [was] an intentional tortfeasor." Id. at 911.

More recently, the District Court for the Eastern District of Wisconsin cited Subsection 886A(3) in explaining its earlier decision that the private party plaintiffs in a CERCLA case could not recover in contribution because of their egregious conduct. United States v. NCR

Corp., No. 10-C-910, 2013 WL 1858597 (E.D. Wisc. May 1, 2013).  Before the court was the

question of whether the harm at issue was divisible; if it was not, the defendants would be jointly

and severally liable for all response costs.  The court set the scene as follows:

> Whether or not responsible parties are jointly and severally liable
> also takes on greater significance when the level of culpability of
> those responsible for the harm differs.  Again, the Restatement
> provides guidance: "There is no right of contribution in favor of
> any tortfeasor who has intentionally caused the harm."
> Restatement (Second) of Torts, § 886A(3).  Although the rule
> speaks of harm that is intentionally caused, the comments to the
> section make clear that the rule has been applied to reckless, wilful
> or wanton conduct as well.  Id., cmt. k. . . . This factor is what
> makes the issue of joint and several liability key in this case.

Id. at *2.  Section 886A(3) was "key" in the NCR Corp. case because the court had already ruled,

in a separate but related action brought by two of the defendants in the current case (plaintiffs in

the earlier case), that those parties were not entitled to recover in contribution from other

potentially responsible parties.  Id. at *3 ("The fact that NCR has been held barred under

equitable principles from obtaining contribution from other contributors to the PCB

contamination distinguishes this case from most other CERCLA actions.").  Having been

adjudged unable to recover in contribution in the earlier decision, see Appleton Papers Inc. v.

George A. Whiting Paper Co., No. 08-C-16, 2009 WL 5064049 (E.D. Wisc. Dec. 16, 2009), the

defendants faced the prospect of 100% liability for a $700 million cleanup if (as it turned out)

they were unable to prove the harm was divisible.

The court's earlier grant of summary judgment on, and dismissal of, the plaintiffs'

contribution claim rested on the following facts.  In the early 1950s, the plaintiffs had invented

and begun to market carbonless copy paper that utilized an emulsion that contained PCBs.  Over

time, they learned of the dangers presented by PCBs, but continued to sell the paper until the

early 1970s.  By contrast, its customers and others who used and recycled the paper had no

reason to know of the dangers. As the court put it, "Plaintiffs are denied contribution herein largely because they were the *mobilizers* of the toxin at issue here, not because they directed its disposal, and because of their passive approach to dealing with the problem once it became an appreciable risk." Appleton Papers, 2009 WL 117112, at *5 (emphasis in original); and see id. at *18 ("These companies placed this product into the stream of commerce while knowing that some of it would be recycled and they sold their scraps, for profit, directly to recyclers."). The court later described its conclusion in this way: "Plaintiffs were not entitled to contribution [because] they were responsible for the hazardous condition; they knew there was a risk of environmental damage; and they profited from the very condition (PCBs) that made their product hazardous." Appleton Papers Inc. v. George A. Whiting Paper Co., 776 F. Supp. 2d 857, 868 (E.D. Wisc. 2011).

Quanta's actions, and failures to act, in its acquisition, operation, and abandonment of the Site are equally damning. Quanta purchased the Long Island City facility in 1980, at a time when Russell Mahler was already being investigated, and had been indicted, for violations of various environmental laws. Far from the due diligence that one would expect under such circumstances, Quanta recklessly failed to fully investigate the conditions and contents of the tanks at the Site that it was acquiring, choosing to remain dangerously ignorant of the existence of entire storage tanks full of hazardous substances. Furthermore, despite being aware of Mahler's record of environmental transgressions, Quanta continued to employ Mahler and his associate for the purpose of ensuring a constant supply of waste oil and demand for reprocessed oil for Quanta's profit. Far from reforming or improving operations at the Site, Quanta embraced its disgraced former operator so that those operations could continue.

- 15 -

Soon after acquiring the Site, rather than learning from Mahler's mistakes, Quanta intentionally and willfully engaged in a series of transactions that Mahler himself advised against because of the questionable composition of certain suppliers' waste oil. When Quanta realized that it could not reprocess such waste oil for resale, it began to simply stockpile this hazardous waste at the Site in deteriorating and leaking storage tanks. Indeed, Quanta ceased to operate the Site as a reprocessing center and, instead, Quanta operated it as an illegal and extremely unsafe hazardous waste storage/disposal site.

Just prior to Quanta's acquisition of the Site, the DEC began negotiating a Consent Decree regarding the company that operated at the Site. Still, the illegal operations continued. According to a New York Senate report, "[e]ven while the Consent Order was being negotiated with Quanta, the company was violating its terms. Manifests were falsified, materials it was forbidden to handle were transported and reported dispositions were inaccurate." After being found to have committed more than eighty (80) violations of the Environmental Conservation Law, Quanta was denied a permit to operate in the State of New York. Shortly thereafter, just over one year after acquiring the Site, Quanta ceased all operations and effectively abandoned the Site in a dilapidated and extremely dangerous condition prior to filing for bankruptcy. When the NYCDEP inspected the Site in 1982, it found hundreds of thousands of gallons of hazardous waste oil and sludge, much of which was contaminated with highly toxic PCBs. The Site was in such a state of utter disrepair, with tanks leaking their contents directly onto the ground, that the City of New York described it as a health and environmental disaster.

As in Ward and Appleton Papers, Quanta should be prevented from recovering in contribution under CERCLA Section 113(f) because it knew of the risk of environmental damage, took no action to mitigate the danger, profited from illegally stockpiling waste oil and

other hazardous wastes at the Site, and then abandoned the Site and left hazardous wastes to leak onto and migrate through the environment unabated for decades.  Like the defendant in <u>Ward</u>, Quanta continued the very practices that had begun to contaminate the Site, and caused the problem to deepen and spread.  Like the contribution plaintiffs in <u>Appleton Papers</u>, Quanta knew of the risk of environmental harm and was in the best position to stop it, but did nothing to mitigate it, and instead made matters worse, profiting from its own illegal behavior.

Quanta acted intentionally and recklessly in failing to conduct adequate due diligence regarding conditions at the Site, employing known polluters (including Russell Mahler), illegally accumulating dangerous wastes that could not be recycled, storing those wastes in leaky containers and vessels, failing to mitigate known risks that it had created at the Site through its reckless operations, and creating an acute hazard that posed significant risks to the residents of the City of New York and entire metropolitan region.  Thereafter, Quanta acted recklessly in abandoning a dangerous site, which it continued to own, and allowing the contamination to spread and migrate for decades.  In accordance with the equitable principles that underlie the traditional right of contribution that is codified in Section 113(f), and pursuant to the equitable principles reflected in Section 886A(3) of the Restatement (Second) of Torts, Quanta should be prevented from recovering in contribution from Movants.

## CONCLUSION

For all of the foregoing reasons, Third-Party Defendants Crown Cork & Seal Company, Inc., Novelis Corporation (f/k/a ALCAN Aluminum Corporation), Rexam Beverage Can Company, River Terminal Development, Wyman-Gordon Company respectfully submit that the contribution claim asserted under 42 U.S.C. § 9613(f) by Defendant/Third-Party Plaintiff Quanta Resources Corporation in Count II of the Third Amended Third-Party Complaint should be dismissed with prejudice.

Respectfully submitted,

**GIBBONS P.C.**
Attorneys for Third-Party Defendant
Rexam Beverage Can Company and
Liaison Counsel for Movants

By: _____

William S. Hatfield

_____

Camille V. Otero

Dated: June 14, 2013

- 18 -

# Exhibit A

Westlaw.

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
**(Cite as: 2009 WL 5064049 (E.D.Wis.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
E.D. Wisconsin.
**APPLETON** PAPERS INC. and NCR Corp., Plaintiffs,
v.
GEORGE A. **WHITING** PAPER CO., et al., Defendants.

No. 08-C-16.
Dec. 16, 2009.

West KeySummary**Environmental Law 149E**
☞**447**

149E Environmental Law
   149EIX Hazardous Waste or Materials
      149Ek436 Response and Cleanup; Liability
         149Ek447 k. Contribution and indemnity; allocation of liability. Most Cited Cases
    Under CERCLA, developer and manufacturer of carbonless paper containing toxic polychlorinated biphenyls (PCBs) were not entitled to contribution for cleanup costs resulting from the discharge of PCBs into a river from paper recyclers and municipal sewerage entities that processed the carbonless paper and PCB-contaminated water. The developer and manufacturer were in the best position to discover the risks of recycling their carbonless paper and failed to conduct any serious studies. Further, during the period in which the developer and manufacturer knew of the potential PCB problem, their use of PCBs and corresponding releases into the river rose to their peak. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 113, 42 U.S.C.A. § 9613.

**DECISION AND ORDER DISMISSING PLAINTIFFS' CLAIMS FOR CONTRIBUTION**
WILLIAM C. GRIESBACH, District Judge.
   **\*1** In 1954 the National Cash Register Corporation introduced "No Carbon Required" copy paper, the name being a play on NCR's corporate name. A key component of NCR paper was an emulsion (a mixture of liquids that do not mix) containing Aroclor 1242, a solvent manufactured by the Monsanto Corporation. Aroclor 1242 is a type of polychlorinated biphenyl ("PCB"), a stable compound that does not easily degrade.[FN1] PCBs have been linked to illness and death in fish, birds and other wildlife, and studies suggest that their persistence in the environment has caused numerous health problems, including cancer, in humans who have consumed fish or had other contact with PCBs.

> FN1. The "12" stands for the number of carbon atoms, while the "42" represents the percentage of chlorine.

   Although NCR developed and sold its carbonless paper product and created the PCB-containing emulsion, the paper was actually manufactured by the Appleton Coated Paper Company, which coated sheets of paper with NCR's emulsion. This manufacturing process resulted in significant discharges of PCBs into the Fox River. PCBs also escaped into the river when Appleton Coated sold its paper waste to paper mills for recycling, also a water intensive process.

   After years of working closely together, NCR purchased the Appleton Coated Paper Company in 1970, and Appleton Coated merged with another company and formed Appleton Papers, Inc. the next year. As a result of their ownership interests in Appleton Coated, Plaintiffs Appleton Papers, Inc. and NCR Corp. have been named by the United States Environmental Protection Agency as potentially re-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
**(Cite as: 2009 WL 5064049 (E.D.Wis.))**

sponsible parties ("PRPs") for the environmental damage done to the Lower Fox River, which stretches 39 miles from Lake Winnebago to Green Bay and into Lake Michigan.[FN2] Pursuant to a number of government orders and consent decrees, these two companies have begun paying several million dollars to fund the ongoing cleanup of PCBs from the Lower Fox River. The cleanup project, which is thought to be the largest of its kind ever undertaken anywhere in the world, involves a combination of dredging and capping (covering the PCB-laden river sediment with sand and gravel), aided by technology such as a GPS-guided barge that allows dredge operators to be accurate within a few centimeters.[FN3] The dredging operation continues 24 hours a day, five days a week (excepting winter), and it is expected to take nine years to complete. The slurry of PCB-laden river sediment is sent to a custom quarter-million square foot processing plant, where it is filtered, separated, dried, and pressed into "cakes" that are then transported to a landfill. Recent estimates have suggested that the total price for the cleanup could approach one billion dollars.[FN4]

> FN2. Not to be confused with the Upper Fox River, which stretches from central Wisconsin into Lake Winnebago.

> FN3. The technical aspects of the cleanup process are explained in an online article. "World's Largest PCB Cleanup Takes Fresh Approach," *GreenSource,* Sept. 1, 2009, http:// green-source.construction.com/news/2009/090901 Fox-rivercleanup .asp.

> FN4. "Prognosis Appears Good for Fox River," *Milwaukee Journal-Sentinel,* Sept. 29, 2009, http:// www.jsonline.com/news/wisconsin/6248517 2.html.

The Lower Fox River area boasts the largest concentration of paper mills in the world, and prior to 1972 many of these mills recycled NCR-brand carbonless copy paper and thereby unwittingly released PCBs into the river. Other entities, such as cities, utilities and sewerage districts, treated and/or released wastewater containing NCR's PCBs into the river. These entities, along with the paper mills, are the Defendants in this action. Plaintiffs NCR and Appleton Papers seek contribution from these Defendants for the costs Plaintiffs have incurred in cleaning up sections of the Lower Fox River. Plaintiffs assert that because the entities named above-paper mills, utilities, and others-also released PCBs into the river, they should share in the cost of cleanup.

*2 At the suggestion of several Defendants, this case was bifurcated into separate phases. The Defendants argued that one issue-the knowledge of the parties about the dangers of PCBs-could play a key, or even dispositive, role in the equitable analysis that must be made under CERCLA § 113. And because I agreed that a ruling on that issue could potentially resolve the case entirely or facilitate a settlement, the case has focused, in the first phase, on evidence probative of what each party knew, and when, about the dangers of PCBs and their release into waterways. In a case governed by principles of equity, my premise was that parties who knew, or should have known, about the dangers of PCBs should bear the brunt, or even the entirety, of any cleanup costs resulting from PCB contamination. Relatedly, in Phase I the parties were also to explore the question of how each party reacted upon learning of the risks of environmental harm that were linked to PCBs. These issues comprise "Phase I" of this action, and the parties have thus focused their substantial efforts to date on these questions.

Five motions for summary judgment have now been filed, supported by roughly nine hundred exhibits, including expert reports, government reports, corporate records (some of which date back to the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
(Cite as: 2009 WL 5064049 (E.D.Wis.))

1950s), correspondence, laboratory notebooks, and deposition testimony of employees who had recollections of the events and decisions of the 1960s when the dangers of PCBs became more widely appreciated. In their motions, the Defendants assert that there is no equitable basis for allowing the Plaintiffs to receive contribution from any of them because the Defendants are essentially innocent parties who had no knowledge that recycling NCR paper or processing wastewater could lead to environmental damage. The Plaintiffs disagree and argue that further proceedings are necessary before any such determination may be made. The Plaintiffs additionally argue, in their own motion for summary judgment, that any inquiry into the central question of knowledge should be sharply curtailed.

Following my conclusion that Plaintiffs may not proceed with a claim under CERCLA § 107, *see* Dkt. # 751, the parties' motions on the § 113 contribution claim are now ripe. For the reasons given below, I conclude that Plaintiffs are not entitled to contribution. Accordingly, the Defendants' motions will be granted and the Plaintiffs' denied.

**I. Background and Factual Findings**

**A. PCB Discharges into the Fox River**

The discharge of PCBs into the Fox River has been well-documented, and the history of such discharges is not materially contested.[FN4] As noted above, the National Cash Register Company invented its brand of carbonless copy paper ("CCP") in 1953 and began selling it in 1954. Its CCP used an emulsion in-between two sheets of paper. The emulsion contained microscopic dye capsules that burst when pressure was applied (by a pen or typewriter, for instance), thus creating a copy of the top sheet of paper without the need to use an intervening carbon sheet.[FN6] This result was made possible through NCR's novel process of micro-encapsulation. "By

encapsulating one of two colorless components which react to form & color, the components may be separately carried by one or more pieces of paper in colorless form." (Ferguson Decl., Ex. 18 at 436.) [FN7] This proved to be a very useful product in the business world, where forms and other documents were routinely made in duplicate, and NCR paper became a very profitable line for the company.

> FN5. I note that in related proceedings in Case No. 09-C-692, Plaintiffs allege that something like one-fifth of the PCBs found in the river did not result from NCR paper but came from other kinds of Aroclor used in other industrial applications. The basis for this assertion is highly questionable, however, and I am in agreement with the United States' general conclusion that there is no basis to parse the PCBs in the river in such a fashion.

> FN6. A more detailed description of the product can be found, for example, in the expert report of Joseph Rodericks, Ph.D. (Ferguson Decl., Ex. 60 at 24.)

> FN7. The Ferguson Declaration is found beginning at Dkt. # 575, and its exhibits stretch into Dkts. # 582 and 583.

*3 Unfortunately, the microcapsules were dissolved in a solvent called Aroclor 1242, which was a polychlorinated biphenyl now known to be toxic and persistent in nature. Countless references in the record suggest that Aroclor 1242 was an ideal solvent for the carbonless paper application, and in fact it was so useful that despite years of effort an adequate substitute was not adopted by NCR until 1971. Although the emulsion was produced by NCR, it was applied by the Appleton Coated Paper Company, who created the carbonless copy paper and then sold the paper back to NCR. NCR then marketed and sold

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
(Cite as: 2009 WL 5064049 (E.D.Wis.))

the carbonless copy paper to its customers.[FN8] (Dkt. # 656, PPFOF ¶¶ 10-11.)

> FN8. NCR acquired ACPC in 1970 and then merged it with another paper company in 1971 to form Appleton Papers, Inc. After a series of mergers and transfers of ownership, Appleton Papers, Inc. is now owned by its employees. Herein I use the term "Plaintiffs" to denote both NCR and Appleton Papers, although in some instances only one of the two companies might be involved. In my view, any distinctions that might exist in the knowledge of the two Plaintiffs are not material in these proceedings because the question is whether it is equitable to require any of the *Defendants* to contribute. Although Plaintiffs' own motion for summary judgment argues that only the knowledge of Appleton Coated should be material to this action, the two Plaintiffs have not made any other distinctions between their own knowledge and have not suggested that either of their abilities to recover from the Defendants might differ as between themselves. Accordingly, to the extent there is any material difference in the culpability of the two Plaintiffs, that is an issue for other proceedings.

The CCP using Aroclor 1242 was manufactured by the Plaintiffs between 1954 and 1971, a span the parties have called the "production period." During that time, according to the Wisconsin Department of Natural Resources, roughly 30 million pounds of the PCB-laden emulsion were used. (2002 Record of Decision at 4.) [FN9] Given the concentration of PCBs in the emulsion, the DNR calculated that some 690,000 pounds of PCBs were released into the river during this time. [FN10] It further calculated that by the time NCR stopped using Aroclor 1242 in 1971, some 98 percent of the total PCBs had been released into the river. (*Id.*)

> FN9. (Ferguson Decl., Ex. 1.)

> FN10. This figure is given with a broad range, but the EPA suggests it is a "conservative" estimate.

During that time, PCBs found their way into the Fox River in a number of ways. [FN11] Plaintiffs' own manufacturing process resulted in some discharges into the river, an amount the DNR has estimated at some 39% of the total. [FN12] Second, Appleton Coated Paper Company sold CCP "broke" to brokers, who sold it to recycling mills, including some of the Defendants. "Broke" is a term encompassing the waste paper and trimmings that inevitably resulted from the CCP manufacturing process. Paper is made of wood fibers, which come from wood pulp. Turning trees into paper can be an expensive process, and thus recycling of the fibers from used paper is a common way to save costs. (Ferguson Decl., Ex. 60 at 26.) Recyclers took the broke from Plaintiffs in order to recover the wood fibers from the product and reuse them in other paper products, and in the process they released some of the PCB-laden emulsion into the river. In addition, printers and paper converters sold their scrap from manufacturing forms to the recyclers. Recycling of this "trim" also resulted in PCBs being released into the river through wastewater. The DNR has estimated that some 56% of the PCBs discharged into the river resulted from the recycling process during the production period.

> FN11. I recognize that the volume of discharge was not encompassed within the scope of Phase I. I use the following figures for informational and general background purposes. Moreover, I recognize that Plaintiffs have not conceded that the government's discharge estimates are accurate.

> FN12. Compilation and Estimation of Historical Discharges of Total Suspended Sol-

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
(Cite as: 2009 WL 5064049 (E.D.Wis.))

ids and Polychlorinated Biphenyls from Lower Fox River Point Sources, Technical Memorandum 2d, at 1, 34. (http:// dnr.wi.gov/org/water /wm/foxriver/documents/modeldocs/tm2d.p df).

Finally, even after NCR stopped using Aroclor 1242 in its carbonless paper in 1971, stocks of the pre-1971 paper still lingered in offices for years. As this paper was used up, it was sent for recycling along with other paper, and the recycling process resulted in small quantities of PCBs releasing into the river throughout the 1970s and possibly later. As noted above, however, government estimates put the post-1971 releases of PCBs at only 2 percent of the entire total.

**B. Knowledge of the Parties**

**\*4** As already noted, the parties' knowledge about the dangers of PCB discharges into waterways was the principal subject of Phase I of this case. What distinguishes this case from many CERCLA contribution actions is that the toxic nature of the discharged product was not appreciated by most of the dischargers until almost all of the environmental damage had already occurred.

Prior to 1971, when PCBs were removed from NCR's emulsion (after Monsanto stopped producing Aroclor 1242 for use in carbonless paper), there is not a definitive moment or document from which one could indisputably conclude that a given party knew about a specific, quantifiable risk of injury. This is perhaps typical of many products that are only later revealed to be harmful. Instead, knowledge is a product of bits of information that trickle in over time through studies, memoranda, meetings, government inquiries, and other reports. At first, perhaps, someone notices a correlation between a product and a certain effect (e. g., after dead seals are found with high concentrations of PCBs in their fat), and that prompts further investigation. Tests are conducted,

and meetings are held, and at some point (possibly years later) a party may suspect that the relationship is something more than pure chance. The data give rise to a cause and effect relationship, or at least a reasonable suspicion that the product is the cause of a given effect.

Most of the underlying facts in this case are undisputed, as they are based on documents-mostly business records-whose authenticity is not questioned. But questions of knowledge also involve reasonable inferences drawn from the record, and even if the documentary evidence is not disputed, reasonable inferences at the summary judgment stage must be drawn in favor of the non-moving party. *Morton Intern., Inc. v. A.E. Staley Mfg. Co.,* 343 F.3d 669, 682-83 (3d Cir.2003). Accordingly, I will not draw any inferences from the record except for those I conclude are not reasonably disputable. For example, the Defendants have cited an extensive history of events leading back to the 1950's, including the publication of Rachel Carson's *Silent Spring* in 1962, which they suggest should have placed the Plaintiffs on notice about the potential harms of using PCBs in their product. Although an inference *could* be made to that effect-PCBs were often compared to DDT, and they produced similar effects in the environment-it would not be an inference made in the light most favorable to the Plaintiff's.[FN13] With that in mind, I will set forth the basis of my conclusion that the Plaintiffs knew, or should have known, about the relevant dangers of using PCBs in their product by the late 1960s.

> FN13. This is not to say that such information is wholly irrelevant at the summary judgment stage. The entire historical background provides the context for the actions of the parties.

Many of the documents involve a company called Wiggins Teape, which was NCR's exclusive licensee for CCP production in Europe.[FN14] Wiggins Teape began investigating the PCBs in its NCR paper

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
**(Cite as: 2009 WL 5064049 (E.D.Wis.))**

in 1964. A letter from G. Mawdsley of Wiggins Teape to Dr. C.W. Ayers of British-American Tobacco (a part-owner of Wiggins Teape) confirms a telephone conversation between the two in which they discuss the presence of Aroclor in CCP and the fact that the Aroclor "comes from the NCR emulsion which has been coated on to the waste paper used in preparing these particular sheets." (Ferguson Decl., Ex. 70.) A November 5, 1964 memo from Dr. Ayers indicates that a meeting was held on the subject:

> FN14. Records from NCR, Appleton Papers and Appleton Coated Paper Company have evidently not survived.

**\*5** Mr. Gough explained the reason for their interest in Arochlor [sic]; it is present in the emulsion used to coat NCR paper. In the production of NCR paper there is a very large amount of waste which is repulped and used to make other types of papers. Arochlor, a chlorinated diphenyl, is toxic and so it is necessary to know how much is removed during the repulping process especially if the paper is to be used for food wrapping.
(*Id.*, Ex. 68.)

Thus, as of 1964 British scientists had clearly appreciated not only the toxic nature of Aroclor but also the possible dangers of recycling NCR paper and the fact that some Aroclor could be removed during the repulping process. A 1965 document reiterates the concern about recycling NCR broke, citing the "special problem posed by the arochlor [sic] (which, being toxic, must be removed if the broke is to be reused in papers likely to come into contact with food, and which is virtually impossible to destroy chemically)." (Hogan Decl., Ex. 754, Ex. 12 at BCFOX00064050.) [FN15] Even so, knowledge about the PCB problem was still in its infancy, and in 1965 at Wiggins Teape they were still determining how best to measure the presence of Aroclor in their product. (Ferguson Decl., Ex. 69.)

FN15. Plaintiffs argue that although they knew NCR broke was being recycled, there is no evidence that either of them knew that PCBs from NCR broke would end up being discharged into the river as a result of recycling. Given the lack of any contemporary records from either of the Plaintiffs, however, the absence of evidence to that effect is not surprising. Even so, it does not require a stretch to conclude that the Plaintiffs, two sophisticated corporations with exposure to the paper industry in the Fox Valley, knew that recycling and production of paper using recycled materials was a water-intensive process and that paper plants released significant quantities of wastewater, water that would find its way into the river. And it was long known that the Aroclor capsules would not all cling to the recycled paper and that a significant percentage of the Aroclor could be released through recycling. (*See*, e.g., Dkt. # 727, Ex. 3 (discussing, in 1950s, process of "beating" and using various procedures to get the capsules to disperse prior to reuse, so as to avoid the blue color that they would produce in higher quantities); Dkt. # 727, Ex. 8 at 47489 (discussing recycling of NCR broke and possible method for "floating off" the Aroclor)).

More importantly, and as described more fully below, Plaintiffs are denied contribution herein largely because they were the *mobilizers* of the toxin at issue here, not because they directed its disposal, and because of their passive approach to dealing with the problem once it became an appreciable risk.

Scientists at NCR were also discussing the toxicity of Aroclor 1242 in 1965. A letter from an NCR toxicologist to a Dr. Thomas summarizes toxicology

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
**(Cite as: 2009 WL 5064049 (E.D.Wis.))**

tests performed on rats and rabbits. (*Id.,* Ex. 74.) In addition to the animal studies, the toxicologist pointed out that "the Aroclors, when in contact with human skin, have a defatting effect similar to that of many organic solvents. Therefore, care should be exercised to avoid skin contact." (*Id.*) During 1965, NCR records indicate it was searching for a replacement to Aroclor 1242, a persistent theme throughout the decade. (*Id.,* Ex. 73 at 13.) A March 2, 1965 NCR manager's report indicates limited progress on that front:

> The possibility of replacing aroclor in our standard CB coating with a new solvent is being studied presently in Fundamental Research. The new solvents under consideration ... both have the advantages of being able to offer significant cost reductions and of being less odorous and irritating. However, they are slightly more volatile and have toxicities roughly equivalent to aroclor. Further studies of these solvents is now being undertaken.

(*Id.,* Ex. 72 at 5.)

Although the Defendants believe the documents described thus far demonstrate that Plaintiffs knew, by 1965, about the dangers of PCBs and the corresponding danger of recycling NCR broke, the Defendants place a particular focus on a 1966 article written by Soren Jensen, a Swedish scientist. A December 15, 1966 article in *New Scientist* described Jensen's findings as follows:

> A Swedish research worker has expressed concern over the increased amounts of polychlorinated biphenyl (PCB) entering the air, presumably from industrial smoke and rubbish-dump smoke, and being absorbed by water and taken up by fish and later humans. PCB which is related to and as poisonous as DDT was detected by Mr. Sören Jensen ... in some 200 pike taken from different parts of Sweden, fish and fish-spawn throughout the country, an eagle which was found dead in the Stockholm Archipelago, and in his own, his wife's and baby daughter's hair.

*6 ...

> [PCB] is particularly harmful to the liver, and also the skin; this has been demonstrated by experiments on mice. PCB is much harder to break down than DDT and there is every reason to suppose that it is much more difficult to get it out of the system. The substance has also been detected in the air over London and Hamburg and also in seals caught off Scotland. It can therefore be presumed to be widespread throughout the world.

(Ferguson Decl., Ex. 21)

Around this time, it is apparent that Monsanto, the manufacturer of Aroclor, was beginning to become concerned about PCBs. What appears to be an internal Monsanto memorandum from Dr. R. Emmet Kelly notes that they held a "rather extensive meeting" about Aroclor being found in the air and in fish. (*Id.,* Ex. 23.)[FN16]

> FN16. The Defendants suggest this memorandum was sent to D. Wood, an NCR employee, but that does not appear to be the case.

> We are very worried about what is liable to happen in the states when the various technical and lay news media pick up the subject.... We have been receiving quite a few communications from our customers, but the most critical one is NCR, who are very much involved with their carbonless carbon [sic] paper.
> (*Id.*)

Monsanto's own chemist, E. Scott Tucker, Ph.D. reviewed the Jensen report and confirmed that its

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
(Cite as: 2009 WL 5064049 (E.D.Wis.))

information was "valid" and "real." (*Id.,* Ex. 39 at 14: 4-7.) The original of the Jensen report, or a copy of a speech based on the report, was sent by Monsanto's Dr. Kelly to NCR's Dr. M.J. Thomas in February 1967, roughly two weeks after the Kelly memorandum described above was distributed at Monsanto. (*Id.,* Ex. 24.) The parties have disputed whether the report was sent at NCR's request or not, but the cover letter suggests that the report had been discussed already, or at least that the report did not arrive at NCR out of the blue. (*Id.*) In any event, the Jensen report, which described PCBs as "related to and as poisonous as DDT," was in the hands of NCR scientists as of February 1967. (*Id.,* Ex. 21.)

Other Monsanto documents describe the industry's approach to increasing publicity about PCBs, which Monsanto believed could "have little impact or it may be very damaging." (*Id.,* Ex. 26 .) For instance, a March 12, 1969 Monsanto memo set forth that company's process for dealing with customer inquiries and possible new regulation.[FN17] (*Id.*) Monsanto noted that some of its customers were large chemical companies who "are bound to have had experience of publicity of this nature before and are less likely to panic." (*Id.* at 9.) The primary purpose of the memo was to make it known that Monsanto did not want to be in the position of routinely fielding PCB questions from jittery customers or to voluntarily share information with such customers. Even so, the memo makes clear that such an approach would not apply to NCR, who bought some 6 million pounds of Aroclor 1242 in the previous year (1968), roughly 40% of the total Monsanto sold. The memo proposed to gauge NCR's reaction to the PCB publicity and then to set a course based on that reaction. In a section of the memo titled "Communications on Aroclor Publicity," the author recommended that "with the exception of NCR, we do *not* bring this publicity to the attention of our Aroclor customers. With the exception of NCR and distributors, we have only eight customers who buy over 140 M pounds of chlorinated biphenyl per year." (*Id.* at 9.)

FN17. For whatever reason, there is a dearth of records between 1967 and 1969.

*7 Two weeks later, Monsanto sent three people to NCR's headquarters in Dayton, Ohio. The purpose of the meeting was "to discuss (i) recent publicity on Aroclors as pollutants and (ii) research efforts to find an Aroclor 1242 replacement." (*Id.,* Ex. 28 at 1.) Recent publicity included a *San Francisco Chronicle* article about PCBs found in the San Francisco Bay. According to the notes of the meeting, NCR continued to be interested in learning about developments, but it was not going to take any action unless "a second article appeared specifically naming their paper as a source of pollution." (*Id.* at 1-2.) "Such an article," the memo stated, "could play into the hands of 3M's Action Paper," NCR's chief competitor in the carbonless copy paper market.[FN18] (*Id.* at 2.)

FN18. The Defendants portray NCR as being in fierce competition with 3M during this period and suggest that NCR's other lines of business were foundering. Such a scenario would explain its stubborn reluctance to meddle with its profitable NCR paper and move away from use of Aroclor 1242. Although that is one possible explanation, I cannot draw such a conclusion at the summary judgment stage based on the record alone.

One of NCR's employees, Gordon Taylor, was not available for the March 1969 meeting with Monsanto, and in April he called Monsanto "to find out what action was being taken as a result of the article on Aroclors in the SFO Chronicle. He said he regarded this as just another in the series of articles on the toxicity of PCBs and viewed them with patience." (*Id.,* Ex. 29.) The memorandum documenting the conversation indicated that Monsanto told Taylor that it was working on alternatives for Aroclor 1242, but

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
(Cite as: 2009 WL 5064049 (E.D.Wis.))

this was "not being undertaken in any degree of panic but because we would rather be 'safe than sorry' if the worst happened." The effort was described as an "insurance policy," but NCR's Taylor acknowledged that "[i]n light of Nader's effect on the auto industry, however, there was always the possibility that the second shoe would drop." [FN19] (*Id.*)

> FN19. By 1969 Ralph Nader had helped force the Corvair off the market. *See, e.g.,* "The U.S.'s Toughest Customer," *Time,* (December 12, 1969), available at http://www.time.com/time/magazine/article/0,917 1,840502-2,00.html.

An October 30, 1969 Monsanto memo picked up on the publicity theme, a motif that runs through many of the historical documents in the record. "The recent publicity on PCB content in dead birds in the Irish Sea accentuates the importance in the U.K. and continental Europe of this problem." (*Id.,* Ex. 35.) The memo stated that an H.A. Vodden would become the point man for coordination of information regarding PCBs. Vodden testified in his deposition that during late 1969 he met with NCR representatives from NCR's Borehamwood plant as well as representatives from Wiggins-Teape. (*Id.,* Ex. 36 at 26-30.) At that meeting, he informed NCR and Wiggins Teape employees about continued environmental problems he expected from the use of Aroclor 1242. He further testified that he told NCR's Martin Kelly about Monsanto's impending decision to end sales of Aroclor 1242 for NCR paper applications.

A December 3, 1969 Monsanto report from E. Scott Tucker details test results Monsanto performed on NCR water samples that NCR had sent. (*Id.,* Ex. 37.) The samples ranged from 1.7 parts per million (ppm) to 1063 ppm of Aroclor 1242. A January 23, 1970 report written by Monsanto's H.A. Vodden stated that "[a]nalyses of samples from effluent at the N.C.R. emulsion plant at Boreham Wood have shown quite high levels of Aroclor 1242. The mud in the stream taking surface water drainage contains 150 p.p.m." (*Id.,* Ex. 38 at 2.)

*8 On January 5, 1970, D.E. Hatton of Wiggins Teape wrote to C.C. Zimmerman of NCR and copied the letter to numerous NCR and Wiggins Teape employees. (Hogan Decl., Dkt. # 754, Ex. 18.) The letter contains a sort of bibliography of 49 studies that had been done on the effects of PCBs and DDT, and it notes that both substances are accumulated in body fat rather than broken down.

> They may affect fertility, cause liver damage and also fatalities in some vertebrates, such as birds and fish. No evidence yet exists of any long term toxic effects of these materials in man. Although there is no such evidence, various countries are not prepared at present to take the chance and are banning DDT ...

> (*Id.* at 5.)

Wiggins Teape voiced two concerns. First, it noted that bad publicity would result from any effort to show that PCBs were harmful. Second, it was concerned that "as more and more action is taken against DDT, the close relationship between this and our material may lead to pressure being brought on manufacturers to stop producing PCB's or at least to refrain from installing new plant [sic]." (*Id.* at 6.) "With the fast growth rate of NCR paper we feel that this could well be a very serious problem indeed and could jeopardize our future if we had to rely on Aroclor 1242 as our internal phase." (*Id.*)

Meetings between Monsanto and NCR increased during the winter of 1969-1970. A January 26, 1970 meeting among representatives of Monsanto, NCR and Wiggins Teape is evidenced in a report prepared by Monsanto's D.S. Cameron. (*Id.,* Ex. 41.) The memo summarized affairs as follows:

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
**(Cite as: 2009 WL 5064049 (E.D.Wis.))**

Both N.C.R. and Wiggins Teape are very concerned about the developing PCB residue situation, even though it is the higher chlorinated compounds that are currently being found in nature. They asked that we did not identify NCR paper as a major outlet for Aroclor at our forthcoming meeting with the Ministry of Agriculture, although they realized this information would become public knowledge eventually and that we had our own interests and integrity to protect. A few weeks delay would give them time to check that their own housekeeping was as it should be.

If, in the long run, N.C.R. paper is considered a pollution source they foresee no effective method for controlling the disposal of used paper. For this reason they must find an alternative to Aroclor which would be introduced if the Aroclor system were deemed undesirable. They intend to complete this contingency plan as quickly as possible.

(*Id.* at 1-2.)

The memo concluded by noting that "Wiggins Teape and N.C.R. want to develop a story to support their position. We suggested the transcript of the BBC T.V. interview with a scientist from Monkswood Research Station illustrated a good factual statement when faced with an aggressive interviewer." (*Id.* at 2.)

Three weeks later several of the same individuals met in London:

This meeting was called at the request of Wiggins Teape, who wish to exchange views on the PCB problem at a top management level. Hendry [of WT] had just returned from Dayton [NCR Headquarters] and explained that a decision had been taken, in principle, to move away from Aroclor in Europe. This decision was subject to certain qualifications such as the possible, but still unproven

biodegradation of 1242, and demonstrative a satisfactory alternative to Aroclor.

**\*9** (*Id.*, Ex. 42 at 1-2.)

The notes of that meeting further reflect the author's belief that "a move from Aroclor to another solvent seems inevitable," but progress was staled because the proposed substitute, HB 40, still had some problems. These problems resulted in "Dayton's [i.e ., NCR's] greater reluctance to consider HB.40 as a suitable replacement for Aroclor." (*Id.* at 2.)

A Wiggins Teape internal memo dated February 13, 1970 explains the quandary NCR's European producer was in. (Hogan Decl., Dkt. # 667, Ex. 17 at BCFOX00004097.) "Ever since Wiggins Teape started making NCR paper in Britain in 1955 they have known that one of its ingredients was potentially toxic. The ingredient is a chemical called Aroclor 1242." (*Id.*) The memo's author described the PCB problem as a "sleeping tiger," that was awoken by the 1966 Jensen report out of Sweden. "Wiggins Teape noted the Jensen report and began to build a dossier containing reports on PCB." (*Id.* at BCFOX00004099.) The memo noted that although the science at that point (February 1970) did not definitively establish any causal link between PCBs and health problems, the same could also be said for cigarettes-"but statistical evidence has led to wide public awareness [of cigarettes' adverse health effects] ..." (*Id.* at BCFOX00004103.)

The Wiggins Teape memo notes the problem of Aroclor leaking into rivers through the effluent from recycling NCR broke. Its principal focus, however, is in assessing the potential for commercial harm to WT's business in the event the problem became public. Like other memos described herein, the primary consideration involves the impact of adverse publicity on the companies' bottom line-publicity could lead to less use of NCR paper, or (even worse) it could

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
**(Cite as: 2009 WL 5064049 (E.D.Wis.))**

lead to an outright ban:

> The public could become aware of the significance of Wiggins Teape's use of Aroclor before a ban was imposed or in prospect. Public reaction, stimulated by the communications media, could lead to such a ban being imposed. Even if it did not, the public relations aspect is serious ...

*(Id.* at BCFOX00004108.)

The next month, a March 12, 1970 Wiggins Teape memo notes that NCR was continuing its insistence that NCR paper not be identified as a source of PCBs in the course of the British government's inquiries. (Hogan Decl., Dkt. # 754, Ex. 22 at 1.) NCR's people in Britain "completely disagreed" with that strategy, however, as they felt it was a "potential time bomb." *(Id.)* "One day the Ministry will discover that they have not discussed an application which takes up 40% of their U.K. sales." *(Id.)* Wiggins Teape's conclusion at this stage was that the government scientists were confused by the scope of the PCB problem and the complexities of discovering the source of PCBs. "The more they look into the matter, the more complex and diffuse it becomes. All of this is obviously to our good." *(Id.* at 2.) The confusion and continued nondisclosure of NCR paper as a source of PCBs would allow Wiggins Teape some "breathing space to put our house in order before it is inspected." *(Id.)*

**\*10** On April 16, 1970, representatives of Wiggins Teape met with Monsanto near London. The context during this period was an ongoing series of meetings with various UK government agencies, including the Ministry of Agriculture and the Ministry of Technology. Recently, a government scientist, J. Bailey, had discovered PCBs in boxed cashews, and his report concluded that the cardboard boxes-made from recycled NCR broke-were involved in the contamination. (Ferguson Decl., Ex. 52.) (Recall that the problem of PCBs in food wrappings had been anticipated by Wiggins Teape some five years earlier.) At the April 16 meeting, Wiggins Teape told Monsanto that it was going to disclose its production of NCR paper to the government, apparently in order to get ahead of Bailey's soon-to-be published article linking PCBs to cardboard food cartons. Monsanto's minutes of the meeting indicate that Wiggins Teape had "liaised closely with NCR and ourselves" about the issue. *(Id.,* Ex. 53 at 1.) At some point, Wiggins Teape had proposed that perhaps the government could be convinced to withhold Bailey's report, but both Monsanto and NCR thought that would be "dangerous ... particularly if it misfired and subsequently became public knowledge." *(Id.* at 2.)

Although Wiggins Teape had decided that disclosure was the best course of action, at this time NCR was still insisting to Monsanto that its name be kept out of any governmental correspondence or meetings. At Monsanto's January 1970 meeting with the Ministry of Agriculture, Monsanto was "questioned closely about the quantities of PCB used in the U.K. and the major industrial applications.... No mention was made of NCR but it will become increasingly difficult to maintain this position." *(Id.,* Ex. 49 at 3.) As noted earlier, at a meeting the previous day NCR had "asked that we [Monsanto] did not identify NCR paper as a major outlet for Aroclor at our forthcoming meeting with the Ministry of Agriculture, although they realized this information would become public knowledge eventually and that we had our own interests and integrity to protect." *(Id.,* Ex. 41.) NCR soon did an about-face and decided that disclosure to the UK government would be a "positive step." *(Id.,* Ex. 42, at 3.)

In June, 1970, Monsanto informed its customers, including NCR, that it was ceasing the sale of Aroclor 1242 effective August 30, 1970:

Dear Customer:

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
**(Cite as: 2009 WL 5064049 (E.D.Wis.))**

You have received our letter mailed February 27, 1970 notifying you of the allegations that certain polychlorinated biphenyls (PCBs) had been found in the environment and were contaminants. Since that time, other reports concerning PCBs have been published. An examination of the PCB matter has indicated that their use in synthetic resin compositions may be a source of the alleged environmental contamination.

...

In review of the allegations which have been made concerning PCBs, and being a concerned and responsible member of the world community, we have come to a decision to discontinue the sale of PCB-containing products for modifier and plasticizer applications effective August 30, 1970.

**\*11** ...

(*Id.*, Ex. 44.)

By April 1971, NCR had fully phased-out its use of PCBs in the production of CCP (Monsanto continued selling its existing stock of Aroclor 1242). As noted earlier, the EPA and DNR have estimated that 98 percent of PCB discharges into the river had occurred by this time, i.e., the production period between 1954 and April 1971 when the broke arising out of the production of NCR carbonless copy paper was sold to the Defendant mills for recycling.

A year later, NCR employee T.E. Hoover prepared an internal memorandum for NCR's vice president of research entitled, "The Status of Polychlorinated Biphenyl Uses at NCR." (Bogart Decl., Ex. 7.) The memo, dated October 13, 1972, was an attempt to summarize NCR's past use of Aroclor, the dangers of such use, and itemize any remaining uses of PCBs within NCR's operations. Among other things, the memo noted that

In the late 1960's accumulative evidence began to show that PCB's may have adverse effects on certain forms of animal life. The same properties that contributed to their usefulness were indi[c]ted as contributing to the possible hazardous effects. The resistance to breakdown-such as thermal and bio-degradation-was shown to lead to accumulations in the environment.

(*Id.* at 350916-350917.)

Although the use of PCBs in carbonless paper had ended, the fallout was in its infancy as regulators and media began investigating the extent of the problem. Two post-production period documents stand out in the record. In 1975 Plaintiffs had occasion to comment on a brief regarding PCBs that the Wisconsin Paper Council had submitted to the Wisconsin DNR. Among other things, NCR's Lowell Schleicher (one of the inventors of carbonless copy paper) commented that the "Brief made a strong and correct plea that the recycling companies are the innocent victims of circumstance created by carbonless manufactures which are still a part of the paper industry." (Ferguson Decl., Ex. 67.) This view was echoed in a January 29, 1976 editorial in the *Appleton Post-Crescent*, which stated that the "recycling mills are innocent victims in the PCB controversy." (Ferguson Decl., Ex. 7 at API-GE026911.)

My own conclusions regarding the parties' knowledge and the implications of that knowledge are set forth below.

**II. Analysis**

Section 113(f)(1) of CERCLA provides that "[i]n resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). Not only does the statute

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
**(Cite as: 2009 WL 5064049 (E.D.Wis.))**

allow allocation based on equitable factors, it provides that district judges may determine which factors are "appropriate." The Seventh Circuit has called a district judge's power in this context "broad and loose." *Browning-Ferris Industries of Illinois, Inc. v. Ter Maat,* 195 F.3d 953, 957 (7th Cir.1999). Yet of course a court's analysis is not unfettered: it is governed by traditional principles of equity, such as the relative fault of the parties, any contracts between the parties bearing on the allocation of cleanup costs, and the so called "Gore factors." *Kerr-McGee Chemical Corp. v. Lefton Iron & Metal Co.,* 14 F.3d 321, 326 (7th Cir.1994). These factors include:

**\*12** (1) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;

(2) the amount of the hazardous waste involved;

(3) the degree of toxicity of the hazardous waste involved;

(4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

(5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and

(6) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment.

*Id.*

In addition, the Seventh Circuit has stated that "a court may consider any factors appropriate to balance the equities in the totality of the circumstances," and such factors could include a party's degree of in-volvement in the disposal of hazardous waste, the amount of hazardous waste involved, and the degree of care exercised by the parties. *Environmental Transp. Systems, Inc. v. ENSCO, Inc.,* 969 F.2d 503, 509 (7th Cir.1992).

**A. Plaintiffs Knew of PCB Risks in the Late 1960's**

Before proceeding further, it is necessary to address the argument Plaintiffs advance in their own motion for summary judgment. Plaintiffs argue that the knowledge of NCR Corp. is irrelevant to Phase I because NCR has no independent CERCLA liability for its own actions. After all, it never operated any facilities on the river-it merely sold its carbonless paper to consumers. NCR and Appleton Papers Inc. (the two plaintiffs in this action) are liable only as successors to their predecessor company, Appleton Coated Paper Company, which purchased the emulsion from NCR to make NCR carbonless copy paper.[FN20] Appleton Coated discharged its PCB-laden wastewater to treatment facilities and thus into the river, and it further sold its broke to the Defendant recyclers who then discharged it into the river. Because these actions are the sole basis of the Plaintiffs' potential liability (i.e., they are the reason the Plaintiffs are PRPs in the first place), the knowledge of NCR itself should not factor into this Court's equitable analysis. Although the two companies had a close business relationship (as detailed above), NCR did not purchase Appleton Coated until 1970. Accordingly, Plaintiffs argue, there is no basis for delving into any knowledge about PCBs that NCR itself might have possessed prior to that date.

> FN20. This leaves aside the unanswered question of arranger liability.

It is well-recognized that the liability of a successor company is limited to the liability possessed by the predecessor. But here we are not addressing the question of liability *per se*-we are here, in the Plaintiffs' own action, to determine whether it is fair to require any of the Defendants to compensate the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
**(Cite as: 2009 WL 5064049 (E.D.Wis.))**

Plaintiffs for the costs of cleaning up the site. In a sense, it is a case about the Defendants' knowledge much more than it is about the Plaintiffs'. The Plaintiffs' knowledge sheds light on the question of comparative fault and, in a more general sense, the question of what is fair and equitable. Such an analysis must account for what each Plaintiff actually knew, however, without respect to *why* the party became a PRP in the first place. As the Defendants point out, several of the oft-cited equitable factors in § 113 actions have nothing to do with the reasons the parties are considered PRPs. And Plaintiffs have not identified any case suggesting that a court may not consider the knowledge of a company who is only liable as a successor based on the actions of another company. Instead, the cases cited above overwhelmingly suggest that a court's equitable powers are broad, and the considerations it chooses to use are not bound by the kinds of narrow and legalistic arguments such as the one Plaintiffs now put forward. Simply put, if one company is instrumental in causing environmental damage, it would not make sense, in an equitable action, to ignore that company's past actions on the grounds that it is liable only as a successor in interest to another company. Accordingly, I will consider the knowledge of NCR not just in its role as a successor corporation to Appleton Coated, but also in its role as the creator of carbonless copy paper and a key customer of Monsanto.

**\*13** I will turn now to the evidence. From the documents produced in this case, it is clear that Plaintiffs knew PCBs were "toxic," in a general sense, at a very early stage-the 1950's, certainly. But here we are concerned about a particular kind of toxicity, namely, the problem of PCBs persisting in the environment and causing health problems to animals and humans through their release into waterways. It is this particular problem that gave rise to the cleanup action and its attendant costs, and awareness of that problem did not arise until much later.

As one 1971 article put it, PCBs "have been sus-

pected since 1966 of causing many of the same ill effects in organisms as DDT and other chlorinated pesticides. Gradually the evidence has accumulated, and now there is little doubt of their danger." ("First DDT, Now PCB," *Science News,* October 28, 1971; Ferguson Decl., Ex. 52 at 332.) But at what point did the Plaintiffs actually appreciate the risks of using and recycling PCBs? As a starting point, it is clear that Plaintiffs knew about the potentially serious environmental impact of using PCBs by early 1970, when Monsanto sent its customers a letter notifying them that because of the environmental concerns it had it was discontinuing the production of Aroclor 1242 for paper coating applications. (Ferguson Decl., Ex. 44.) But it is also clear that NCR must have appreciated the *risk* of the use of PCBs much earlier. In 1965 NCR was performing toxicity tests on rabbits, and its licensee in Europe was noting the possible dangers of using repulped NCR paper in food wrappings.[FN21] In 1966 the Jensen report was produced, and the record shows that this was very quickly shared between Monsanto and NCR. This report showed not only that PCBs were "toxic" in a general sense but that they persisted, like DDT, in the environment-particularly in waterways-and could lead to lingering environmental and health problems. In fact, if Monsanto's documents establish anything, it is that it and NCR were working in tandem on the PCB problem. NCR was Monsanto's largest customer for Aroclor 1242, and both companies, along with Wiggins Teape, coordinated their approaches not just internally but in their relations with the government and media. By 1969, the parties were conducting increasingly frequent meetings on the subject of PCBs. In 1970 an internal WT memo noted that "[e]ver since Wiggins Teape started making NCR paper in Britain in 1955 they have known that one of its ingredients was potentially toxic. The ingredient is a chemical called Aroclor 1242." (Hogan Decl., Dkt. # 667, Ex. 17 at BCFOX00004097.)

FN21. At this time NCR and Appleton Coated also knew, of course, that broke was

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
**(Cite as: 2009 WL 5064049 (E.D.Wis.))**

being recycled. (*See, e.g.*, Bogart Decl., Dkt. # 716, Ex. 2)

Thus, the Plaintiffs' present claim that they never knew about the dangers of PCBs until after 1971 rings roughly as hollow as Captain Renault's feigned outrage upon being "shocked, shocked" to discover gambling at Rick's Casablanca café. Wiggins Teape concluded that it was Jensen's 1966 report that awoke the "sleeping tiger" of PCB dangers and even NCR's own 1972 analysis concluded that

*\*14 In the late 1960's* accumulative evidence began to show that PCB's may have adverse effects on certain forms of animal life. The same properties that contributed to their usefulness were indi[c]ted as contributing to the possible hazardous effects. The resistance to breakdown-such as thermal and biodegradation-was shown to lead to accumulations in the environment.

(Bogart Decl., Ex. 7 at 350916-350917) (italics added).

Although the nature of the knowledge question precludes fixing a date with any kind of scientific exactitude-particularly at the summary judgment stage-it is enough for present purposes to conclude that, in NCR's own terms, the evidence showed "in the late 1960's" that PCBs were a dangerous environmental toxin. And from that it may readily be inferred that sending broke and wastewater for recycling and treatment could have led to the same kinds of harms described in the Jensen report. But more importantly, as set forth more fully below, it was the known *potential* for environmental harm that is key to the equities in this case. In the face of increasing red flags, Plaintiffs' approach in the late 1960s was to worry about publicity and wait for the "second shoe" to drop. At its essence, Plaintiffs' approach was a risk management strategy to accept the risk of potential environmental harm in exchange for the financial

benefits of continued (and increasing) sales of carbonless paper containing Aroclor 1242. So although there is little basis to conclude that Plaintiffs *knew* about specific harms that would definitely occur (no one had such concrete knowledge at the time), I am satisfied that by the late 1960's Plaintiffs had access to the vanguard of data suggesting an appreciable *risk* of serious and long-lasting environmental damage resulting from the production and recycling of NCR paper.[FN22]

FN22. For completeness, I note that there is frequent notation in the record about NCR's desire to find a substitute for Aroclor 1242, and this effort began in the early 1960's or even earlier. Although the Defendants find this suggestive, the record would not support making any kind of negative inference out of NCR's early efforts to stop using Aroclor 1242. Instead, the record suggests other issues (cost, odor) were the principal reasons for the proposed substitute. This changes, however, by 1969, when it is clear that bad publicity and fallout from PCBs is a key component of the desire to change or to develop, in Monsanto's term, an "insurance policy." (Ferguson Decl., Ex. 29.)

**B. No Defendant Appreciated the Risks of PCBs until after the Production Period**

Plaintiffs argue that the equities balance out because many of the Defendants themselves knew that they were discharging toxic PCBs into the Fox River during the 1960s. Plaintiffs limit their argument to a single page in one of their briefs, however, and the evidence they cite is extremely sparse, especially when compared to the mountain of documentary evidence the Defendants have marshaled. I will address their assertions briefly.

First, Plaintiffs note that a paper industry report stated that the presence of PCBs in "paper products and mill effluents has been recognized since the late

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
**(Cite as: 2009 WL 5064049 (E.D.Wis.))**

1960s." [FN23] The document they cite, however, is a 1976 report, and thus it is not "evidence" that the Defendants themselves recognized the presence, and dangers, of PCBs seven or more years earlier. Moreover, Plaintiffs do not explain which, if any, of the Defendants were involved in producing the report, nor do they identify which Defendants might have received the report. In short, the report is not material to the question of whether any of the Defendants actually knew about the risks of recycling CCP during the production period.

> FN23. Plaintiffs' brief (Dkt. # 658 at 27) cites to their proposed findings of fact at ¶¶ 311-313, but these findings do not refer to this report. Instead, it appears the report is found at Ex. 105 to the Roach Declaration (Dkt.# 677).

*15 Plaintiffs also cite the testimony of a Menasha Corporation purchasing agent, David Austin, who claimed in another proceeding that as early as the 1950s he was instructed not to buy CCP because it might contain PCBs. This testimony has been repudiated by the deponent. (Dkt.# 727, Ex. 47.) In fact, even the Plaintiffs themselves have specifically rejected Austin's testimony in their comments on the January 15, 1999 revision of the Technical Memorandum 2nd. (*Id.,* Ex. 48 at 5.) In their comments to the DNR, they described Austin's testimony as "not believable" and sarcastically suggested that Austin must have been "prescient" to be aware of PCBs as early as the 1950s or 1960s. (*Id.* n. 8.) It is disturbing that a decade later, when it is convenient, they now cite Austin's discredited testimony as evidence of the knowledge of one of the Defendants.

Plaintiffs further cite the testimony of Donald Schneider, a Fort Howard employee, who testified that Monsanto's decision to stop production of Aroclor 1242 in 1970 was "well known." Thus, Plaintiffs argue, he and employees of the other Defendants would have known in 1970 about the dangers of PCBs in NCR's emulsion. It should go without saying, however, that one individual's testimony about what others might have known is not probative evidence of the others' knowledge. In addition, review of Schneider's deposition testimony makes clear that his memory of events was not particularly crystalline (which is not surprising). As such, no jury would place any weight on the snippets of testimony the Plaintiffs have cited. More importantly, Schneider testified that his knowledge of Monsanto's decision arose out of reading various trade journals in 1971, and thus there is no evidence that he or any other of the Defendants' employees learned of it in 1970. In fact, Schneider dates his company's knowledge of the problem to 1974, when the DNR started testing for PCBs. (Dkt. # 677, Ex. 112 at 126.) In sum, none of the evidence cited by Plaintiffs suggests that any of the Defendants possessed any knowledge of PCBs in NCR's emulsion during the production period.

Not only do the Plaintiffs lack any evidence that Defendants appreciated the risks of PCB use during the production period, it appears likely from the record that few, if any, of the Defendants learned of the risks until significantly later. In fact, there is no evidence that the Defendants even knew NCR broke *contained* PCBs during the production period, much less that PCBs could cause environmental damage. Accordingly, I will wholly reject Plaintiffs' unsupported claims that any of the Defendants possessed meaningful knowledge of the risks of recycling PCBs during the production period.

**C. Plaintiffs are not Entitled to Contribution for Damage Caused by Releases Made During the Production Period**

Plaintiffs raise a number of arguments in support of their claim for contribution. At its essence, their claim can be boiled down to two assertions. First, they argue that many of the Defendants were knowing polluters of the Fox River over the course of many decades, and these Defendants therefore cannot now claim to be "innocent" parties in these proceed-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
**(Cite as: 2009 WL 5064049 (E.D.Wis.))**

ings. Second, they assert that none of the parties knew about the dangers of PCBs during most of the production period, and thus the equities balance out and liability for the cleanup costs should be shared. I address these arguments below, and I explain the other considerations that factor into my conclusion that Plaintiffs' claim for contribution should be denied in its entirety.

### 1. Other forms of Pollution

*16 One of Plaintiffs' key lines of argument highlights several Defendants' knowing pollution of the river over the course of many decades. (Dkt.# 655.) Plaintiffs note that the unhealthy condition of the river was obvious to any passerby in the late 1960's and 1970's. Dead fish were floating amid pools of filth and other debris; the "waters at this point had a turbid gray appearance;" and there existed a "strong odor of hydrogen sulfide gas from decomposing organic deposits." (Dkt. # 656, PPFOF ¶ 39.) Because several of the Defendants knew they were dumping significant quantities of solids into the river, the Plaintiffs argue, they cannot now assert that they are "innocent" parties upon whom it would be unfair to impose some liability for the PCB cleanup.

I do not rule out the possibility that the polluting actions of some Defendants could, under other circumstances, reasonably be considered by a court in equity. But this case is about a very specific toxin-PCBs, primarily in the form of Aroclor 1242-and it is the presence of that toxin that has given rise to the massively expensive cleanup action that has itself given rise to this case. This is, at its core, a case about money-who should pay for that cleanup. Although several of the Defendants may have polluted the river in other ways, that pollution simply did not result in an EPA-ordered cleanup. Accordingly, any arguments based on the existence of *other* kinds of pollution do not speak to the equities of whether any of the Defendants should pay for the cleanup of PCBs in the Lower Fox River.

### 2. The Equities Overwhelmingly Favor the Defendants

Plaintiffs' key assertion is that during much of the production period neither the Plaintiffs nor the Defendants were cognizant of the risks of PCBs being released into waterways through recycling or otherwise. During this period of general ignorance, Plaintiffs believe the equities balance out on the knowledge issue, which would mean that liability should be apportioned on equitable factors *apart* from knowledge. This would require additional phases of the trial so that the parties could, for example, prove how many pounds of PCBs they released into the river, and when.

A number of reasons cause me to reject Plaintiffs' claim that the equities balance out. First, as I have concluded above, Plaintiffs were not completely ignorant of the dangers of PCBs during the production period. I need not repeat those conclusions here, but it is worth highlighting the fact that PCB releases did not occur at a steady rate throughout the 1960s. During the period Plaintiffs *were* aware of the potential PCB problem-the late 1960s and 1970-71-their use of PCBs and corresponding releases into the river rose to their peak. Graphs depicting the production of NCR paper containing PCBs show a steady, and then precipitous, increase in production throughout the decade. Production grew from about a million reams in 1961 to roughly 1. 5 million reams in 1964, but then production spiked to nearly 4 million by 1970-71. (Dkt. # 47, Fig.5.) Accordingly, it is clear that a large percentage of the releases occurred when Plaintiffs would have known that there was risk of environmental damage. As such, Plaintiffs' premise that both sides were equally ignorant of the risks during the production period is simply not accurate.

*17 Second, I conclude that during much of the period when Plaintiffs did not actually appreciate the risks of recycling their CCP, they were in fact in the best position to learn of those risks. The records show that Wiggins Teape, the exclusive producer of NCR

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
**(Cite as: 2009 WL 5064049 (E.D.Wis.))**

paper in Europe, had been conducting tests throughout the 1960s. Plaintiffs have not attempted to identify any serious studies they undertook during the crucial period; instead, the records are suggestive of a completely passive "wait and see" approach based on reacting to information *others* produced. (For example, in 1969 NCR appeared unimpressed by a *San Francisco Chronicle* article on PCBs and "regarded this as just another in the series of articles on the toxicity of PCBs and viewed them with patience." (Ferguson Decl., Ex. 29.)) Rather than capitalizing on their position as the largest consumer of Aroclor 1242 and the close relationship NCR had with Monsanto, not to mention the legions of scientists they employed, Plaintiffs appeared content to allow remote journalists and scientists to uncover any potential environmental problems in a wholly unsystematic fashion. The fact that they were in a much better position to learn of the risks of PCBs than the Defendants substantially weakens their assertion that the Defendants should be forced to share in the cleanup costs. *See, e.g., Lone Star Industries, Inc. v. Horman Family Trust,* 1990 WL 640001, *8 (D.Utah 1990) ("the court concludes that there is an insufficient equitable basis to apportion response costs onto the Williamsen defendants. Lone Star was the party that generated, transported and disposed of the waste. Lone Star claims to have had no knowledge about the potential hazards of its waste, and yet it was in the best position of all the parties to have reason to know about such hazards. Equity should not condone imposing liability upon a landowner who merely consented to the deposit of waste materials under these circumstances.")

Third, and relatedly, I conclude that even during the period when *no* parties could have been aware of the dangers inherent in the use and recycling of PCBs (i.e., 1954 through the mid-1960s), the equities strongly favor the Defendants. This case is apparently unique among contribution actions in that the environmental repercussions of the discharged product were not fully appreciated until much of the damage

had already been done. It does not require persuasive precedent, however, to conclude that between parties who *produced* the product and those who merely processed it and recycled it along with all other paper products or water sources, these latter parties are significantly less blameworthy. One reason is that it makes sense from a policy perspective to place the risk of future harms on the creators and marketers of products rather than their end users. As noted above, the parties in the best position to investigate PCBs in general were Monsanto, their creator, and Plaintiffs, the largest consumer of the product. But Monsanto (not a party here) made its Aroclor products for a variety of applications, most of which had nothing to do with paper. It was NCR who developed CCP using Aroclor 1242 and created the market for that product, and Appleton Coated (whom NCR bought) that coated Aroclor onto the carbonless paper. These companies placed this product into the stream of commerce while knowing that some of it would be recycled and they sold their scraps, for profit, directly to recyclers. (In 1965 an Appleton Coated employee boasted about receiving a "quite high" price for its recycled NCR paper. (Bogart Decl., Ex. 2.)) Defendants are recyclers of paper and municipal sewerage entities who simply processed paper and water, and they would have had little reason or ability to inspect or investigate the chemical makeup of anything that came in the door. As the inventor of NCR paper himself stated, the recyclers were the "innocent victims" of the circumstances. (Ferguson Decl., Ex. 67.) This is even more true for Defendants who merely received and released wastewater containing invisible PCBs in it.

**\*18** That innocent end-users should not have to bear the burdens of unknown defects is reflected in Restatement § 886B. Plaintiffs are correct that this is not a lawsuit for indemnification, and indeed by its terms § 886B applies only when one party brings an indemnification lawsuit against another *after* having discharged their common liability. Even so, the principles reflected in that section would require a manu-

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
**(Cite as: 2009 WL 5064049 (E.D.Wis.))**

facturer to compensate an innocent party if, for example, the manufacturer "supplied a defective chattel or performed defective work upon land or buildings as a result of which both were liable to the third person, and the indemnitee innocently or negligently failed to discover the defect." Rest. (2d) Torts § 886B(2)(d). Similarly, one could get compensation from the manufacturer if "[t]he indemnitor created a dangerous condition of land or chattels as a result of which both were liable to the third person, and the indemnitee innocently or negligently failed to discover the defect." Id., § 886B(2)(e). Here, the Plaintiffs created a dangerous condition and product that gave rise to a common liability, and the Defendants innocently failed to discover that condition.

Defendants make clear that they are not making an independent claim for indemnification, but they argue that the considerations set forth in § 886B are nevertheless properly considered in a CERCLA contribution action like this one. Although the indemnification model does not fit the procedural stance of this case, indemnification reflects primarily equitable considerations (such as preventing unjust enrichment), and I agree that there is no reason CERCLA § 113 should exclude reference to such considerations, if only by analogy. As noted above, a contribution action under CERCLA allows judges to consider a multitude of equitable considerations, and principal among these is relative fault. Restatement § 886B expresses a particular kind of fault-based analysis that allows a party who innocently failed to discover a defect to recover from the creator of that defect, and there is no reason that analogy to such a result cannot be applied prospectively in a case like this to prevent the creator of the hidden defect from recovering from the innocent party.

Such considerations are especially salient in a case like this where the Plaintiffs are the creators of the product in question and where the "defect"-the PCB-containing emulsion-was itself key to the product's usefulness and thus its profitability. The Aroclor

was not incidental to the carbonless paper product; it was a crucial element. And without their Aroclor-containing product, there would have been nothing to recycle and no PCB-laden wastewater. As the EPA's 1977 study noted, "In a sense, these PCBs were mobilized upon the initial production of the paper, and their passage through paper mills merely resulted in partition between the accepting media (water, air, solid wastes, products)." (Ferguson Decl., Ex. 9 at 24.) In other words, by creating ("mobilizing") the product in the first place, Plaintiffs set in motion the pollution that has given rise to this cleanup effort. And because the disposal of the waste products (broke and trim) was a necessary byproduct of the manufacture of CCP, Plaintiffs' involvement in the creation of the pollution was paramount. *Kerr-McGee Chemical Corp. v. Lefton Iron & Metal Co.,* 14 F.3d 321, 326 (7th Cir.1994) (court may consider party's involvement in the generation of waste). Plaintiffs themselves point out that recycling of the product was a deliberate profit-making strategy for Appleton Coated. (Dkt. # 671, ¶ 10.) The Defendants' contact with the product was largely incidental by comparison; it was, in the 1977 study's words, merely a function of partitioning the PCBs between release into the water, air, and other media.[FN24]

> FN24. I am discussing the Defendants generally, but it is clear that some of their involvement is exceptionally limited.

**\*19** An additional reason for denying contribution involves Plaintiffs' sluggish response to the data during the late 1960s and early 1970s. *Kerr-McGee Chemical Corp.,* 14 F.3d at 326 (holding that courts may consider parties' efforts to address environmental problems and their cooperation with authorities). The DNR has estimated that roughly 45 million pounds of Aroclor 1242 was used in NCR CCP production during the production period.[FN25] (Foley Decl., Dkt. # 727, Ex. 15 at APIFOX00000021.) These figures are based on Plaintiffs' own records. (Ferguson Decl., Ex. 30.) The figures for the final

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
**(Cite as: 2009 WL 5064049 (E.D.Wis.))**

years are, as noted above, the highest (with the exception of 1971, when use of Aroclor ceased in April). For the years 1969, 1970 and 1971, for example, roughly 14 million pounds were used, an amount constituting roughly 31 percent of the total. If 1967 and 1968 are included, this adds another 22 percent. In other words, NCR produced *more than half* of all PCBs used in the production of NCR paper after receiving the Jensen article highlighting PCBs' persistence in the environment.

> FN25. This figure apparently includes NCR's plant in Dayton, which produced about one-third of the total NCR paper. As noted earlier, the government estimates that roughly 30 million pounds of PCBs were used in the production of NCR paper in the Fox River area.

I suggested earlier that this is a case about risk management because we are dealing with a product whose danger was not fully appreciated until recently. Various red flags and warning signs appeared along the way, as with products like asbestos or prescription drugs that eventually prove dangerous only after years of distribution on a large scale. And so at each new bit of data, corporate meeting or scientific study, the company faces and makes a choice, either explicitly or implicitly: move forward, pause, or stop. Here, the record clearly shows that Plaintiffs did not pause. But neither did they continue with business as usual. Instead, they pressed "Fast Forward" and ramped up production in the final years that Aroclor 1242 was available. There is no evidence that production increased at the end *because* they knew Monsanto would soon discontinue Aroclor 1242; that is, it was not necessarily a considered effort to obtain as much of the soon-to-be-discontinued product as they could before Monsanto stopped selling it. The increased production was likely a result of demand. Even so, the decision to move forward and accelerate production in 1969 and 1970 despite having frequent meetings about PCBs and increasing dangers' signs is

enough, in my view, to preclude Plaintiffs from recovering from the Defendants. These were the highest-selling years of the product and resulted in the most environmental damage. In fact, even after Monsanto wrote its customers explaining why it was discontinuing production of Aroclor 1242 (early 1970), Plaintiffs continued producing carbonless paper for another year at a rapid pace. Although Plaintiffs were in the best position, by far, to appreciate the risks of PCB contamination, during the last few years of production they single-handedly mobilized more PCB-laden product and sent more through the system than had been produced in the decade prior.

**\*20** Plaintiffs protest that they moved quickly to change from Aroclor 1242 to another product once it became feasible, but economic feasibility is not the only touchstone equity affords. The language of CERCLA and equity is not limited by business or competitive concerns-it allows for the not-so-radical possibility that Plaintiffs could have done something that was *not* economically advantageous-e.g., stopping or slowing production-rather than gradually transitioning from one product to another after years of trials established that the substitute would be tolerable to the marketplace. This happens in the consumer world all the time-dangerous products are recalled or taken off the market altogether. If a company is making poisonous breakfast cereal, surely it is no defense to say that the company switched ingredients as soon as it found a less toxic ingredient at an economically viable price. Ceasing production might have been hugely expensive, of course, but it was a legitimate choice they could have made (it is a choice similar to the one Monsanto did make). Wiggins Teape, notably, showed that it could change from Aroclor to another product (HB 40) as early as July 1970. (Hogan Decl., Dkt. # 754, Ex. 23.)

And perhaps, under the circumstances, ceasing production was not considered to be a serious option. No doubt many companies would have made similar decisions-to wait and see, to hope for the best, etc.,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
(Cite as: 2009 WL 5064049 (E.D.Wis.))

particularly given that potential liability under CERCLA (enacted in 1980) was not on anyone's radar screen at the time. But even so, the strategy of waiting was a deliberate acceptance of a large amount of risk to the environment and public health, and in fact the records suggest that the parties viewed their decisions through the lenses of risk. (At one point, they even discuss treating the future replacement of Aroclor as an "insurance policy.") (Ferguson Decl., Ex. 29.) Continuing on with the production of carbonless paper using Aroclor 1242 might have made a certain amount of business sense at the time, but CERCLA contribution is not an insurance policy designed to insure against the bad business judgments of toxin manufacturers. The public health risks assumed by Plaintiffs are not fairly translatable into financial burdens to be borne by any of the Defendants, and in fact the continued and increased use of Aroclor 1242 at the end of the production period caused so much of the damage that the Plaintiffs should be barred from contribution entirely. And certainly there is an element of moral hazard at work. If manufacturers of a toxin are allowed to recover from innocent processors of that toxin, their own risky behavior is at least partially insulated from financial consequences. Such a result would encourage the taking and assumption of undue risks in an area where society would prefer extreme caution.

Finally, and relatedly, I conclude that denying contribution is the surest way to protect the public. "The hallmark of a court of equity is its ability to frame its decree to effect a balancing of all the equities and to protect the interest of all affected by it, including the public." *United States. v. R.W. Meyer, Inc.,* 932 F.2d 568, 572 (6th Cir.1991) (quoting *Kay v. Mills,* 490 F.Supp. 844, 855 (E.D.Ky.1980) (citing W. DeFuniak, *Handbook of Modern Equity* § 25 (1956); H. McClintock, *Equity* § 70 (2d ed.1948); D. Dobbs, *Remedies* 52-57 (1973))). I have concluded above that roughly one-third of the entire PCB discharge into the river occurred during a period in which NCR knew there was a significant risk that

persistent environmental damage could occur. Half of the PCBs were produced *after* the Jensen report reached NCR. Plaintiffs could have turned off the spigot much earlier than April 1971-either by ceasing production of CCP using Aroclor 1242 or simply by Appleton Coated ceasing the selling of broke to recyclers-and practically speaking they were the only entities that had such power. By curbing their ability to now recover for cleanup costs, this Court's equitable power will encourage other manufacturers to act swiftly and proactively-rather than wait for the second shoe to drop-as soon as data suggest that their product might cause environmental damage.

**D. Plaintiffs are not Entitled to Contribution for Releases During the Post-Production Period**

**\*21** I have concluded that Plaintiffs are not entitled to contribution for cleanup costs resulting from damage that occurred during the production period (1954-1971). But what about the *post*-production period? Plaintiffs have identified several defendants who continued to take in and recycle post-consumer waste products, which contained small amounts of PCBs from the emulsions found in lingering supplies of pre-1971 NCR paper that found its way into the waste they processed. In other words, pre-1971 carbonless paper sat on the shelves of businesses for months or years after NCR stopped using Aroclor 1242, and when the paper was finally used it was sent into the recycling stream along with other paper. Plaintiffs allege that this recycling occurred while these Defendants knew (a) that PCBs posed an environmental risk when discharged into the river and (b) that the post-consumer waste paper contained some non-negligible amount of PCBs.

For the following reasons, I conclude that the same considerations set forth above should apply to the post-production period as well. In the view of the Plaintiffs, the key obstacle to entry of judgment after Phase I is that the volume of discharges is a crucial element to any analysis and it was not a subject of the first Phase. They posit that the amounts the various

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
**(Cite as: 2009 WL 5064049 (E.D.Wis.))**

parties discharged, and *when* these discharges oc-curred, are key issues in apportioning liability. For example, if Defendant Georgia-Pacific discharged 8 percent of the total PCBs into the river in 1976, while knowing full well of the risks of that discharge, it must be held liable for contribution on that basis. The Defendants, and the United States, argue that the relatively minimal discharges that occurred post-1971 should not factor into the contribution analysis. The amounts at issue are negligible in contrast to the flood of PCBs that flowed prior to the end of the pro-duction period, they argue, and sorting out when each Defendant discovered the dangers of PCB discharges would be an impossible task.

Although it is true that the volume of discharge was not specifically a topic of Phase I, this Court did note in a July 30 hearing that in some respects vol-ume was "inevitably part of the analysis I'll make." (Ferguson Decl., Ex. 47 at 25:19-20.) Not in the sense that I expected independent and new evidence to be marshaled, but in the more basic sense that by all accounts most of the damage had been done by the time NCR stopped using Aroclor in its carbonless paper. To recall, the DNR has concluded that no less than 98 percent of the discharges had occurred by the end of 1971, and that figure has been much bandied-about. The DNR's figure is neither binding on this Court nor conclusively established (an issue that is the subject of its own motion), but even so it is unde-niable that all accounts confirm that the vast majority of the PCB releases-whether 98 percent or some other figure-occurred during the production period. For the reasons given below I conclude that it is enough that the overwhelming majority of the release occurred before any of the Defendants appreciated the risk; as such, I see no reason to forestall entry of judgment merely to sort out a few percentage points.

**\*22** I begin by noting that the 98 percent figure is obviously a reasonable estimate. The DNR ex-plained its conclusion more fully in its Record of Decision:

During the period of use (1954-1971) an estimated 13.6 million kg (30 million lbs.) of emulsion were estimated to be used in the production of car-bonless copy paper produced in the Fox River Val-ley. PCBs were released into the Lower Fox River in discharge water from several facilities. By ana-lyzing purchase, manufacturing, and discharge re-cords, conservative estimates have shown that ap-proximately 313,600 kg (690,000 lbs.) of PCBs were released to the Fox River environment during this time. Ninety-eight percent of the total PCBs re-leased into the Lower Fox River had been released by the end of 1971. Ceasing production of car-bonless copy paper and the wastewater control measures put in place by the Clean Water Act were effective in eliminating point sources.

(ROD 1 at 4; Dkt. # 552, Ex. A.)

This conclusion makes perfect sense, since dur-ing the period of production using Aroclor 1242, Plaintiffs were shipping the broke, waste materials and wastewater *directly* to the Defendants for proc-essing and release into the river. In fact, this direct relationship is one of the hallmarks of this case. As opposed to post-consumer waste products, which may have *happened* to contain some carbonless copy paper, *all* of the material sent by the Plaintiffs during the production phase contained PCBs. The recycling of the material during that period was essentially part-and-parcel of the manufacturing process itself, as the broke and other waste products were necessary by-products of manufacturing.

In addition, it is noteworthy that the DNR's analysis is backed by an EPA study conducted in 1977 by Versar, Inc. (Ferguson Decl., Ex. 9.) That report concludes that "Since 1971, when NCR car-bonless copy paper was no longer manufactured with a PCB dye solvent, PCB concentrations in paper products, effluents and sludges have shown a precipi-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)

**(Cite as: 2009 WL 5064049 (E.D.Wis.))**

tous decline." (*Id.* at 4-5.) "The historical perspective shown by our mathematical model, and validated by the available data, show PCBs in paper mill effluents and product to have passed a maximum in the 1970-71 period and to be continuing down to pre-1957 levels under the influence of declining amounts of PCBs in the recycled waste paper stream." (*Id.* at 5.) Thus, although I have not relied exclusively on the DNR's conclusion that 98 percent of the PCBs had been discharged by 1971, I agree with the United States that there is no evidence that would "substantially undermine" the conclusion that 98 percent of the total PCBs were released by the end of 1971. (Dkt. # 649 at 5 n. 4.) For purposes of equitable contribution, the key factor is that the overwhelming majority-whether 98 percent or 92 percent-of PCBs had been released during the production period. And because many of the Defendants did not learn of the risks of recycling NCR paper until even later-1972 or 1973, for example-the amount of PCBs released by the time any of the Defendants possessed adequate knowledge of the risks of their activities could actually be more like 99 percent.

**\*23** Having concluded that the overwhelming majority of PCBs had been released before any of the Defendants appreciated the risks of recycling, I further note that any recycling of post-consumer waste paper during the 1970's occurred within a regulatory scheme that allowed such use (even if it did not specifically "encourage" it, as some of the Defendants suggest). Even in 1979, when the dangers of PCBs were widely known, the EPA specifically allowed the continued use of PCB-laden pre-1971 carbonless copy paper in light of several practical factors:

Under this authorization, existing PCB carbonless copy paper may be used indefinitely. Prior to 1971, carbonless copy paper distributed by NCR Corporation was made with ink containing PCBs. There does not appear to be a way to distinguish PCB carbonless copy paper from non-PCB carbonless copy paper except perhaps by dates or other indica-

tions on unused inventories. A large portion of the PCB carbonless copy paper that has not been destroyed is probably in files. An enormous undertaking would be required of both business and government to purge existing files of PCB carbonless copy paper. Moreover, the amount of PCB on each sheet of carbonless copy paper is extremely small. In view of these practical considerations and because the potential PCB exposure and risks to human health or the environment are negligible, EPA has concluded that this activity does not present an unreasonable risk and is authorizing the continued use of existing PCB carbonless copy paper. In the proposal, EPA limited this authorization to five years. However, EPA does not now believe that a method for inexpensively separating PCB from non-PCB carbonless copy paper will be developed in the near future. Accordingly, EPA is authorizing the use of existing PCB carbonless copy paper indefinitely.

44 Fed.Reg. 31514, 31535 (May 31, 1979).

The Plaintiffs note that these regulations were the result of strenuous lobbying efforts by the paper industry, and no doubt that is true. The regulations do not constitute an official "permit" to release PCBs into the river, certainly. But it must be remembered that it is the government that ordered the cleanup in this action, and its own view at the time was that "the potential PCB exposure and risks to human health or the environment [from recycling waste paper] are negligible." *Id.* Granted, that was the view in 1979 rather than, say, 1972, when there was more Aroclor-containing carbonless paper circulating through the system. But the EPA's view was clear: after 1971, the amount of PCB on lingering sheets of CCP was "extremely small" and there was no practicable way of sorting it out. This again underscores the government's apparent view that the damage here was primarily a result of the *manufacturing* process rather than the post-1971 *recycling* process that involves the Defendants.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
**(Cite as: 2009 WL 5064049 (E.D.Wis.))**

In addition to the fact that only a negligible amount of PCBs were discharged after 1971, a related reason for precluding contribution altogether is that the knowledge of the numerous Defendants during the post-production period is not easily determined, and their knowledge did not necessarily arise the instant the Plaintiffs stopped using PCBs in 1971. Although Plaintiffs have cited various studies and interactions with governmental officials during the 1970's that suggest that different defendants knew (or should have known) about PCB dangers at various times, it would be a Herculean task to isolate and apportion contribution amounts among the Defendants given the shifting time frames and the fact that the Defendants would only be responsible for a tiny fraction of the entire total in any event. For example, suppose after a Phase I trial I concluded that Defendant A should have known about the risks of recycling post-consumer waste in September, 1973; Defendant B in July, 1975; and Defendant C in November, 1975. That would not end the question. Another phase of the trial would be required to show that, for example, Defendant A released 900 pounds of PCBs after it should have known about the dangers of doing so, and Defendant B released 1230 pounds, and so on. But of course such releases would be truly negligible. If 98 percent (or some similar amount) of the total discharge occurred during the production period, then it follows that the majority of the *post*-production releases (the remaining two percent) occurred in the months and years soon after April 1971 when recently produced NCR paper containing PCBs was working its way through the system. The record suggests that many of the Defendants did not learn about the risks of PCBs until significantly later, however, and thus it is likely that the result of a multi-phase trial would show that something like one percent or less of the total amount of PCBs had been discharged by Defendants who appreciated some risk of environmental damage. The cost of sorting out this puzzle would far exceed any benefit. As the United States has aptly put it, "equity argues in favor of an

early determination that [the Defendants] should not be dragged through a multi-year, costly litigation in order to assess whether they should contribute respective portions of approximately 2% of the costs for remediation of a problem created and perpetuated, in nearly all respects, by the Plaintiffs." [FN26] (Dkt. # 649 at 5.)

> FN26. Arguably, the cost of litigation could be considered as an equitable factor in an action like this one. The leverage afforded by the specter of a multi-year massive lawsuit like this one is particularly acute with respect to several Defendants who have almost no conceivable liability whatsoever. Though I do not rely particularly strongly on such a rationale in this decision, the United States' statement seems to stand for the common sense principle that if Plaintiffs are indeed responsible for somewhere in the vicinity of 98 percent of the damage, it does not serve equity to hold a multimillion-dollar trial to divvy up the remaining two percent, especially given the thorny issues involved in such a venture.

**\*24** A fourth reason to leave the post-production period to one side is that there was very little any of the Defendants could have done even if they had learned of the problem sooner. The record shows that at the time there was no way of sorting out NCR wastepaper from non-NCR paper, nor was there any way of removing the Aroclor 1242 from the NCR paper. And, as noted above, the government sanctioned the continuing recycling of post-consumer paper products as having more benefits than drawbacks.

Finally, it is important to remember that this case is not primarily about assessing liability for environmental *damage,* it is about recovering the *costs* of remediating that damage. Although a more searching attribution of post-1971 activities might be relevant if

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
**(Cite as: 2009 WL 5064049 (E.D.Wis.))**

we were trying to assess liability based on the gross volume or weight of PCBs actually discharged, in actuality this action is simply about responsibility for the cost of cleanup. Despite countless pages of briefing, there has been no evidence, nor any real suggestion, that the relatively minimal actions of the Defendants in the post-production period have added anything significant to the overall cost of remediation. Instead, all indications are that the costs of the cleanup would have been substantially the same even if the relevant Defendants had ceased recycling post-consumer waste paper in 1971. The cleanup effort requires dredging and capping, and the same river sediment would need to be dredged or capped with sand and gravel regardless of whether the Defendants' post-1971 activities added two percent or some slightly larger number to the total. The damage had already been done.

Consideration of the marginal costs of environmental damage was discussed by the Seventh Circuit in *Browning-Ferris Industries of Illinois, Inc. v. Ter Maat*, 195 F.3d 953, 958 (1999): "[S]uppose that even if X had not polluted the site, it would have to be cleaned up-and at the same cost-because of the amount of pollution by Y. (That would be a case, perhaps rare, in which the clean-up costs were sensitive neither to the amount of pollution nor to any synergistic interaction between the different pollutants.) Then X's pollution would not be a necessary condition of the clean up, or of any of the costs incurred in the clean up." But X is not home-free merely because the clean up is attributable to Y's activities:

But that should not necessarily let X off the hook. For suppose that though if X had not polluted the site at all there still would have been enough pollution from Y to require a clean up, *if Y had not polluted the site X's pollution would have been sufficient to require the clean up*. In that case, the conduct of X and the conduct of Y would each be a sufficient but not a necessary condition of the clean

up, and it would be entirely arbitrary to let either (or, even worse, both) off the hook on this basis.

*Id.* (emphasis added).

The underlined portion describes the case where X's pollution, on its own, would have required a cleanup action. In that scenario, it would not make sense to relieve X from contribution merely because Y was also guilty. But here we have a situation where the Defendants' post-production activities would *not* have required a cleanup on their own. How do we know that? The EPA and Wisconsin DNR-the agencies charged with ordering environmental cleanups-have told us that in their view 98 percent of the damage had been done during the period for which I am attributing sole liability to the Plaintiffs, and in the 1970s the EPA allowed continued recycling of waste paper on the basis that further PCB releases were negligible. In other words, there is no evidence either that the post-production period trickle of PCBs would have required a cleanup action or that it added materially to the cost of the cleanup action that *was* required due to the actions of the Plaintiffs.[FN27]

> FN27. While it is conceivable that additional discharges may have added enough parts per million to some sediment to bring it over the threshold for removal (and thus theoretically increase the cleanup cost), that is purely speculative and not a basis on which to award contribution.

**\*25** Ultimately, it is the Plaintiffs' own production of the CCP that is the *sine qua non* not just of the environmental damage, but of the entire cleanup effort and its attendant costs. As such, the cleanup cost is quite literally a "sunk" cost that is not dependent on the kinds of hair-splitting that Plaintiffs propose.[FN28] For all of these reasons, I conclude that it does not make sense to allow contribution based on any of the Defendants' post-1971 activities, which

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)
**(Cite as: 2009 WL 5064049 (E.D.Wis.))**

contributed very little to the overall PCB pollution and even less to the overall *cost* of the cleanup.

> FN28. Even if Plaintiffs were allowed to present a case discussing the relative amounts of volume discharges, I have serious doubts as to whether that would be a constructive undertaking forty years after the fact.

### III. Conclusion

In the light of hindsight we must take care not to impose anachronistic knowledge on the principal actors. And in fact this case is not about blame or the imposition of liability per se-the result does not, for example, mean that the Defendants are "innocent" or not liable to the government, as liability under CERCLA is strict and all parties to this action are all potentially liable under that statute. Instead, the result simply means that as among these liable parties, the Plaintiffs are not entitled to recover from the Defendants for their costs incurred in cleaning up damage caused by dangers the Plaintiffs created. I have concluded that under the circumstances detailed above, when Plaintiffs introduce a toxin into a manufacturing process which they know or should know results in the discharge of that toxin into the environment, and then take a "wait and see" approach and view the danger as a matter of risk management and publicity control, equity will not allow them to later receive contribution from entities who are either completely faultless or nearly so, and who had no role to play in the risk strategy Plaintiffs undertook, a strategy that has now proved quite costly.

Accordingly, the Defendants' motions for summary judgment are **GRANTED.** The Plaintiffs' motion for summary judgment is **DENIED.** The Plaintiffs' motion regarding the "98 percent" statement is **GRANTED.**[FN29] The Plaintiffs' motion to strike the United States'response (Dkt.# 713) is **DENIED.**[FN30] The Final Pretrial Conference scheduled for December 21 is cancelled, as is the trial scheduled to begin

January 4. Parties with other pending motions are to notify the Court within 30 days whether there is any reason to delay entry of judgment in this action or whether their motions are now moot.

> FN29. As discussed above, I have agreed with Plaintiffs that the 98 percent figure is not binding on the Court.

> FN30. It is true that the government's brief was not specifically a "response" to any motions filed against it, but under the unique circumstances of this case there seems little reason to ignore its filings, any more than I would ignore any positions it has advanced orally at the numerous hearings held in this action.

**SO ORDERED.**

E.D.Wis.,2009.
Appleton Papers Inc. v. George A. Whiting Paper Co.
Not Reported in F.Supp.2d, 2009 WL 5064049 (E.D.Wis.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit B

Westlaw.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)

**(Cite as: 2013 WL 1858597 (E.D.Wis.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Wisconsin.
**UNITED STATES** of America and State of Wisconsin, Plaintiffs,
v.
**NCR** CORP. et al., Defendant.

Case No. 10–C–910.
May 1, 2013.

**Background:** United States and Wisconsin brought action against paper manufacturing and coating companies under Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), seeking injunction requiring companies to comply with most recent order of Environmental Protection Agency (EPA) concerning remediation of polychlorinated biphenyls (PCB) they discharged into Lower Fox River between 1954 and early 1970s.

**Holdings:** After 11-day trial, the District Court, William C. Griesbach, Chief Judge, held that:

(1) companies failed to prove that harm caused by pollution to river was capable of divisibility;

(2) permanent injunctive relief requiring all potentially responsible parties (PRP) to complete remediation was appropriate;

(3) expert testimony of environmental engineer was admissible; and

(4) testimony of government witness was admissible.

So ordered.

West Headnotes

[1] Environmental Law 149E ⟜445(3)

149E Environmental Law
    149EIX Hazardous Waste or Materials
        149Ek436 Response and Cleanup; Liability
            149Ek445 Persons Responsible
                149Ek445(3) k. Joint and Several Liability; Divisibility. Most Cited Cases

The rule holding responsible parties jointly and severally liable for environmental remediation, where appropriate, is therefore an important tool in furthering Comprehensive Environmental Response, Compensation and Liability Act's (CERCLA) policy of promoting the timely clean-up of hazardous waste sites and ensuring that the costs of such cleanup efforts are borne by those responsible for the contamination. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 101 et seq., 42 U.S.C.A. § 9601 et seq.

[2] Environmental Law 149E ⟜445(3)

149E Environmental Law
    149EIX Hazardous Waste or Materials
        149Ek436 Response and Cleanup; Liability
            149Ek445 Persons Responsible
                149Ek445(3) k. Joint and Several Liability; Divisibility. Most Cited Cases

Environmental Law 149E ⟜464

149E Environmental Law
    149EIX Hazardous Waste or Materials
        149Ek462 Evidence
            149Ek464 k. Presumptions, Inferences, and Burden of Proof. Most Cited Cases

To demonstrate that a harm subjecting an entity to liability under the Comprehensive Environmental Re-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)

**(Cite as: 2013 WL 1858597 (E.D.Wis.))**

sponse, Compensation, and Liability Act (CERCLA) is divisible, a defendant bears the burden of showing: (1) the harm is theoretically capable of being divided; and (2) a reasonable factual basis for apportionment exists. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 101 et seq., 42 U.S.C.A. § 9601 et seq.

**[3] Environmental Law 149E ☞445(3)**

149E Environmental Law
    149EIX Hazardous Waste or Materials
        149Ek436 Response and Cleanup; Liability
            149Ek445 Persons Responsible
                149Ek445(3) k. Joint and Several Liability; Divisibility. Most Cited Cases

    Paper manufacturing and coating company, one of the potentially responsible parties (PRP) in a CERCLA action brought against it by United States and Wisconsin, failed to prove that the harm caused by pollution of Lower Fox River through discharge of polychlorinated biphenyls (PCB) for nearly two decades was capable of divisibility, as was required to support its claim that it was not responsible for further remediation efforts; relationship between PCBs discharged and resulting contamination was quite loose, as once an area was contaminated additional PCB loads did not make area more contaminated, PRP's expert calculations were based upon uncertain principles and incorrectly estimated all PRPs' discharges of PCB into river, and sediment found at bottom of river was reflection of number of independent factors that rendered it difficult or even impossible to pinpoint source of contaminants found in sediment. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 106(a), 42 U.S.C.A. § 9606(a); Restatement (Second) of Torts § 433A.

**[4] Environmental Law 149E ☞445(3)**

149E Environmental Law
    149EIX Hazardous Waste or Materials

        149Ek436 Response and Cleanup; Liability
            149Ek445 Persons Responsible
                149Ek445(3) k. Joint and Several Liability; Divisibility. Most Cited Cases

    Paper manufacturing and coating companies, the potentially responsible parties (PRP) in a CERCLA action brought against it by United States and Wisconsin, failed to prove that the harm caused by pollution of Lower Fox River through discharge of polychlorinated biphenyls (PCB) for nearly two decades was capable of divisibility, as was required to support their claims they were not responsible for further remediation efforts; companies were a significant cause of harm in one of "operable units" of river, as solids they deposited in another unit passed into current and were deposited in unit in dispute. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 106(a), 42 U.S.C.A. § 9606(a); Restatement (Second) of Torts § 433A.

**[5] Injunction 212 ☞1032**

212 Injunction
    212I Injunctions in General; Permanent Injunctions in General
        212I(B) Factors Considered in General
            212k1032 k. Grounds in General; Multiple Factors. Most Cited Cases

    Before a court may award permanent injunctive relief, a party must demonstrate: (1) it has succeeded on the merits; (2) no adequate remedy at law exists; (3) the moving party will suffer irreparable harm without injunctive relief; (4) the irreparable harm suffered without injunctive relief outweighs the irreparable harm the nonprevailing party will suffer if the injunction is granted; and (5) the injunction will not harm the public interest.

**[6] Environmental Law 149E ☞700**

149E Environmental Law
    149EXIII Judicial Review or Intervention

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
**(Cite as: 2013 WL 1858597 (E.D.Wis.))**

149Ek699 Injunction
149Ek700 k. In General. Most Cited Cases

It was appropriate to issue permanent injunctive relief requiring all potentially responsible parties (PRP) under CERCLA to complete specified remediation work addressing polychlorinated biphenyl (PCB) contamination of Lower Fox River; permitting the pollution to continue unabated would cause the further spread of PCBs into fish, and thence into humans who ate fish despite posted warnings, consumption of PCBs led not only to higher rates of cancer but also certain developmental, reproductive, immunologic and endocrine problems, thereby posing a public health hazard, and fact that one PRP was currently performing the work did not mean that others could not be enjoined to do so as well. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, §§ 107(a), 113(f) 42 U.S.C.A. §§ 9607(a), 9613(f).

**[7] Evidence 157 ⬅➡555.4(4)**

157 Evidence
157XII Opinion Evidence
157XII(D) Examination of Experts
157k555 Basis of Opinion
157k555.4 Sources of Data
157k555.4(4) k. Records or Reports. Most Cited Cases

Expert testimony of environmental engineer was admissible, despite his reliance and adoption upon government-commissioned report, in CERCLA action brought by United States and Wisconsin against paper manufacturing and coating companies, seeking injunction requiring companies to comply with most recent order of Environmental Protection Agency (EPA) concerning remediation of polychlorinated biphenyls (PCB) they discharged into Lower Fox River between 1954 and early 1970s; report's estimates had guided remedial action and had repeatedly relied on for more than a decade by government, expert explained experts in his field traditionally relied on government reports and regulatory investiga-

tions, and experts shared same area of expertise, and even if expert testimony was struck, issue of divisibility would not have been decided differently at trial. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 101 et seq., 42 U.S.C.A. § 9601 et seq.

**[8] Evidence 157 ⬅➡542**

157 Evidence
157XII Opinion Evidence
157XII(C) Competency of Experts
157k542 k. Physical Facts. Most Cited Cases

Testimony of government witness was admissible in CERCLA action brought by United States and Wisconsin against paper manufacturing and coating companies, seeking injunction requiring companies to comply with most recent order of Environmental Protection Agency (EPA) concerning remediation of polychlorinated biphenyls (PCB) they discharged into Lower Fox River between 1954 and early 1970s; witness was expert in general area of expertise in which sediment trend analysis (STA) was used, namely geology, she was familiar with use of STA from previous experience and understood each step of process, as well as computer software. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 101 et seq., 42 U.S.C.A. § 9601 et seq.

Christian R. Larsen, Gregory J. Haanstad, Susan M. Knepel, United States Department of Justice, Milwaukee, WI, Cynthia R. Hirsch, Wisconsin Department of Justice, Madison, WI, Randall M. Stone, Iva Ziza, Jeffrey A. Spector, Joshua M. Levin, Kristin Michelle Furrie, Matthew R. Oakes, Maya S. Abela, Sean K. Carman, Sumona N. Majumdar, Kristin Michelle Furrie, United States Department of Justice, Washington, DC, for Plaintiffs.

Eric W. Ha, Evan B. Westerfield, Kathleen L. Roach, Margaret R. Sobota, Sidley Austin LLP, Mary Rose Alexander, Latham & Watkins LLP, Chicago, IL, Bradley M. Marten, Linda R. Larson, Meline G. MacCurdy, Mar-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
(Cite as: 2013 WL 1858597 (E.D.Wis.))

ten Law PLLC, Seattle, WA, <u>Darin P. McAtee</u>, <u>Evan R. Chesler</u>, <u>Omid H. Nasab</u>, <u>Sandra C. Goldstein</u>, <u>Vanessa A. Lavely</u>, Cravath Swaine & Moore LLP, New York, NY, <u>Charles Fried</u>, Cambridge, MA, <u>David R. Erickson</u>, Shook Hardy & Bacon LLP, Kansas City, MO, <u>Dennis P. Birke</u>, <u>Megan A. Senatori</u>, <u>Ronald R. Ragatz</u>, Dewitt Ross & Stevens SC, <u>Margaret I. Hoefer</u>, <u>Paul G. Kent</u>, <u>Richard C. Yde</u>, <u>Ted Waskowski</u>, Stafford Rosenbaum LLP, <u>Sarah A. Slack</u>, Foley & Lardner LLP, Madison, WI, <u>Gregory A. Krauss</u>, Davidson Berquist Jackson & Gowdey LLP, Arlington, VA, <u>Heidi D. Melzer</u>, Melzer Law LLC, Green Bay, WI, <u>James P. Walsh</u>, Appleton City Attorney, Appleton, WI, <u>Anne E. Lynch</u>, Hunsucker Goodstein PC, Kristin Michelle Furrie, United States Department of Justice, Washington, DC, <u>Allison E. McAdam</u>, <u>David A. Rabbino</u>, <u>Marc A. Shapp</u>, <u>Philip C. Hunsucker</u>, Hunsucker Goodstein PC, Lafayette, CA, <u>Kelly J. Noyes</u>, <u>Michael P. Carlton</u>, <u>Susan E. Lovern</u>, <u>Thomas Armstrong</u>, Von Briesen & Roper SC, <u>Linda E. Benfield</u>, <u>Paul Bargren</u>, Foley & Lardner LLP, <u>Elizabeth K. Miles</u>, <u>Kevin J. Lyons</u>, <u>Tara M. Mathison</u>, <u>William J. Mulligan</u>, Davis & Kuelthau SC, Milwaukee, WI, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS' FIFTH CLAIM FOR RELIEF

<u>WILLIAM C. GRIESBACH</u>, Chief Judge.

### I. Introduction

**\*1** This is an action brought by the United States and the State of Wisconsin under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), <u>42 U.S.C. § 9601 et seq.</u>, seeking, among other relief, an injunction requiring the defendant paper manufacturing and coating companies to comply with the most recent order of the United States Environmental Protection Agency (EPA) concerning the remediation of polychlorinated biphenyls (PCBs) that they discharged into the Lower Fox River between 1954 and continuing into the early 1970s. On April 27, 2012, <u>2012 WL 1490200</u>, this Court issued a preliminary injunction requiring Defendant NCR Corporation to comply with a Unilateral Administrative Order ("UAO") issued by the Environmental Protection Agency (EPA) in 2007. That

decision was affirmed by the Seventh Circuit United States Court of Appeals in August 2012. The United States and the State of Wisconsin then sought to make the injunction permanent, and to have it deemed enforceable against the other defendants as well. To that effect, in December 2012 the defendants appeared for an eleven-day trial to the Court on the fifth claim for relief presented in the Plaintiffs' amended complaint. In that claim, the Plaintiffs sought a judicial determination that the defendants—NCR and other paper companies situated in Little Lake Butte des Morts and along the Lower Fox River—must comply with the 2007 UAO and continue cleaning up the Lower Fox River, particularly the stretch between De Pere and Green Bay, a portion of the river designated Operable Unit 4, or just OU4. In large part, the trial and its related pre- and post-trial motion practice were a comprehensive effort designed to allow this Court to determine whether the *preliminary* determinations it had made in its April 27, 2012 ruling should be made permanent.

Prior to trial, the court granted summary judgment affirming the propriety of the clean-up remedy, holding that the Administrative Record compiled by the EPA and the Wisconsin Department of Natural Resources demonstrates that the selected remedy is not arbitrary and capricious or otherwise contrary to law. Based on that ruling, along with the stipulations of several parties, the liability of all of the recipients of the UAO, with the exception of Appleton Papers Inc., which had been previously dismissed from the case, was established. The central issue that remained for trial was whether the financial responsibility for the clean-up of the downstream sections of the river was a joint and several obligation of the upstream defendant dischargers or merely several. In other words, the key issue was whether the general public, represented by the Plaintiffs, was entitled to a ruling requiring each of the defendants to comply with the UAO, leaving those defendants free to seek further resolution among themselves of any disputes they may have over what share of the clean-up costs each should bear.

Section 107(a) of CERCLA imposes strict liability for contamination upon the owner of any facility that dis-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
(Cite as: 2013 WL 1858597 (E.D.Wis.))

charges hazardous substances into the environment. 42 U.S.C. § 9607(a). But what is the rule where the owners of two or more facilities discharge hazardous substances into a body of water such as a river? Federal courts have consistently interpreted section 107(a) to impose joint and several liability on responsible parties unless they can show that a reasonable basis for apportionment of the harm exists. *Burlington N. & Santa Fe Ry. Co. v. United States,* 556 U.S. 599, 613–15, 129 S.Ct. 1870, 173 L.Ed.2d 812 (2009). This rule is consistent with the RESTATEMENT OF THE LAW OF TORTS: "Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor." RESTATEMENT (SECOND) OF TORTS, § 433B(2). The reason for the rule placing the burden of proof as to apportionment on the defendants is to avoid the injustice of allowing multiple defendants who have combined to cause the plaintiff harm to further burden the plaintiff by requiring that he or she present such evidence or, even worse, allow the defendants to escape liability where the nature of the harm makes apportionment difficult or impossible. "As between the proved tortfeasor who has clearly caused some harm, and the entirely innocent plaintiff, any hardship due to lack of evidence as to the extent of the harm caused should fall upon the former." *Id.,* cmt. d.

*2 Further, while it would be unjust to hold a defendant liable for the entire harm sustained by the plaintiff when such defendant caused only a portion of it, the same is not the case when the defendant's own conduct, either by itself or combined with others, was a cause of all or substantially all of the harm. In the latter case, the plaintiff can look to such a defendant for the entirety of the loss and leave it that defendant to seek equitable contribution from other parties who may be liable. This is what is meant by joint and several liability: "Each of two or more persons whose tortious conduct is a legal cause of a single and indivisible harm to the injured party is subject to liability to the injured party for the entire harm."

RESTATEMENT (SECOND) OF TORTS, § 875.

These are the principles of law that underlie the instant dispute. In many cases, the question of whether a party's liability for harm is both joint and several or merely several is almost entirely academic. This is because it will often make little difference whether the liability of multiple responsible parties is apportioned in the trial of the plaintiff's claim against the defendants or in the trial of a separate claim for contribution among the several responsible parties. As long as all of the defendants who share responsibility for the harm are solvent and share the same level of culpability, they are assured it will all be sorted out in the end. Where either condition is absent, however, a finding of joint and several liability can dramatically increase a responsible party's ultimate liability.

[1] If, for example, one or more of the parties responsible for the pollution of a river was insolvent, the remaining parties, assuming their liability is joint and several, would be liable for the entire clean-up even though they had no chance of recovering in contribution from the other responsible party or parties. This result rests on the view that an innocent plaintiff should not suffer the wrong caused by an insolvent wrongdoer when another wrongdoer is also liable. *Matthies v. Positive Safety Mfg. Co.,* 2001 WI 82, ¶ 11, 244 Wis.2d 720, 628 N.W.2d 842. The rule holding responsible parties jointly and severally liable, where appropriate, is therefore an important tool in furthering CERCLA's policy of promoting the timely clean-up of hazardous waste sites and ensuring that the costs of such cleanup efforts are borne by those responsible for the contamination. *Burlington,* 556 U.S. at 602, 129 S.Ct. 1870.

Whether or not responsible parties are jointly and severally liable also takes on greater significance when the level of culpability of those responsible for the harm differs. Again, the RESTATEMENT provides guidance: "There is no right of contribution in favor of any tortfeasor who has intentionally caused the harm." RESTATEMENT (SECOND) OF TORTS, § 886A(3).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
(Cite as: 2013 WL 1858597 (E.D.Wis.))

Although the rule speaks of harm that is intentionally caused, the comments to this section make clear that the rule has been applied to reckless, wilful or wanton conduct as well. *Id.*, cmt. k; *see also Browning–Ferris Industries of Illinois, Inc. v. Ter Maat,* 195 F.3d 953, 959 (7th Cir.1999) (noting that "polluters differ in the blameworthiness of the decisions or omissions that led to the pollution, and blameworthiness is relevant to an equitable allocation of joint costs," while acknowledging that "it would not entitle the judge to make one polluter pay for separable costs wholly imposed by other polluters"). This factor is what makes the issue of joint and several liability key in this case.

**\*3** In 2008 NCR, along with Appleton Papers Inc., brought a lawsuit for contribution against the other Potentially Responsible Parties (PRPs) in this action. In a 2009 decision, however, the court ruled that equitable principles (which apply in contribution cases but not in divisibility/apportionment cases) precluded NCR from receiving contribution from the other PRPs and required that the other PRPs receive contribution from NCR for the money they had paid. Specifically, the court concluded that NCR either knew or should have known that PCBs were environmentally toxic, but instead of halting sales of its PCB-laden product it actually increased production to record levels. In the court's view, NCR brought about the PCB problem and failed to mitigate its extent when it had the chance, and therefore should bear the cost of the cleanup rather than having it shared by parties who had no idea they were using dangerous toxins in their manufacturing process. *Appleton Papers Inc. v. George A. Whiting Paper Co.,* No. 08–C–0016, 2009 WL 5064049 (E.D.Wis. Dec. 16, 2009).

The fact that NCR has been held barred under equitable principles from obtaining contribution from other contributors to the PCB contamination distinguishes this case from most other CERCLA actions. If that ruling stands, NCR would be responsible for paying the entirety of the estimated $700 million remediation costs for OU2 through OU5. But if NCR can show that the harm is divisible, it will no longer be considered jointly and sever-

ally liable for the harm but only severally liable for its portion of the harm, which NCR argues is at most 20%. The distinction between joint liability and merely several liability thus has major implications for NCR and for the other defendants.

A finding of joint liability also has serious implications for the government's enforcement efforts. First, a finding of joint liability would allow the government to pursue any of the jointly liable PRPs for funding of the cleanup effort. Second, NCR has already paid substantially more for the cleanup in OU4 than the 20% or less it believes is its divisible share. Thus, if NCR succeeds in proving its divisibility defense, the government can no longer require NCR to keep funding the remediation.

This, then, is the underlying context in which the dispute between the parties arises. Having considered the evidence presented and the arguments of counsel, the court now concludes that NCR and the upstream defendants have failed to prove that the harm at issue is divisible for purposes of determining liability under CERCLA. This is not to say that the costs of the clean-up cannot be reasonably apportioned among the responsible parties. Clean-up costs in CERCLA actions can always be apportioned among the responsible parties; that is the whole point of section 113(f), which explicitly authorizes a court to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). If the costs of clean-up were not reasonably divisible in some fashion, it would make little sense to allow for contribution. Rather, as explained below, it is the upstream defendants' failure to demonstrate how the downstream harm can be reasonably apportioned among the multiple causes of that harm that makes their liability joint and several. More specifically, neither NCR, nor any of the other responsible parties have proved that each individually was not either a sufficient or necessary cause of the harm at issue. Accordingly, the relief requested in the fifth claim in the plaintiffs' amended complaint will be granted.

**II. Background**

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
(Cite as: 2013 WL 1858597 (E.D.Wis.))

**A. The PCB Problem**

*4 Between 1954 and 1971 the NCR Corporation sold a product called carbonless copy paper, which proved to be a useful product having a wide array of commercial applications. A key component of that paper was an emulsion containing Aroclor 1242, a type of PCB manufactured by the Monsanto Company. PCBs have subsequently been shown to cause serious health problems in humans. Throughout this period, NCR sold its emulsion to a company called Appleton Coated Paper Company ("ACPC"), which coated paper with the emulsion to produce the carbonless copy paper. NCR then sold that coated paper on the commercial market.

The process of coating paper with NCR's emulsion resulted in releases of emulsion into the Lower Fox River from ACPC. As discussed in more detail below, estimates of ACPC's releases of emulsion into the river were between roughly 10 and 40% of the total PCB releases to the river. In 1970 NCR purchased Appleton Coated Paper Company, and as a result NCR is liable for the discharges made by ACPC. The fact that NCR happened to be the source of the PCBs in the first place does not impact its liability, although (as the court held in the parallel case and as discussed in Part II below) it has major implications if equitable considerations rule the day.

Most of the remainder of the PCB pollution in the Lower Fox River arises out of the recycling, rather than the production, of carbonless copy paper. Many paper mills take in bales of used paper (called post-consumer waste paper), mix the paper into a watery slurry, and then recover the paper fibers for use in producing new paper. Discharges from this process represented a relatively small 4 to 12 % of PCBs discharged into the river, according to 1998 government estimates. (Ex. 2127 at NCR–FOX 438509.) The rest of the PCB discharges (the majority of the total) resulted from several mills' use of the "broke" and trim from ACPC's coating process. Broke is an industry term denoting the unusable paper scraps that are produced during the manufacture of coated paper. In these ways, many paper mills along the river unwittingly took in large quantities of contaminated paper products

for re-use in their own paper. The papermaking process is water-intensive, and these mills ultimately released significant quantities of PCBs from recycled NCR paper into the river, either directly or through publicly owned treatment works ("POTW"). (After a previous trial in the parallel case, the court determined that ACPC had not "arranged" for the disposal of its broke, and thus NCR is not liable on the basis of its sales of broke to other paper companies. Instead, its liability results from the discharges ACPC itself made during the production of NCR paper.) In sum, there were three principal ways that PCBs were released into the River: (1) ACPC released emulsion containing PCBs during the production of NCR paper; (2) some mills recycled post-consumer waste paper that had small quantities of NCR paper in it; and (3) some mills directly recycled NCR "broke," which contained NCR's emulsion.

**B. PCBs and the Lower Fox River**

*5 When PCBs are discharged into a waterway, they tend not to dissolve. Instead, because PCBs are "hydrophobic" substances, they adsorb (attach) to sediments in the river and then either deposit in the riverbed or flow through the river into Green Bay. This affinity for solids (particularly finer solids, which have relatively more surface area than larger solids) is the primary reason that many PCBs have deposited in substantial quantities in the river bottom. The depositing of PCBs in the riverbed is thus dependent not only on the quantity (mass) of PCBs released but also on the amount and kind of sediment available to which the PCBs can adsorb and then deposit.

The Lower Fox River stretches some 39 miles from Lake Winnebago to the mouth of Green Bay. For remedial purposes it has been administratively divided into five "operable units," called OUs: OU1 is Little Lake Butte des Morts; OU2 is the stretch from Appleton to Little Rapids; OU3 is Little Rapids to De Pere; OU4 is De Pere to Green Bay; and OU5 is Green Bay itself. OU1 has already been cleaned up (at a cost of nearly $100 million), and most parts of OU2, OU3 and OU5 are being monitored rather than remediated because levels of contamination are relatively low. At trial the key issue was the on-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
(Cite as: 2013 WL 1858597 (E.D.Wis.))

going cleanup effort in OU4, which is the most complex and expensive cleanup site in the whole project, with estimates suggesting it could cost on the order of $700 million to remediate.[FN1]

Much of the complexity of this case is due to the fact that there were a number of companies discharging PCBs from different locations along the river. For example, the PCBs from dischargers far upstream in OU1 deposited themselves in different quantities and concentrations all along the river's entire 39–mile stretch, with a large but unknown quantity not depositing at all and making their way out into the Bay. Even without knowing anything about hydrodynamics or bathymetry (the study of underwater geography), one can envision the difficulty in tracing PCB concentrations in OU4 to the various dischargers, some of which are more than thirty miles upstream.

Each discharge site has its own idiosyncratic characteristics, which adds still further to the difficulty in tracing PCBs. OU1, OU2 and OU3 are faster moving sections of river that, according to one expert, have a "trapping efficiency" of between 0.2(OU2) and 7 % (OU1). (Tr. 2183–84.) This means that PCBs discharged into those faster-moving sections do not settle as readily as they do in OU4, which is a slower and deeper stretch of river. And PCBs that do settle in these areas are subject to "scouring," which is the process of being swept up by currents after settling. These PCBs are then resuspended in the water column and then they either redeposit or travel farther downstream. Thus, in order to settle to the river bottom in significant quantities, PCBs need a sufficient quantity of solids to attach to, and they need a hospitable environment for settling as well. This partially explains why the slower-moving OU4, parts of which were described as a "sediment trap," contains the largest amounts and concentrations of settled PCBs.

*6 The varying speeds of the river are explained in large part by the river's elevation changes. Lake Winnebago and the Appleton stretches of the Lower Fox River are nearly 750 feet above sea level, whereas Green Bay and OU4 are less than 600 feet above sea level. This drop in elevation is roughly equivalent to that of Niagara Falls, and much of the elevation change occurs in a small section of the river in OU2. Thus, as discussed at some length below, sediment containing PCBs has a general tendency to flow downriver rather than settle. Exhibit 9962 demonstrates the drop in elevation:

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
**(Cite as: 2013 WL 1858597 (E.D.Wis.))**



A further feature aiding the downstream movement of PCBs is the design of its nine federally-operated dams. These dams all contain what are known as Tainter gates (named for their inventor, Jeremiah Burnham Tainter, who designed the first such gate at a dam in Menominee, Wisconsin). For our purposes, the salient design feature of Tainter gates is the fact that they open from the bottom, rather than letting water spill over from the top. (Tr. 2307:12–14.) This means that sediments that accumulate at the base of a dam are allowed to sluice through the bottom rather than build up behind the dam. (Tr. 2307:18–21.)

A final characteristic of OU4 is the presence of a shipping channel that was dredged periodically by the Army Corps of Engineers. The dredging process removed layers of sediment and moved the sediment to the sides of the channel, thus redistributing the PCBs that had already settled. In addition, the increased depth of the dredged channel, combined with the slower current, made the channel area a sediment trap, an area highly conducive to the deposition of solids and the PCBs that had attached to them. Thus, large masses of PCBs that had arrived from upstream sources ended up settling in the dredged channel of OU4 and then being dispersed by dredging.

The map below shows the length of OU4, from the De Pere dam in the upper left to the mouth of Green Bay in the inset on the bottom. The areas that are subject to dredging are shown in green (the majority of this dredging has already been done in upper OU4), as well as high-concentration areas in red. (Ex. 5003, 5004.)

<- Image not available via Offline Print ->

In sum, several features of OU4 render it a far more depositional area than the other sections of the river. Its lower elevation, greater depth and slower currents made it a hospitable place for PCBs to settle, and the dredging

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
**(Cite as: 2013 WL 1858597 (E.D.Wis.))**

channel added to that effect. On top of that, the swift current of other sections of the river, as well as the dams' Tainter gates, all aided the process of PCBs flowing downstream and settling in OU4.

### C. The Defendant Facilities

As noted above, the paper companies that discharged PCBs into the river were not consolidated in a single area. Instead, they lined the river from its source in OU1 (Little Lake Butte des Morts) all the way to OU4. The environmental harm in OU4 was caused primarily by three major dischargers: P.H. Glatfelter, located in OU1; NCR, in OU2; and Georgia–Pacific, in lower OU4. What follows is a thumbnail sketch of each PRP and its location along the river.

#### 1. Bergstrom Mill (P.H. Glatfelter)

*7 The Bergstrom mill, now owned by P.H. Glatfelter, lies at the upstream end of OU1, some 39 miles from the mouth of Green Bay. The Bergstrom mill took in large quantities of NCR broke to recycle for use in its paper. As with the other recycling mills, it released significant amounts of PCBs into the river when it discharged its effluent. Initial government estimates suggested that Glatfelter's mill was responsible for some 16 to 27% of PCBs released into the river. (Ex. 2127 at NCR–FOX 438509; Ex. 7257, Table 4.) [FN2]

#### 2. Wisconsin Tissue Mills (WTM I Company)

Wisconsin Tissue Mills is also an OU1 Defendant. During the production period (1954–71), it discharged directly to the Lower Fox River only sporadically during sewer bypass events. After 1976, it discharged its wastewater through its own treatment plant. Its liability arises from the fact that during the PCB era it took in significant (but relatively smaller) quantities of NCR broke and then discharged effluent to the river through the Neenah–Menasha publicly owned treatment works.

#### 3. Menasha Corporation

Menasha Corporation owned the John Strange Paper Mill in Menasha, Wisconsin, until 1983. Unlike many of the other mills, the John Strange facility was not a de-inking mill, meaning that it did not remove the inks from paper it recycled. The John Strange facilities recycled little or no NCR broke directly, but it did recycle post-consumer waste paper, called mixed paper. It used this paper to manufacture paperboard products such as boxes and cardboard tubes rather than traditional office paper. Mixed paper, as the name implies, included all sorts of office paper, including NCR paper in quantities that are disputed. Because mixed paper includes only a small but unknown amount of NCR paper, the presence of PCBs in post-consumer mixed paper is believed to be significantly lower than the levels found in NCR broke.

#### 4. CBC Coating

CBC Coating, Inc. operated the Riverside Paper production facility in Appleton. Like Menasha, CBC was not a de-inking mill, meaning that it did not use NCR broke directly in its recycling process. Instead, it took in post-consumer wastepaper, some of which contained PCBs from NCR's paper. CBC discharged its wastewater to the City of Appleton's POTW. Its releases are not believed to be a significant source of PCBs, however.

#### 5. Appleton Coated Paper Company (NCR)

As noted earlier, Appleton Coated Paper Company, now owned by NCR, discharged PCBs differently than the other mills. Instead of discharging through the process of recycling broke, ACPC's discharges were a direct by-product of the process of coating NCR paper with the emulsion that contained PCBs. These production releases of PCBs were released to the River when small amounts of the emulsion (somewhere between 1 and 5%) were lost during production and after occasional events like spills. A preliminary government estimate suggested that ACPC's facilities were responsible for nearly 40% of PCBs released into the river. (Ex. 7257, Table 4.)

#### 6. U.S. Paper

*8 U.S. Paper Corporation operated a mill in De Pere at the bottom of the De Pere Dam, which is located at the beginning (upstream) end of OU4, also known as OU4A. Like Menasha's John Strange mill, U.S. Paper's mill was a

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
**(Cite as: 2013 WL 1858597 (E.D.Wis.))**

paperboard mill making cardboard products, including toilet paper rolls. Thus, it did not recycle NCR paper, which was white, as a significant part of its business. In about 1966, however, it began manufacturing white paper rolls using white NCR broke, but even then it used only a small portion of NCR broke in the process, as white rolls themselves constituted only a limited portion of its recycled product business.

### 7. Georgia–Pacific

Finally, the Fort Howard mill owned by Georgia–Pacific operated in the downstream portion of OU4, known as OU4B. Georgia–Pacific discharged significant quantities of PCBs into lower OU4, but unlike the other mills it has settled its liability with the governments by virtue of a consent decree. As such, although it is a significant party and one of the three major dischargers, it is not currently the subject of the governments' request for injunctive relief.[FN3]

### III. Legal Standards for Divisibility and Apportionment

[2] The Seventh Circuit has described exceptions to joint and several liability as "rare." *Metropolitan Water Reclamation Dist. of Greater Chicago v. North American Galvanizing & Coatings, Inc.,* 473 F.3d 824, 827 n. 3 (7th Cir.2007). The exception to joint and several liability arises if the defendant can demonstrate that the harm in question is capable of being divided. Historically, this so-called divisibility defense had not been well-received, but in 2009 the Supreme Court issued its decision in *Burlington N. & Santa Fe Ry. Co. v. United States,* which NCR argues revived the defense. To demonstrate that the harm is divisible, a defendant bears the burden of showing two things. First, it must prove that the harm is theoretically capable of being divided. This is a question of law that depends largely on the RESTATEMENT (SECOND) OF TORTS. *United States v. NCR,* 688 F.3d 833, 838 (7th Cir.2012). Citing the RESTATEMENT, both the Supreme Court and Seventh Circuit framed the analysis this way:

[W]hen two or more persons acting independently caus[e] a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused. Restatement (Second) of Torts, §§ 443A, 881 (1976); Prosser, Law of Torts, pp. 313–14 (4th ed. 1971).... But where two or more persons cause a single and indivisible harm, each is subject to liability for the entire harm. Restatement (Second) of Torts, § 875; Prosser, at 315–17.

*Id.* (citing *Burlington Northern,* 556 U.S. at 614, 129 S.Ct. 1870) (ellipses in original).

Although a question of law, the analysis relies on policy and facts; at its essence it asks whether one polluter should be considered such a significant cause of the harm that the harm attributable to that cause is incapable of being divided, or whether the parties' contribution to the harm is so impossible to trace that the harm is indivisible. If a court concludes that the harm *is* theoretically capable of being divided, the second question is whether a reasonable factual basis for an apportionment exists. *Id.*

*9 The *Burlington Northern* case, which addressed only this second question, has already been discussed at length in numerous previous iterations of this action and its companion contribution action. It is clear that *Burlington* lowered the bar for defendants in the sense that they need only show "rough" calculations of apportionment in order to clear the second hurdle, i.e., in demonstrating a reasonable basis for apportionment. *United States v. NCR,* 688 F.3d at 842. For example, in *Burlington Northern* the district court conceded that its apportionment could have been off by as much as 50%, but the fact that the court included an uncertainty factor of 50% in its calculations allowed the Supreme Court to uphold it. Yet, even though it is undeniable that *Burlington Northern* loosened the rules governing *how* a given harm might be apportioned, it did not address the key issue here, which is *whether* the harm is theoretically divisible in the first place.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
**(Cite as: 2013 WL 1858597 (E.D.Wis.))**

In this case we are guided not only by _Burlington Northern_ but by the Seventh Circuit's consideration of this court's grant of preliminary relief to the government in 2012. The Seventh Circuit affirmed by concluding, on the sparse record then before it, that NCR's discharges were a sufficient cause of the environmental harm in OU4. The Court began by noting that apportionment is improper "where either cause would have been sufficient in itself to bring about the result, as in the case of merging fires which burn a building." 688 F.3d at 839 (citing Rest. (2d) Torts § 434, cmt. i). It then found it dispositive that NCR had not refuted "the government's contention that NCR's contributions of PCB would, alone, require approximately the same remedial measures." 688 F.3d at 839. Although there was some evidence that dredging costs would be lower if there were fewer PCBs, the Court found that point to be poorly developed. Instead, it found that although the "details" of the cleanup might vary if NCR had been the only discharger, there was not enough of a difference to suggest that the harm was divisible. _Id._ at 840. Thus, because NCR's discharges would, on their own, require roughly the same remedial measures that are now being undertaken, it could be deemed a sufficient cause of the harm. And because it would have essentially caused almost all of the harm just on its own, as a legal and policy matter it made sense to conclude that NCR should be deemed jointly and severally liable for the OU4 harm. In addition, the Seventh Circuit observed that some kinds of harm are simply unsuitable for divisibility by their very nature. For example, divisibility may be improper when "a chemical is harmful when it surpasses a certain amount" or when "a chemical may not be very harmful but becomes so when mixed with other chemicals." _Id._ at 841.

## IV. Using NCR's Approach, the Harm in OU4 is Not Theoretically Capable of Being Divided

The first question is whether the harm in OU4 is theoretically capable of being divided. In its decision preliminarily answering that question "no," the Seventh Circuit appeared most persuaded by the fact that NCR had not meaningfully disputed the government's claim that the cleanup in the river would be similar or identical even if NCR had been the only contributor of PCBs to the Site. 688 F.3d at 839. In other words, at the preliminary injunction stage, it appeared that NCR's PCB discharges would have been sufficient, _on their own,_ to require approximately the same remedial measures that are now being undertaken. As such, dividing the harm on the basis of each party's degree of contribution to the harm would be inappropriate.

### A. NCR's Divisibility Argument

*10 NCR marshaled substantial resources in its attempt to demonstrate the falsity of the premise that had proven dispositive during the preliminary injunction stage. In an effort to "refute the government's contention that NCR's contributions of PCB would, alone, require approximately the same remedial measures," _id.,_ NCR's expert, John Butler, used a "stand-alone" cost method to demonstrate the remedial measures and costs that would be required by each PRP's relative PCB pollution. Relying on estimates of the parties' PCB discharges, Butler concluded that the remediation effort would be substantially more modest if NCR had been the only discharger. As such, NCR could not be considered a sufficient cause of the harm in OU4.

Butler's analysis depended on the work of other experts, however. First, James Braithwaite analyzed the most fundamental question facing the PRPs, namely, how many pounds of PCBs each party discharged. Using that data, Dr. Craig Jones built a model that attempted to demonstrate how PCBs moved within the river and where they ended up. Philip Simon assessed the costs that would be required based on the discharges of each PRP, and then Mr. Butler tied everything together by explaining how, in his view, the remedy would be much more modest had NCR been the only discharger. Before addressing Mr. Butler's analysis, the court must describe the data and models that formed the basis of his opinions.

### 1. James Braithwaite

Mr. Braithwaite is an environmental engineer with more than 40 years of experience in hazardous waste management and remediation of hazardous waste sites.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
**(Cite as: 2013 WL 1858597 (E.D.Wis.))**

(Tr. 691–92.) As noted above, Braithwaite's principal role was to estimate how many PCBs each PRP discharged into the river. Naturally it is a difficult task to determine PCB discharges from numerous parties, given that most of the discharges occurred in the 1960s. Braithwaite thus relied heavily on a 2000 report drafted by a consulting firm called Amendola Engineering on behalf of the United States Fish and Wildlife Service. (Tr. 695.) In addition to the Amendola Report, which itself relied partly on an earlier study by the Wisconsin DNR known as Tech Memo 2d (Ex. 2127), Braithwaite spent some three years investigating matters on his own—reviewing documents, conducting interviews, and the like.

Mr. Braithwaite did not simply adopt all of the Amendola Report's figures, however. In fact, he altered many of them. With respect to Appleton Coated Paper Company (ACPC)—NCR's predecessor and the source of NCR's liability in this action—Braithwaite downwardly adjusted the Amendola PCB discharge calculations. The discharge estimates rely on a key figure that the parties have heavily disputed: the emulsion loss rate. Although the NCR-produced emulsion was valuable and efforts were made to save as much of it as possible, some of the emulsion was inevitably "lost" during ACPC's paper-coating process and was flushed into the sewer and eventually into the river.

*11 Case 2 of the Amendola Report, which represented a middle range of many variables, had assumed an emulsion loss rate of 2.5%. This, along with other assumptions, produced an estimate for NCR's discharges at about 313,000 pounds, or roughly 40% of the total amount released to the river. (ECF No. 90, Ex. 1 at 12 (Case 2)). Braithwaite, however, concluded that the proper loss rate should be a mere 1.0% rather than 2.5%. Braithwaite relied in part on the interviews and testimony from ACPC employees who stated that they treated the emulsion like "gold" because its high cost made up some 60% of the entire cost of making carbonless copy paper. (Tr. 703:6.) Employees had several mechanisms for conserving the emulsion, including weighing the emulsion more than once and capturing as much of it as possible.

(Tr. 703–704.) They monitored emulsion use with weekly reports and used every conceivable measure to conserve it.

This information (which was not accounted for in the Amendola Report) was corroborated in Braithwaite's view by other information suggesting that the loss rate was even lower than 1%. For example, a contemporary document hand-written by the late Thomas Busch, of ACPC, suggested that the loss rate could have been as low as 0.22%. (Ex. 4223.) Busch, who would later become president of ACPC, entitled the document "Potential Aroclor to Appleton Sewer in 1954 to 1969." (Recall that Aroclor was the trade name of the type of PCBs involved here.) Braithwaite testified that, based on the figures within the document as well as its title, his understanding was that the document was intended to estimate how many PCBs were discharged by ACPC during the relevant period. Although the document did not contain a loss rate, Braithwaite was able to calculate one (0.22%) using the numbers Busch provided. Braithwaite believed that although the document was hand-written, its level of detail and facts rendered it reliable and not a rough, "back-of-the-envelope" type of effort. In addition, he also relied upon another contemporary document prepared by Mr. Busch. (Ex. 4221.) Using a number of calculations and estimates he described as conservative, Braithwaite arrived at an emulsion loss rate of about 0.9% after interpreting the figures from the Busch report, which was a formal, typed business report. Rounding up and using an emulsion loss rate of 1.0% (which he asserted was conservative), Braithwaite calculated that ACPC and the Combined Locks mill were responsible for discharging some 68,000 pounds of PCBs into the river, or only about 10.74% of the total. (Tr. 728.)

Mr. Braithwaite also disagreed with the Amendola Report's conclusions about PCB discharges from non-deinking mills, namely Menasha (the John Strange mill) and U.S. Paper (De Pere mill). The Amendola report had assumed that these mills, which made paperboard products rather than white paper, would not be able to recycle much carbonless copy paper ("CCP") because color from

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
**(Cite as: 2013 WL 1858597 (E.D.Wis.))**

the paper would show up in the final product, a fact that would be unacceptable in the industry. Braithwaite, however, concluded that these mills *had* recycled significant quantities of NCR's carbonless copy paper, both as broke from ACPC and from the recycling of post-consumer mixed paper, which had small amounts of CCP in it. Relying on the testimony of mill employees, Braithwaite testified that these mills could, in fact, have used CCP without color problems. He further found that if mixed paper constituted between 16% and 30% of their recyclable stock, and if CCP constituted 1% of incoming mixed paper (a conservative estimate), then the John Strange mill discharged some 13% of all of the PCBs into the river while U.S. Paper discharged some 3%.

*\*12 Braithwaite's estimates of discharge percentages for all of the PRPs are as follows:

| | |
|---|---|
| NCR (ACPC and Combined Locks): | 10.74% |
| Glatfelter: | 20.14% |
| Menasha (John Strange mill): | 13.34% |
| WTM I: | 4.40% |
| CBC Coating (Riverside Paper): | 1.26% |
| U.S. Paper (De Pere): | 3.19% |
| Georgia–Pacific: | 46.93% |

(Ex. 5044.)

**2. Dr. Craig Jones**

Mr. Braithwaite's discharge estimates are simply estimates of the amount of PCBs each PRP discharged. As such, they do not explain how, or whether, or to what extent, the discharged PCBs actually made their way into sediment at the bottom of OU4. That is where Dr. Jones comes in. Dr. Jones, an environmental engineer, has been working on hydrodynamic modeling for eighteen years. (Tr. 1091.) Using the estimates provided by Mr. Braithwaite, Dr. Jones input that data into a fate-and-transport model designed to simulate the movements of sediment and PCB transport in the river. Key to the model was the use of EFDC software ("Environmental Fluid Dynamics Code"), which was described as the state-of-the-art model for applications such as this. (Tr. 1108:17.) In addition to the discharge estimates from Braithwaite, Jones used other data, such as information about water levels and wind, as inputs. The model also incorporated variables, or parameters, that account for water movement, as well as the transport of sediments and PCBs.

(Ex. 5114.) To take just a single example, one parameter is what's called shear stress, a measurement of how much friction the water current exerts on the river bottom. As the stress level increases (in faster currents), more sediment is disturbed and resuspended in the water column. (Tr. 1110–11.) Thus, the model attempts to account for areas of the river where resuspension occurs due to scouring effects as well as those areas where sediments are more likely to deposit permanently. With these inputs and parameters, including bathymetry data (the topography of the river bottom), Jones divided up the Site into roughly 8,000 grid cells and was able to simulate water and sediment movement, as well as PCB deposition, within those individual cells. (Tr. 1120.)

Dr. Jones testified that he was able to calibrate the hydrodynamics of the model and was able to validate it using actual data from the river. He testified, for example, that the sediment transport model was able to show accurate deposition rates throughout a number of sediment sample cores that were taken. (Tr. 1137–40; Ex. 5123.) Jones also testified that the model accurately predicted PCB contamination as well. In other words, he showed

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
**(Cite as: 2013 WL 1858597 (E.D.Wis.))**

that the model's predictions of PCB contamination roughly matched up with actual core samples taken from the river. (Ex. 5124.) Finally, Dr. Jones testified that the model results passed a sensitivity analysis, meaning that even if the variables and inputs were altered dramatically, the relative contributions of the PCB dischargers did not change dramatically. (Ex. 5162.) This allows increased confidence in the model because it demonstrates that the results are not due to any idiosyncracies that might exist in the model's inputs or parameters.

**3. Philip Simon**

*13 Philip Simon's role was to take the conclusions arrived at by Dr. Jones and Mr. Braithwaite and link those with actual remediation costs within OU4. Simon divided OU4 into 73 "apportionment polygons," (Ex. 5067) which were areas of relatively similar characteristics, and using cost data and the PCB fate and transport information from Dr. Jones, he was able to calculate each party's share of the remediation cost in each polygon. For example, Simon was able to determine that polygon 4–31, would cost roughly $6.3 million to remediate. Of that amount, he determined that Georgia–Pacific owed the lion's share, or 76%, while NCR owed 5% and Glatfelter owed 10%. (Ex. 5068.) Aggregating all this information from the 73 different polygons, Simon concluded that NCR's share of the cost to remediate the harm in OU4 was only about 15%.[FN4]

**4. John Butler**

John Butler, a chemist and former EPA employee with 35 years of experience analyzing environmental economic issues, reached his conclusions by using estimates from Dr. Connolly and the experts described above. The other experts in effect painted a picture of what OU4 would look like if NCR had been the only discharger of PCBs. Based on that picture, Butler then applied the remedy criteria used by the government to determine what kind of remedy OU4 would require if NCR had been the only polluter. One of the key remedial rules is the 1.0 ppm threshold that separates areas that need to be remediated from those that do not. Applying this and other of the government's remediation rules, Butler went about deter-

mining which remedial actions, if any, would need to be applied to different parts of the river, which he had conceptually divided up into polygons. For instance, if a certain polygon would have a concentration lower than 1 ppm if NCR were the only discharger, he could determine that that polygon would not need to be dredged or remediated at all. In other cases, a polygon that otherwise needed to be dredged might have been a candidate for capping (a cheaper remedy) had NCR been the only polluter. Thus, Butler's analysis determines areas that would not need to be remediated at all in the NCR-only scenario, as well as areas for which different remedies could be applied. Using the estimates provided by the Simon team and Dr. Connolly, Butler concluded that the remedy in OU4 would be much less extensive and substantially cheaper.[FN5]

Butler also claimed to have reached a similar result using assumptions provided by Dr. Wolfe, Georgia–Pacific's expert. Dr. Wolfe's analysis had found that NCR had contributed some 43% of the PCBs in OU4A and 27% for OU4B, and Butler applied these figures to the data in the same way he had with the estimates given by Dr. Connolly and the Simon team. Even with these much higher estimates of NCR's PCB contribution, Butler testified that the NCR-only scenario would still require 40% less dredging than the Site currently requires—a substantial reduction. (Tr. 2783 at 25.) Thus, in NCR's view, even using the numbers of an adversarial party (Georgia–Pacific), the remedy would be 40% less if NCR had been the only discharger of PCBs. In fact, NCR claims that even the government's principal witness, Richard Fox, accepted the premise that if NCR were the only discharger, the costs of remediation would naturally be lower. (Tr. 333:22.) And during the preliminary injunction phase, the same witness had agreed that the costs involved in an NCR-only scenario would be "dramatically lower." (Tr. 334:3–8; ECF No. 365 Tr. 125:1–4.)

**B. Analysis**

*14 [3] NCR's analysis was thorough and it addressed, in a comprehensive fashion, one of the key questions that the Seventh Circuit had focused on, namely: to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
(Cite as: 2013 WL 1858597 (E.D.Wis.))

what extent can NCR (or anyone else) be considered an independent, sufficient cause of the harm in OU4? But several problems with the analysis and its underlying assumptions and data convince me that NCR has not met its burden to show the harm in OU4 is theoretically capable of divisibility.

**1. The Loose Relationship Between PCB Mass and Harm**

Before determining whether the harm is theoretically capable of divisibility, it is important to define what the "harm" is. As set forth in my previous decision granting the government's motion for a preliminary injunction (ECF No. 172), I noted that the harm could include the danger to the public, the actual volume of PCB-containing sediment at the bottom of the river, the cost to remediate (remove or cover) that sediment, or the remediation work itself. The Seventh Circuit concluded that the harm was best defined with reference to the contamination, as set forth in the government's remediation rules. As noted above, the government has established a remedial threshold of 1.0 ppm, meaning that areas containing concentrations higher than that ratio are contaminated and thus subject to remediation. Thus, if a PRP's discharges were necessary for that area to require remediation, that PRP contributed to the harm in that area. "Here ... contamination occurs whenever PCBs pass a threshold level (thereby triggering remedial requirements.)" 688 F.3d at 841.

The question, therefore, is whether a logical connection may be drawn between the amount of a given party's PCB discharges and the contamination in OU4. On its face, it would seem reasonable to conclude that if Party A discharged 1,000 pounds of PCBs into the river and Party B discharged 500, then the harm would be capable of division based on the 2:1 ratio of the parties' discharges. But the harm in this case is not so easily divided. At the preliminary injunction stage and during the trial, it was made clear that the amount of PCBs a given party had discharged bore little relation to the harm that existed in OU4. Since "harm" is defined with reference to the 1.0 ppm remedial action level, a given area of sediment will be considered contaminated harm regardless of whether it

has 1.1 ppm or 35 ppm of PCBs. Because the need to remediate that parcel exists once that 1.0 ppm threshold is reached, even a very large increase in PCB concentration does not move the needle in making that area any more harmful. Put another way, once an area qualifies as contaminated, additional PCB loads do not make that area any more contaminated, at least from a remedial perspective.

For purposes of determining the cause of the harm in OU4, what this means is that the relationship between the mass of PCBs discharged and the resulting contamination is quite loose. Suppose it were possible to trace a given discharge of PCBs from A into a given spot in OU4. If that spot had a concentration of 2.0 ppm due to A's discharges, it would not matter from a remedial perspective if B proceeded to discharge large masses of PCBs that brought that spot's concentration from 2.0 up to 30 ppm. The area would require remediation either way. Because the exact same harm would have occurred with or without B's discharges, we would consider A (as well as B) to be a sufficient cause of that harm. Throughout the Lower Fox River there are countless areas reflecting similar patterns. Because the 1.0 ppm threshold is relatively low, these areas would need remediation even if many of the PCBs had never been discharged to the river in the first place. In other words, a hypothetical reduction in PCB discharges—even by two-thirds—does not necessarily mean the remedy is reduced in any meaningful way.

**\*15** These examples merely demonstrate what might be called the binary characteristics of contamination (as we have defined it) in a river: either the river is contaminated, or it is not. Just as one cannot kill a corpse by shooting more bullets into it, one cannot change the remedy in a given area by discharging more PCBs, assuming the minimum threshold of contamination has already been reached. Mr. Butler conceded that the relationship between the mass of PCBs discharged and the harm the PCBs ultimately caused was non-linear, meaning that there is not a strong correlation between discharges and harm. His task, however, was to show that the contamination in OU4 was *not* binary, that is, that the extent of the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
(Cite as: 2013 WL 1858597 (E.D.Wis.))

harm in the river was sensitive enough to PCB loads that it would get better or worse depending on the masses of PCBs discharged into the river.

At the extremes, it is obvious that there is *some* relationship between discharge masses and harm. For example, if A discharged only an eyedropper full of PCBs into the river, surely there would not need to be a $700 million remedial action, or any remedial action at all, since such a small discharge would not produce concentrations high enough for any areas to reach the 1.0 ppm threshold. At the other extreme, suppose that A discharged 10,000,000 pounds of PCBs into the river. In that case, it is easy to imagine how the discharges of *other* parties might have had no effect at all on the contamination. If A discharged 10,000,000 pounds, the discharges of B and C would have produced no marginal increase in the harm because A's discharges had already resulted in concentrations in excess of 1.0 ppm throughout the entirety of the river. In short, the more contamination our hypothetical Party A causes, the more likely it is that A's discharges were a sufficient cause of the resulting harm.

In essence Mr. Butler was attempting to demonstrate that NCR's discharges were more like the eyedropper example and less like the 10,000,000 pound example. Based on the discharge estimates provided by Mr. Braithwaite, Butler believed that NCR's discharges were low enough that the discharges of the other PRPs made a difference to the remedy required. At the risk of repetition, it is worth exploring the mechanism of how Butler's theory would work. As discussed above, if the other parties' discharges raised the concentration in a given area from 4 to 6 ppm, then those discharges had no affect on the remedy, and NCR would be deemed the "sufficient cause" of the need to remediate that area. Butler conceded that large areas of OU4 fit that description because, in his view, even a two-thirds reduction in PCB loads would have resulted in only a 40% reduction in the remedy, meaning that there was not a 1:1 relationship between PCB masses and remedial work. So in order to show that there was *some* meaningful relationship (albeit non-linear) between NCR's PCB discharges and harm, Butler had to show that there were

large swaths of river bed where the discharges of other parties actually made a difference to the remedy. Specifically, he had to show that there were areas of the river where: (1) NCR's discharges alone produced concentrations *below* the 1.0 ppm remedial action level; and (2) the concentration actually exceeded 1.0 ppm, due either to the other parties' discharges or to a combination of their discharges with NCR's.

**\*16** Mr. Butler's testimony on these crucial points was limited and unconvincing. He testified that there would be significant reductions in both TSCA and non-TSCA dredging if NCR had been the only discharger, but his testimony was short on details and did not get to the heart of the issue identified above. The loose, non-linear relationship between PCB discharges and harm is a substantial hurdle to overcome. Given the very large discharges by NCR, the assumption is that the remedy would have been roughly the same whether the other parties discharged or not. *NCR*, 688 F.3d at 839 ("Even if all that were present in the river were NCR's contributions, the Lower Fox River would still need to be dredged and capped ...") Mathematically speaking, there is a universe of potential concentration increases that would increase the concentrations in ways that would *not* impact the remedy. For example, concentration increases from 2 to 3 ppm, 3 to 4, 6 to 9, 12 to 13, 14 to 35 or 25 to 40, etc. have no impact on the remedy because in each case the concentrations are already above 1.0 ppm. By contrast, the kinds of concentration increases that would actually make a difference to the remedy are limited to a very narrow category of areas where the concentration was *below* 1.0 in an NCR-only scenario and then rose *above* 1.0 due to the discharges of other parties. Thus, all things being equal, we would have no reason to assume that contamination in a given parcel of river bed would fall into that more narrow category; unless a good explanation is given, we would assume instead that contamination in a given area would *not* be sensitive to PCB discharges from other sources because most contamination increases fall into the immaterial category (say, from 6 to 8 ppm) rather than the narrow, threshold-crossing category that triggers remedial action (e.g., 0.8 to 1.3 ppm).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
**(Cite as: 2013 WL 1858597 (E.D.Wis.))**

NCR did not provide any convincing reason to undercut these assumptions. Knowing what we know about the non-linear relationship between mass and harm, and given the low remedial action threshold, it was incumbent on NCR to show exactly how the other PRPs' discharges would have materially increased the remedy. This would have required a detailed showing of large numbers of polygons where remedial action was actually required (because concentrations exceeded 1.0 ppm) but where NCR's contribution to the concentration was *less* than 1.0 ppm. Butler testified that that was the case, but he did not give anything approaching a detailed explanation of, for example, how many polygons fit that description. He did not suggest that most areas of the river were contaminated at a relatively low level that was close to the threshold (say, 1.2 ppm) where we might expect the contamination would actually be sensitive to discharges by other PRPs. Nor did he highlight specific areas of the river where it would be reasonable to conclude that substantial areas fall into the category of being sensitive to other PRPs' discharges. Thus, although it is likely that there are certain discrete areas in the river where the contamination might have been sensitive to additional PCB loads, it would be speculation to conclude that these areas constituted a significant part of OU4—certainly not as much as Butler suggested. Mr. Butler's analysis would likely be somewhat persuasive as a method of apportioning damages, but the RESTATEMENT requires us to divide not damages but *causation,* and his testimony on that score was limited. RESTATEMENT (SECOND) OF TORTS, § 443A. Here, the initial question is who caused the need for OU4 to be remediated, not how much each party should pay. Accordingly, even if there were not other problems in NCR's analysis (as discussed below), I would not be persuaded that NCR had met its burden to show that the remedy would be materially different even if NCR had been the only polluter.

## 2. NCR's Discharge Estimates Were Flawed

**\*17** As noted above, Mr. Butler's goal was to make NCR appear more like the eyedropper discharger than the 10,000,000 pound discharger. The importance of NCR

discharging a relatively low mass of PCBs cannot be understated. In a general sense, it is easy to imagine why NCR would want to minimize its contribution to the PCB problem and limit its apportioned share, just as any tortfeasor would want to limit its damages. But minimizing PCB discharges is crucial not only in that general damages sense but in the more fundamental *causation* sense as well. As discussed above, given the low 1.0 ppm remedial threshold, a lower discharge assumption makes it much more likely that many areas of the river would be sensitive, from a contamination perspective, to additional PCB loads from other dischargers. In other words, a low discharge assumption for NCR makes it more likely that discharges from *other* PRPs had a material impact on the remedy, which is another way of saying NCR is an insufficient cause of the harm. In short, as NCR's PCB discharge estimates rise, OU4 becomes less sensitive to additional PCB loads as more and more areas in OU4 reach the 1.0 ppm threshold based on NCR's discharges alone. Mr. Butler's causation analysis thus only works in a world where NCR discharged a relatively small amount of PCBs. Keeping the numbers low was therefore crucial to NCR's entire analysis.[FN6]

Mr. Braithwaite's discharge estimates were the foundation upon which Mr. Butler built his causation analysis, and the United States and some of the other parties concentrated their greatest efforts at undermining Braithwaite's discharge estimates. Some of the Defendants suggest that the errors inherent in Braithwaite's analysis resulted in a "garbage in, garbage out" situation rendering NCR's entire causation and apportionment framework unreliable. These criticisms are addressed below.

### a. Reliance on the Amendola Report

First, the other parties note that the bulk of Braithwaite's figures came from the 2000 Amendola Report, which was a "preliminary" report that itself acknowledged major uncertainties. In fact, according to the government, the report used the word "preliminary" no fewer than 16 times. The report employed four "cases" to demonstrate how a wide range of assumptions about PCB

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
(Cite as: 2013 WL 1858597 (E.D.Wis.))

discharges would affect the final results. (Ex. 7257 at 366445.) Braithwaite, without having any actual hands-on knowledge of the paper-coating process at ACPC, simply chose a mid-range case (Case 2) as a starting point for his estimates. The report's "key assumptions" themselves had ranges of possibilities. For example, the report used ranges of 2–5% for emulsion loss during the production of NCR paper, and changing the percentage of emulsion loss by only two percentage points (from 3% to 5%) had a major effect on PCB discharges: the estimate for NCR's discharges rose from 452,000 pounds in Case 3 to 836,000 in Case 4. (*Id.* at 366452.)

In addition, the numbers in the Amendola report changed after the 2000 report was issued. In 2001, Amendola issued an updated report altering its estimates for the PRPs. Some of the changes were marked: for example, the estimate for Georgia–Pacific's discharges was cut nearly in half. Despite these changes, Braithwaite did not use these figures. (He testified that he believed the government had refused to turn over the 2001 report. (Tr. 696:18–19.)) The government also argues that Braithwaite violated a basic rule of mass balance analysis when he upwardly adjusted the discharge estimates for Menasha and U.S. Paper but made no downward adjustment for other recyclers to balance that out. (The estimate for the total amount of recycled broke in the Fox Valley was to remain constant.)

**\*18** Although these problems with Mr. Braithwaite's analysis are not necessarily fatal to NCR's divisibility analysis, they result in (at best) an uncertain footing for the defense. It goes without saying that there simply are no hard numbers from the PCB era that can be relied upon. Thus, the fact that Braithwaite relied on estimates from the government's own reports cannot, in itself, be surprising. Even so, the failure to account for the updated Amendola estimates is puzzling, especially given the nature of the problem here. Specifically, the Amendola Report attempted to estimate the PCB discharges of *all* of the significant PRPs, which means changes to one PRP's estimates at least implicitly affect estimates for the others. Moreover, as discussed in Section VII below, Amendola

himself was not produced to testify as to his methods or the underlying data he used. Although this does not warrant the outright exclusion of Braithwaite's testimony, it certainly speaks to the weight that should be afforded his conclusions. In essence, NCR's divisibility case is based largely on estimates made thirteen years ago by someone who was not called as a witness, and the actual data that individual used were not subject to inquiry in these proceedings. It is true that the report in question was prepared on behalf of the government, and so I have assumed, like many of the parties, that its conclusions are at least within the ballpark of reasonableness. But without an assessment of how Amendola actually reached his conclusions (apart from the spare explanation given in the report itself), the foundation on which NCR built its divisibility defense is somewhat shaky.

**b. Use of 1% Emulsion Loss Rate**

A more salient and specific objection came by way of an expert, Charles Klass, an industry consultant who has worked in the paper industry since the 1950's. He persuasively testified that machines like those in use at the ACPC facility during the PCB era would produce emulsion losses of at least 2 to 3%, far higher than the 1% figure Braithwaite used. (Tr. 1935–36.) Klass had performed loss audits on more than 30 facilities using air knife coaters like the one ACPC used, and had never seen losses less than 2%. Klass also testified quite credibly that the 0.22% figure Braithwaite had calculated based on Mr. Busch's handwritten notes was essentially impossible to achieve, even with modern technology. (Tr. 1977.) At best, the most modern coating devices could get down to 0.4%. (Tr. 1977:17–18.) Klass conceded that there could be a great deal of uncertainty about the efficiency of a company's coating process several decades ago, but much of that uncertainty was on the high side. (Tr. 1985:15–16.) Mr. Klass also explained that the losses he calculated were only losses that occurred during the coating process itself; there were inevitably other losses during the rest of the process, including spills, washing out of tanks and trucks, leaking seals, and the like. (Tr. 1978:2–6.)

**\*19** Unlike Braithwaite, Klass had actual industry

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
**(Cite as: 2013 WL 1858597 (E.D.Wis.))**

experience and had been an auditor of the exact process that is at issue here. He was a believable and highly competent witness, and his estimations of loss rate should be given more weight than Braithwaite's estimates. Ultimately, using a mid-range loss rate of 2.5%, rather than 1%, means that NCR's facilities discharged a substantially greater mass of PCBs than Braithwaite believed. Instead of the 68,000 pounds he ascribed to NCR, it is far more likely that the actual number is much closer to 150,000 pounds.[FN7] Although the estimate for NCR's discharges is the most important number, I will also address Braithwaite's estimates for the other dischargers because their discharges impact the question of whether the remedy would be approximately the same if NCR had been the only discharger.

**c. Menasha Corp.**

As discussed above, Mr. Braithwaite rejected the Amendola Report's assumption that the non-deinking mills (paperboard manufacturers like Menasha and U.S. Paper) did not use NCR broke for recycling. Instead, he assumed that these mills used NCR broke in proportion to their production capacities. For example, he believed that Menasha took in some 23% of all the NCR broke ever generated—a very large quantity. The government and some of the Defendants note, however, that there was no concrete evidence that the non-deinking mills ever used broke at all. Mr. David Ruby, an industry veteran and consultant, visited the John Strange mill (Menasha's facility) and concluded that they would not have used NCR broke. (Tr. 2079.) He also credibly explained that NCR broke would have been inappropriate for use in paperboard manufacturing because it would not have produced a robust enough product to be used as a cardboard box, for example. (Tr. 2047–49.) Mr. David Austin, who worked at the mill for forty years, testified that during the 1960's he was responsible for buying paper stock for use at the mill. (Tr. 1524.) He testified credibly that 75 to 80 percent of paper stock came from old corrugated containers, with the remainder being newspapers, mixed paper and craft cuttings. (Tr. 1527.) Mr. Roger Ackerman, an ex-Marine who became a purchasing agent for Menasha in the 1970's, echoed Austin's testimony and noted that

white paper, such as NCR's, was more expensive and was not suitable for use in making paperboard. (Tr. 1571–72.)

There was simply no use for NCR broke in the making of standard paperboard products during the PCB era, and thus the Amendola Report's assumption that Menasha did not use broke was sound. There was no evidence that Menasha actually purchased NCR broke, and there was little reason to assume that it did. Although these mills did discharge PCBs by virtue of their recycling of mixed paper, which would have contained uncertain but small amounts of NCR paper, Braithwaite's view that these mills discharged PCBs as a result of recycling significant quantities of NCR broke is not supportable. Accordingly, his discharge estimates for the non-deinking mills, particularly Menasha, should be adjusted downward.

**d. Wisconsin Tissue Mills**

**\*20** WTM also attacked Braithwaite's assumption that WTM had used NCR broke during the entire production period. Braithwaite had assumed that WTM used NCR broke for the entire seventeen-year PCB period (1954–1971), but WTM cited a letter indicating that it had only used broke for "several" of those years. A 1973 letter from WTM's wastepaper buyer indicated that "We did buy [NCR paper] on a regular basis for several years but somewhere along the line there were objections on the part of the papermaking people who did not wish to do any blending ..." (Ex. 8602.)

WTM's argument thus depends on what is meant by "several." But the letter it cites indicated not only that WTM purchased broke for "several" years, but that it did so "on a regular basis," which suggests more than a fleeting association with NCR broke. (*Id.*) "Several" does not mean "every," and the letter in fact makes reference to the fact that they stopped using NCR broke "somewhere along the line." (*Id.*) If WTM stopped in 1972, it would not matter, because PCBs were already absent from broke by that time. But if WTM stopped using NCR broke in 1965, it would have avoided using NCR paper during the period that NCR paper was at its highest levels of production. Since we do not know exactly what the author of the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
(Cite as: 2013 WL 1858597 (E.D.Wis.))

letter meant, it is important to refrain from reading too much into the forty-year-old document. Instead, the letter is useful simply for rebutting Mr. Braithwaite's assumption that WTM used broke during the *entire* PCB era. The most plausible conclusion is that WTM *did* purchase a significant amount of NCR broke during the PCB era, but that it did not do so during the entire period. Thus, it would be reasonable to reduce Braithwaite's assumptions about WTM's broke usage by a significant amount—perhaps forty percent—a figure that accounts for the 1973 letter but still acknowledges that WTM did use a substantial amount of NCR paper.

### e. U.S. Paper Mills

U.S. Paper operated a mill in De Pere in the upper portion of OU4, also known as OU4A. Like the other PRPs, it argues that Braithwaite overestimated its discharges in order to downplay NCR's own contribution to the harm in OU4. Braithwaite had assumed that all of the mills had used NCR broke throughout the entire PCB era, but there was no evidence that U.S. Paper's mill used NCR broke until 1966. Based on samples taken from two different lagoons that were in service at different times, U.S. Paper's expert David Merrill was able to show that concentrations in the earlier-used lagoon were some 100 times lower than in the lagoon that was used after 1969. (Tr. 2324–25.) Merrill's analysis was a credible rebuttal of Braithwaite's assumption that the U.S. Paper mill had used NCR broke during the entire PCB era, and thus a reduction of U.S. Paper's discharge estimates is warranted.

And as a non-deinking mill, the same considerations that applied to Menasha apply to U.S. Paper as well. That is, there was little use for recycled white wastepaper in the production process because it was more expensive and the mill's ultimate product was paperboard, not white paper. Thus, although U.S. Paper did use NCR broke, it was only for a limited product called white core stock that it made a few days per month—not, as Braithwaite had assumed, in proportion to its overall production capacity. In sum, Braithwaite's estimates for U.S. Paper's discharges were not credible, meaning that a substantial departure is

warranted.

### f. Heinritz Letter

**\*21** One further issue concerning PCB discharge estimates offered by NCR should be addressed. U.S. Paper and several other defendants have cited a 1965 letter allegedly written by Bud Heinritz, of ACPC, to Wiggins Teape in London as support for their contention that NCR has overestimated their discharges. In the letter, Heinritz suggests that "the bulk" of NCR broke was being recycled by the Kimberly–Clark Company in Ohio. (Ex. 8427.) He acknowledged that other papermakers, such as Bergstrom, used its broke, and he further conceded that ACPC's wastepaper was sold through dealers, meaning that ACPC was not privy to the final destination of much of its broke.

On cross-examination, Mr. Braithwaite admitted that he did not consider this letter in his discharge analysis. If Braithwaite had believed the letter meant what U.S. Paper and the other Defendants believe it meant, he should have considered it because it implied that use of NCR broke in the Fox Valley was much less than he had assumed. If in fact "the bulk" of NCR broke had been shipped to Ohio for recycling, rather than being recycled in the Fox Valley, then the broke recyclers were not using as much NCR broke as was previously thought. This of course would also mean that NCR—which discharged PCBs through the process of coating paper, not through broke recycling—was a greater cause of the PCB problem than the broke recyclers.

But Braithwaite plausibly explained on cross-examination that he didn't consider the Heinritz letter because he didn't read it the same way U.S. Paper's counsel did. (Tr. 793–94.) He explained that the Mead Corporation also manufactured NCR paper, and it did so in Ohio. Thus, Braithwaite believed Heinritz was likely referring to the fact that the mills in Ohio were using a large amount of NCR broke from Ohio's Mead Corporation—*not* that most NCR broke had been shipped from the Fox Valley to Ohio.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
**(Cite as: 2013 WL 1858597 (E.D.Wis.))**

Braithwaite's reading is plausible for a number of reasons in addition to the one Braithwaite himself provided. First, the notion that most NCR broke had been shipped elsewhere, rather than recycled in the Fox Valley, has no other evidentiary foundation in this action. If such a phenomenon had actually occurred, one would expect more evidence of it than a single cryptic sentence in a 1965 letter. Second, no party has explained why it would have made sense to ship NCR broke *out* of the Fox Valley, where there was a demonstrated and strong demand for it. The volumes of material at issue—railcars carrying tons of paper waste—would have been expensive to ship, and thus one would expect to find some explanation for why material that was needed locally would have been shipped elsewhere. Third, and perhaps most important, the idea that most broke was shipped outside the Valley does not comport with the evidence of PCB pollution in the Fox River, which is characterized by large concentrations of PCBs that we *know* were caused by broke recycling rather than making NCR paper, such as the entirety of OU1, and the downstream sections of OU4 that Georgia–Pacific is largely responsible for. No expert has even attempted to suggest that broke recycling was not a major cause of the PCB problem in the Fox River, and thus there is no basis to believe that the Heinritz letter (which I will assume to be authentic) means what U.S. Paper suggests it does.

**g. Conclusion**

*22 Mr. Braithwaite's analysis rests on the uncertain footing of the Amendola Report and other information and data that was not particularly transparent. In addition, his estimates for the emulsion loss rate dramatically understated NCR's contribution to the PCB problem, which means an estimate closer to 150,000 pounds (roughly in line with the amended Amendola Report) is more appropriate than Braithwaite's figure. Braithwaite's overestimation of the other PRPs' discharges should also be taken into account. Of course we do not know exactly how many PCBs were discharged into the river, and so it cannot be said with certainty that a downward adjustment in the other PRPs' estimates would automatically equate to an upward adjustment in NCR's. Even so, Braithwaite's

somewhat systematic overestimation of the PCB discharges of other PRPs, combined with his underestimation of NCR's discharges, overstates the impact the other PRPs would have had on the harm in OU4. It also suggests that any uncertainty in NCR's figure exists almost entirely on the high side, making a general range of 150,000 to 200,000 pounds appropriate as a rough estimate.

**3. Criticism and Analysis of Dr. Jones' Model**

In addition to relying on Braithwaite's discharge estimates, Butler relied on Dr. Jones' model as a basis for determining where the PCBs discharged by the various PRPs might have ended up in OU4.

**a. Model Calibration**

The government and some of the other parties argue that Dr. Jones' model had not been properly calibrated. As such, they believe the results of the model are unreliable and assert that we cannot have any confidence in NCR's apportionment estimates. As Menasha's witness Dr. Robert Annear and others explained, calibration is the process of adjusting model parameters so that the model produces results that approximate existing data. To validate a model, one runs the model (without adjustment) and compares its results with other known data. (Tr. 1795–98.)

Dr. Annear, a modeling expert, testified that it was not good modeling practice for Dr. Jones to have failed to calibrate the model. At a minimum, he believed the hydrodynamic, sediment transport and PCB fate and transport components of the model should have, and could have, been calibrated. Although Dr. Jones did calibrate the hydrodynamic component of the model to water levels and velocities, his calibration was limited to OU3 and OU4, and, as the government's expert Dr. Bravo noted, it did not account for changes in river velocity or bed shear stress over time. (Tr. 2594)

Dr. Jones explained that calibration of the entire model was not possible because there was not sufficient

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
(Cite as: 2013 WL 1858597 (E.D.Wis.))

data, particularly data from the PCB era. But that, of course, helps prove the government's point: we do not especially care *why* the model was not calibrated, but merely *that* it was not. Dr. Jones proclaimed confidence in the model's results because he had validated some aspects of the model and had performed a sensitivity analysis. (Tr. 1134–35.) He validated the hydrodynamic portion of the model by comparing measured water levels in OU4 to his model's predictions, and the results showed a close association between predictions and reality. (Ex. 5121.) He also compared measured water levels at dams and water velocity data to the model's predictions and concluded that the model was effectively predicting the hydrodynamics of the river. (Tr. 1136.) Dr. Jones validated the sediment transport model as well. Comparing sediment cores in different parts of the river, Jones was able to match sediment deposition to his model's predictions within a centimeter per year. (Ex. 5123.) This told Jones that the model was "reliably predicting and quantitatively predicting the deposition patterns in the OU4 area." (Tr. 1139.) Finally, Dr. Jones also validated the PCB transport model by comparing PCB distributions in the river to distributions predicted by the model.

**\*23** But validation of some parts of a model does not rule out the possibility that the other parts were not properly calibrated. This is especially true given that the parts of the model *not* calibrated were the sediment and contamination transport components—highly relevant aspects of the overall model, particularly since the model's overarching purpose was to model the fate and transport of PCB contamination. Dr. Annear credibly testified that reliable modeling could not be achieved absent calibration of the entire model. (Tr. 1842.)

As noted earlier, Dr. Jones also performed a sensitivity analysis. He conceded that a sensitivity analysis does not confirm that a model is producing correct results, but it demonstrates how sensitive the results are to various inputs. (Tr. 1160.) Some of the parameters he measured for sensitivity include bathymetry, shear stress and erosion rate. (Ex. 5125.) Dr. Jones concluded that the model's changes were small in relation to a number of parameter

variations, which meant that the model was a reliable tool for use in apportionment.

But it is clear that a sensitivity analysis does not cure defects in a model's calibration or overall reliability. Although it demonstrates how sensitive the model is to inputs, that has nothing to do with whether the model is actually reliable or not. As Dr. Bravo testified, "Reliability is related to if the model can reproduce processes that occur in reality and can be measured. The sensitivity analysis, all it is saying is if you vary some of the parameters within a certain range, what is the relative change in this case on the results of the model. But it's not telling you that the results are accurate or not." (Tr. 2598.)

The court is satisfied that there are substantial uncertainties in the calibration process that lead to a lack of confidence in the entire modeling process. Added to this uncertainty is the fact that Dr. Jones relied on Mr. Braithwaite's data, which appears to dramatically understate NCR's contribution to the PCB mass in the river. Even so, the court would be reluctant to reject Dr. Jones' analysis out of hand, if only because it was clear that modeling PCB fate and transport in *any* river would be very difficult, particularly given the lack of underlying data and the number of parameters that must be measured. This is not to suggest that perfect modeling of fate and transport is a *sine qua non* of a divisibility defense. Instead, the uncertainty here is merely another factor among many that convinces the court that NCR has not met its burden to demonstrate that the harm in OU4 is divisible.

**b. Partition Coefficient and Actual River Contamination**

The government also argues that NCR's model overestimated the amount of PCBs that would dissolve into the water. In essence, Jones' model assumed a phenomenon called "preferred partitioning," whereby PCBs were far less likely to attach to solids in the river than to solids that were part of the discharge from the PRPs. Dr. Jones explained that "it takes a long time for PCBs to desorb or come off of those solids. So as those PCBs move downstream associated with those solids, not all of the PCB

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
**(Cite as: 2013 WL 1858597 (E.D.Wis.))**

comes off those solids and goes immediately onto adjacent solids, watershed solids, natural solids." (Tr. 1146.) As Georgia–Pacific's Dr. Wolfe explained, this means that once the PCBs *de*sorbed from those solids, which happened frequently during the course of the last half-century, they were unlikely to reattach themselves to river solids. As a result, in NCR's model the PCBs that desorbed from solids did not reattach themselves but dissolved into the water and were transported out into Green Bay. If this were true, it would have a mitigating effect on upstream dischargers, whose PCB discharges traveled more distance and spent more time in the river while subject to this phenomenon. In other words, in NCR's model PCBs either deposited with discharge sediment near the discharge source or dissolved and went into the Bay. Thus, in NCR's model there is less deposition of PCBs in the first section of OU4 because the assumption is that many of the PCBs have dissolved. As Georgia–Pacific's Dr. Wolfe explained, in NCR's model "either they [PCBs] settle with solids from that discharger or almost all of them are dissolved and transported downstream, in particular through OU4A, OU4B, and all the way to Green Bay. It's the best way to understand why there's so little deposition of upstream sources in OU4 [in NCR's model]." (Tr. 2210:12–16.)

**\*24** NCR was not able to point to strong support for

its assumption that PCBs are dramatically less likely to reattach to river sediments than to discharge sediments. More importantly, the evidence in the riverbed does not support its assumption either. A large deposit exists in OU3 just above the De Pere Dam, while NCR's model predicted just the opposite. As Exhibit 9970 shows, the actual contamination in OU3 is almost exactly the opposite of what the NCR model predicts: the highest levels of contamination are downstream, whereas NCR's prediction (due in part to its assumptions detailed above) was that the *up* stream portion of that section of the river would contain the highest concentrations. (Ex. 9970.) There are no PRPs in OU3, and so the PCBs had to come from upstream sources, demonstrating that they did not dissolve in the manner NCR suggested.

In OU4 the contrast is stark. NCR's model predicts relatively little contamination in the upstream end of OU4 and almost none in the dredged navigation channel, yet those areas are key to the actual remediation project. The dredged channel was, in fact, a sediment trap stretching the length of OU4. As the exhibit below shows, the model thus does not put PCBs in the right places. (Ex. 9971.) On the left is the model's prediction for OU4A, and on the right is the actual remedial plan for that stretch of river based on actual PCB contamination levels.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
(Cite as: 2013 WL 1858597 (E.D.Wis.))





NCR contends that it is not important that its model fails to predict the actual location of the PCBs because what's really important is the *relative* contributions of the parties, which NCR argues is "all that is required for apportionment." (ECF No. 764 at 34.) But that obscures the dual purpose of the model. It might be true that relative figures are all that is required for *apportionment,* as NCR says, but that is not true for causation. Location *is* important. As described above, in order to prove divisibility, Mr. Butler had to show there would be specific areas in the river where the contamination would be less than 1.0 ppm in an NCR-only scenario but where it exceeds that level when the discharges of the other PRPs are added in. If the model he relies on puts large amounts of PCBs in

the wrong areas, we can have no confidence that Butler would have been able to demonstrate that certain polygons would have been sensitive to additional PCB loads from other sources. In fact, if the model Butler relied on has little relationship to the river as it actually is, we can have no confidence in his analysis of the contamination in all of the polygons. As Dr. Wolfe credibly explained, "if the model's not putting the PCBs in the right place and in addition if it's tending to put them too close to the source and underestimate deposition at a distance from the source, that it can't be getting the mix right, PCBs delivered to any particular apportionment polygon, and so is unreliable." (Tr. 2206.)

**4. The Complexity of the Lower Fox River**

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
(Cite as: 2013 WL 1858597 (E.D.Wis.))

**\*25** The sediment found at the bottom of the Lower Fox River—as in most rivers—is a reflection of a number of independent factors that render it difficult or even impossible to pinpoint the source of contaminants found in that sediment. For example, the shipping channel in OU4 has been dredged by the Army Corps of Engineers for some 150 years. In dredging millions of cubic yards of sediment, the Corps repeatedly spread out the sediment and stirred up the bottom. (In fact, the Corps of Engineers is itself potentially liable as a discharger.) For much of the period during which PCBs were discharged into the river, the Corps would dispose of the dredged sediment in other areas of the river. (PCBs were not widely known to be toxic until later.) And when the Corps stopped dredging the shipping channel below the Fort Howard turning basin in the late 1960s, that portion of OU4 filled in and became a sediment trap.

Things are also made more complicated by the seiche effect, a phenomenon whereby the river actually flows backwards during certain weather events, and the fact that countless water craft, from fishing boats to large coal ships, have been stirring up the water for decades. (Tr. 155.) The government's principal witness, Mr. Fox, testified that a ship's propellers and bow thrusters result in "scour," or degradation of the river bed, and sometimes larger ships can become grounded in the river, leaving deep gouges that are eventually filled in by new sediment. (Tr. 272–74.) In addition, Dr. Wolfe testified that "bioturbation" occurs when mussels, fish or worms stir up the river bottom and disturb sediment. (Tr. 2193.) Finally, high flow events after major storms can exert pressure on the sediment and cause resuspension and redistribution of PCBs. All of these natural and anthropogenic factors have resulted in a riverbed where PCBs from different sources are commingled; some are buried deep under layers of sediment, while others lie near the surface and are resuspended over and over. To take just one telling example, Mr. Fox tested for a chemical called Santosol, which was NCR's replacement for the toxic Aroclor 1242. NCR used Santosol 100 in the mid–1970's and later switched to Santosol 150, but in some sediment cores Fox found Santosol 100 layered on *top* of the more recently used chemical—

just the opposite of how one would expect to find it. Fox found this "co-occurrence" to be "surprising" and indicative of the high level of sediment disturbance in the river. (Tr. 311:18–25.)

The government argues that all of these factors led to the riverbed we have now, which is a dynamic environment characterized by a patchy and jumbled distribution of PCB contamination. Given the complexity of the sediment distribution and the number of natural and man-made forces that have stirred up sediment for decades, it is essentially impossible to predict where PCBs from the numerous PRPs along the river would have ended up. As government expert Dr. Jill Singer testified, "while we have a general understanding of how the sediments are moving and behaving through the system, to be able to essentially quantify that and specify where a particular particle originated and where it ends up is not possible." (Tr. 166–67.)

**\*26** The court adopted much of the government's complexity argument in granting the motion for a preliminary injunction. I reasoned that the numerous forces that disturbed the sediment were essentially independent factors that disrupted the chain of causation linking the discharge of PCBs to the actual harm manifested in the river. In essence, because so many independent factors played a role, we could not link a given volume or concentration of contaminated sediment to a particular discharger. In light of the inability to make this link, as well as the relatively loose correlation between PCB masses and remediation efforts, the court concluded that the harm was a unitary, rather than divisible, one. *See United States v. Monsanto, 858 F.2d 160, 173 n. 27 (4th Cir.1988)* ("Volumetric contributions provide a reasonable basis for apportioning liability only if it can be reasonably assumed, or it has been demonstrated, that independent factors had no substantial effect on the harm to the environment.")

The examples given in the RESTATEMENT have played a key role in this Court and the Seventh Circuit, and at this point it is worth exploring them again. At the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
**(Cite as: 2013 WL 1858597 (E.D.Wis.))**

preliminary injunction phase, the Seventh Circuit agreed (or at least found no abuse of discretion) with my initial conclusion that the PCB problem resembles the RESTATEMENT'S example 14:

A Company and B Company each negligently discharge oil into a stream. The oil floats on the surface and is ignited by a spark from an unknown source. The fire spreads to C's barn, and burns it down. C may recover a judgment for the full amount of his damages against A Company, or B Company, or both of them.

RESTATEMENT (SECOND) OF TORTS § 433A, illus. 14.

The salient point about this example is that the spark acts as an independent actor that severs a direct causal link between the pollution and the harm. We do not know if one company's oil discharge would have ignited and burned down the barn, or whether the amount of oil was correlated with the extent of the fire damage. As the Seventh Circuit pointed out, "it is impossible to draw a logical connection between the amount of oil each company discharged into the stream and the ultimate injury." *United States v. NCR*, 688 F.3d at 842. Here, each of the natural and man-made influences on the riverbed are analogous to the spark—independent forces that transform the nature of the pollution and sever the causal link between the mass discharged and the harm that actually exists, which continues even now to change on a daily basis. For example, suppose A releases 100 kg of PCBs into the river, while B releases 1,000 kg. In light of all the factors described above—river currents, attachment to solids, seiche, dredging, ship traffic, etc.—it is conceivable that A's much smaller releases could prove just as dangerous as B's because the independent forces could have moved A's PCBs into areas with high concentrations that require remediation, whereas B's could be buried, or more safely dispersed.

*27 NCR argues that the PCB problem more closely resembles the RESTATEMENT'S fifth illustration:

Oil is negligently discharged from two factories, owned by A and B, onto the surface of a stream. As a result C, a lower riparian owner, is deprived of the use of the water for his own industrial purposes. There is evidence that 70 per cent of the oil has come from A's factory, and 30 per cent from B's. On the basis of this evidence, A may be held liable for 70 per cent of C's damages, and B liable for 30 per cent.

RESTATEMENT (SECOND) OF TORTS § 433A, illus. 5.

In this illustration, however, there are no independent forces at work, and thus nothing to sever the intuitive link between the amount of oil discharged and the harm caused. Without these independent forces, it is easier to conclude that there is some reasonable proportionality between the harm caused and the amount of oil discharged. But because these forces are absent from the example, it does not closely resemble the situation we face here.

NCR also protests that most of the independent factors such as current, boat traffic, dredging, seiche, etc., are phenomena common to almost every waterway. The government's witnesses agreed that there was nothing particularly unusual or complex about the Lower Fox River, and thus NCR suggests that a heavy focus on these factors would unduly imply that environmental harm in a river is *never* divisible. Of course, the complexity of a river system should not always preclude divisibility, and in truth it is not a dispositive factor in the court's analysis here. (It is noteworthy, however, that NCR has not pointed to another similar case involving a river where the harm *was* found divisible.) In this case, the complexity issue is important because NCR's analysis assumed, at least in some minimal degree, that it could predict where PCBs would deposit in OU4. As noted above, in order to demonstrate divisibility, Mr. Butler needed to possess the ability to show that there were significant areas of the river where NCR's discharges did not cause the need for remediation.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
(Cite as: 2013 WL 1858597 (E.D.Wis.))

Thus, while not dispositive of the issue, the fact that the PCBs have been whisked about in the river by numerous independent forces for the last half-century further undercuts any confidence we can have in NCR's ability to show that the harm is capable of division.

**5. Summary and Conclusions about NCR's Approach**

In short, Butler's testimony did not explain in sufficient depth why so many areas of OU4 would not require remediation had NCR been the only discharger of PCBs. And his approach cannot be viewed in a vacuum. It relied on estimates from Mr. Braithwaite and models from Dr. Jones, and these factors play a critical role in determining whether the contamination in OU4 would be substantially less had NCR been the only discharger. Because the inputs Butler used to reach his conclusions were substantially flawed, his overall analysis would be unreliable even if his testimony were otherwise convincing. Finally, the uncertainties in the river itself, as well as in the modeling, undercut any confidence we can have in Butler's conclusion that NCR was an insufficient cause of the harm in OU4.[FN8]

**6. Divisibility Beyond the "Sufficient Cause" Approach**

**\*28** So far, the court has discussed divisibility as though the only relevant question is whether NCR could be deemed a sufficient cause of the harm in OU4. In the court's view, however, joint and several liability may (and should) attach even if a party is *not* a sufficient cause of the harm, so long as the party is *necessary* to the harm. In other words, even if NCR had met its burden to demonstrate that it was not an independent, sufficient cause of the harm in OU4, that would not suffice to show that OU4 would be theoretically capable of division.

NCR proceeded as though the question of sufficient cause was the exclusive lodestar of divisibility, and it is true that the Seventh Circuit's decision highlighted that as a key issue. *United States v. NCR*, 688 F.3d at 839 (holding that "NCR did not put forth any evidence to refute the government's contention that NCR's contributions of PCB would, alone, require approximately the same remedial

measures.") But although the Court noted that NCR had not won the day on that issue, I do not read the Court's opinion to mean that other arguments or ways of looking at the divisibility question are foreclosed. *Id.* at 841 (noting that "there is not necessarily one universal way that we should approach apportionment in pollution cases.")

In fact, the Seventh Circuit observed that, in some complex cases, looking at a party's contribution to the problem fails to solve the disability question. "But for more complicated situations like this one, in which a chemical is harmful when it surpasses a certain amount, or instances in which a chemical may not be very harmful but becomes so when mixed with other chemicals, it will not suffice to look solely at the amount of contamination present in order to estimate the harm." *Id.* As noted at length above, ours is a case in which a chemical is harmful when it surpasses a certain amount, and so it is an uphill battle for a PRP trying to show a meaningful causal relationship between amounts discharged to causation of harm. In addition, however, our case also bears a great deal of resemblance to the case in which a chemical "may not be very harmful but becomes so when mixed with other chemicals." *Id.*

For remediation purposes, PCBs are not considered harmful unless they exceed 1.0 ppm in a given location. Thus, one party's PCBs may not be very harmful on their own, but when mixed with other PCBs the concentrations in a given area might cross the 1.0 ppm remedial threshold and become harmful. In such a case, A's PCBs might not be a *sufficient* cause of the harm in a given section because they resulted only in, say, a 0.7 ppm contamination level. But when mixed with the PCBs of B, the threshold level is reached and remediation is required. Discharger A can therefore be deemed a *necessary* cause of the harm because without its discharges there would be no remedy, even though its discharges were not sufficient, on their own, to bring about the need for a remedy.

**\*29** All this is simply another way of saying that the harm in OU4 is not divisible in terms of degree because there was no evidence as to whether NCR was a neces-

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
**(Cite as: 2013 WL 1858597 (E.D.Wis.))**

sary, if insufficient, cause of any harm in OU4. Even if Butler had succeeded in showing that, say, 40% fewer polygons would need remediation if NCR had been the *sole* discharger, he said nothing about the presumably large number of polygons that would need remediation *in part* because of NCR's discharges. Suppose Butler had identified a polygon that actually had 1.3 ppm of PCBs (thus requiring remediation) but would have had a concentration of only 0.6 ppm if NCR had been the sole discharger. He would place that polygon in the "no remedy" column and use it as evidence that the remedy would have been different had NCR been the only discharger—NCR, in other words, was not a "sufficient cause" of harm in that polygon. That was the end of Butler's analysis.

Given NCR's large discharges of PCBs, one would expect that many or most of the polygons that Butler put in the "insufficient cause" category would fall into this "necessary cause" category as well. If NCR's large discharges were not enough to cause the remediation on their own, surely they were *a* cause of the remediation in a great number of polygons, if not all of them. And Butler certainly recognized this. As he testified in reference to a hypothetical example, "through the collective contribution of all the parties you would get remediation in this core because it exceeds the thresholds, but when you look at the individual parties by themselves, they do not contribute sufficient concentrations so that there would be no remedial action by themselves on a stand-alone basis. Collectively they contribute." (Tr. 1450:1–7.) Butler himself admitted that he had encountered this "collective" contribution scenario "a number of times" in his analysis. (Tr. 1450: 8–15.)

But Butler never took the additional step of considering polygons where there was a "collective" cause of the need for remediation. In his view, these collective polygons were evidence supporting divisibility because they showed that NCR was not the sufficient cause of harm. But in reality they are evidence that NCR was still a *necessary* cause of the harm in many or most of the "collective" polygons that needed remediation. Because Butler's analysis ended at the question of sufficient cause, it did

not account for the countless areas that need remediation because NCR's contribution, when mixed with other PRPs' discharges, caused the harm. Thus, even if Butler had showed that there would be 40% less dredging in an NCR-only scenario, he likely would not be able to show that there would be *any* change in the remedy if we also counted those polygons for which NCR was a necessary, if insufficient, cause. And since there was no evidence on that score, NCR has not met its burden to show divisibility.

The example in which two harmless chemicals mix to create a harmful situation applies squarely to the situation before us. Neither discharger in such an example is a sufficient cause of the harm; it is only when they mix that the harm is realized. The same holds true here, even though the dischargers released the same chemical rather than different ones. On its own, NCR's contribution of 0.7 ppm of PCBs to a given area would not require remediation, but it becomes harmful (requiring remediation) when mixed with the PCBs from other sources. NCR protests that this "necessary cause" analysis is "moving the goalposts," but that is only true if the Seventh Circuit's opinion is read to mean that the "sufficient cause" analysis should be the exclusive framework for answering the divisibility question. As noted above, however, the Court explicitly mentioned the mixed chemicals example in its opinion. Additionally, the Court observed that the RESTATEMENT OF TORTS is what governs divisibility, and the RESTATEMENT explicitly includes exactly this scenario:

**\*30** Where two or more causes combine to produce such a single result, incapable of division on any logical or reasonable basis, and each is a substantial factor in bringing about the harm, the courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm. The typical case is that of two negligently driven vehicles which collide and kill a bystander. The two drivers have not acted in concert, and the duties which they owe are separate and distinct, and may not be identical in character or scope; but the entire liability

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
**(Cite as: 2013 WL 1858597 (E.D.Wis.))**

of each rests upon the obvious fact that each has caused the single result, and that no rational basis for division can be found.

RESTATEMENT (SECOND) OF TORTS, § 433A, cmt. i.

Many areas of OU4 resemble the example of the two vehicles that collide and kill a bystander. Like the PRPs here, they have not acted in concert, but the entire liability for the harm they produced *together* "rests on the fact that each has caused the single result." *Id.* The entire liability in such a case "is imposed also where both are essential to the harm." *Id.* Thus in areas where NCR causes 0.7 ppm of contamination and Glatfelter causes 0.5 ppm, both parties are essential to the harm and are held jointly and severally liable, just as the two drivers who collide and cause a single harm. As a matter of policy, there would seem to be no reason to exclude from a causation analysis areas of harm for which NCR was actually a necessary cause, but that is exactly what NCR did. Because Butler's analysis did not account for these considerations, NCR failed, for this additional reason, to meet its burden to show that the harm is theoretically capable of division.[FN9]

**V. The OU1 Defendants' Divisibility Theory Also Fails**

[4] The OU1 Defendants (Glatfelter, Menasha Corp. and WTM I) have a much different, although more straightforward, approach. These Defendants argue that although PCBs from OU1 undoubtedly made their way in large quantities into OU4, they did not materially contribute to the need for a remedy or increase the remedy in any way because they entered OU4 only in very small concentrations. In other words, they argue that because their share of the harm in OU4 is *zero*, the harm in OU4 is distinct from any harm they may have caused in OU1.[FN10]

**A. Dr. Victor Magar**

The OU1 Defendants' theory was based almost entirely on the expert opinion of Dr. Victor Magar, who testified that *no* cleanup would have been required in OU4 if the OU1 Defendants had been the only discharg-

ers of PCBs. Magar has a Ph.D. in environmental engineering and over twenty years of experience with sediment management, contaminant fate and transport, and hazardous waste remediation.

**1. Concentration versus Mass**

In Dr. Magar's view, the remedy and overall harm is a product of the *concentration* of PCBs in the sediment rather than the mass. The remedial action threshold of 1 ppm means that remedial action is triggered not by how many PCBs are in a given spot, but by how many PCBs are there in proportion to how much other material is there. The ratio—the numerator and the denominator—is what counts, not just the numerator. A high-concentration area of, say, 20 ppm needs to be remediated, while an area having *more* PCBs might not need to be remediated if the concentrations are lower. The OU1 Defendants assert that most of the evidence was directed at demonstrating the *mass* of PCBs that went into OU4 (the numerator) without regard to the amount of sediment that the mass was attaching to (the denominator).

*31 According to Dr. Magar, dilution causes PCB concentrations to drop as the solids to which they are attached become more distant from the source. Using OU1 as an example, he noted that concentrations of PCBs were highest at the upstream end of OU1 nearest the OU1 dischargers. When one moves into the middle or downstream end of OU1, concentrations are much lower, as evidenced by the fact that the sediment there did not require remediation. (The OU1 cleanup has already been completed.) (Tr. 1610.) Magar asserted that the PCBs that made their way out of OU1 would have been in the lower concentrations found at the downstream end of OU1, and concentrations would have dropped even more during the long transit through OU2, OU3 and OU4. This dilution occurs through volatilization (evaporation) as well as the introduction of clean sediment, which further lowers the concentrations by boosting the denominator in the ratio. (The same mass of PCBs becomes mixed with a greater amount of clean sediment, thus diluting the concentration.)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
(Cite as: 2013 WL 1858597 (E.D.Wis.))

Dr. Magar testified that what he called "Middle OU1" in many ways resembled OU4. This section of OU1, downstream from the dischargers, required no remediation because the concentrations were below the 1.0 ppm remedial action level. (Ex. 8560E.) Middle OU1 contains a depositional area that is very similar to OU4, he argued, because Exhibit 4000 (Mr. Simon's report) shows that the shear stress in Middle OU1 is the same or lower than that in much of OU4. (Ex. 4000, Figures 5–13, 5–16 and 5–17.) The lower the shear stress (the force exerted by the current of the river), the more likely it is that solid particles will deposit. Thus, if the solids that deposited in Middle OU1 did not exceed the 1.0 ppm threshold, it is unlikely that they would deposit in concentrations exceeding that threshold once they were transported twenty or more miles downstream into a similar depositional area.

The following illustration shows Glatfelter's location at the southern end of Little Lake Butte des Morts, as well as the Arrowhead Park sludge disposal area. (Ex. 3 at WDNR060002806.)

<- Image not available via Offline Print ->

In sum, Magar argued that downstream portions of OU1 did not meet the 1.0 ppm threshold and required no remediation. Moreover, PCB concentrations dilute as solids are transported down the river due to evaporation and the addition of clean particles in the water column. Given these factors, Magar believed it was unlikely that PCBs from OU1 would exist in sufficient concentrations to trigger remedial action in OU4. Accordingly, Magar asserted that the OU1 Defendants did not contribute in any way to the harm in OU4.

**2. Glatfelter's Discharges**

Dr. Magar also conducted a study to determine the mass of PCBs Glatfelter discharged. To recall, government estimates from the Wisconsin DNR and the Amendola report had been in the range of 128,000 to 188,000 kg. (Ex. 9968) NCR's Simon team adopted the 128,000

figure. Dr. Magar, however, concluded that his client Glatfelter (then known as Bergstrom) had discharged a mere 14,000 kg of PCBs to OU1, or roughly one-tenth of what had been previously assumed. (Tr. 1651:15.)

*32 Dr. Magar conducted a mass balance analysis and tested it by taking cores from the Arrowhead landfill, where some solids removed during the de-inking and coating process ended up after being sent through a clarifier. (Tr. 1642.) A clarifier is a large settling tank in which some of the solids settle out of the wastewater; these solids would be sent to the landfill. Some of the solids did not settle, however, and these were released into the river. (Tr. 1679.) If we know what the solids removal rate of the clarifier is (i.e., its efficiency), we can calculate how many solids went into the landfill versus how many went into the river. In essence, Dr. Magar used the solids found in the landfill as a proxy for those that were discharged to the river.

Dr. Magar testified that the core samples in the Arrowhead landfill showed that the landfill contained some 50,000 kg of PCBs. He stated that he was able to calculate the volume of the landfill itself by using simple measurements; he also knew what the "sludge mass" of the landfill was. (Tr. 1644:21.) By measuring the concentration of PCBs in the sludge, he was able to calculate the total mass of PCBs in the landfill. He corroborated this number by using company records that established how many solids were piped into the landfill. Multiplying this number by the concentration of PCBs on the solids (as he had measured it with sample cores) resulted in a figure that closely matched his own measurements. (Tr. 1645.)

Having measured the mass of PCBs in the landfill, Dr. Magar then proceeded to extrapolate from that a calculation of the mass of PCBs that went into the river. He used company records to establish the efficiency of the clarifying process at various time periods. For example, during the period 1965–69, he found that the clarifier's efficiency was 77.6%. (Ex. 8350 (Magar Expert Report), Ex. 31 (Mass Balance), Table 1.) Thus, during that period, Dr. Magar would say that the clarifier removed 77.6% of

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
(Cite as: 2013 WL 1858597 (E.D.Wis.))

the solids (and thus the PCBs) from the wastewater, and only 32.4% wound up in the river. Using clarifier data for the entire PCB era, Dr. Magar was able to arrive at the total of 28,792 pounds, or roughly 14,000 kg of PCBs released to the river. In sum, his method assumed that the clarifier efficiency rate could be applied to what was in the landfill to determine the mass of PCBs that did *not* make it in the landfill. Thus, when he applied the clarifier efficiency rate to PCBs found in the landfill, the mass of PCBs in the landfill became a proxy for the mass of PCBs released to the river.

**B. Criticism of and Analysis of Dr. Magar**

One key criticism of Dr. Magar's work involves the depositional nature of OU1. Dr. Magar believed that the downstream portions of OU1 were comparable to portions of OU4 in terms of their depositional qualities. In other words, PCBs could be expected to settle in downstream OU1 because the shear stress there was comparable or even lower than OU4. Thus, the fact that PCBs did *not* settle in downstream OU1 in large concentrations suggested that the concentrations by that stretch of the river were already lower than the 1.0 ppm remedial action level. Accordingly, in his view it was doubtful that any PCBs flowed into OU2 at levels *higher* than 1.0 ppm.

**\*33** But the government and the downstream Defendants rejected the idea that OU1 was as depositional as Magar claimed. They argued that high-concentration PCB deposits were absent in lower OU1 not because PCB concentrations had already petered out, but because the PCBs simply were not permanently depositing in that part of the river. Instead, they were moving into OU2 (where almost nothing deposited) and finally depositing in OU3 (in small amounts) and OU4 (the most depositional of the operable units). (Most PCBs, of course, never deposited at all and flowed out into Green Bay.)

Georgia-Pacific's Dr. Wolfe credibly testified that solids in the river "mostly move downstream rather than settle and form deposits." (Tr. 2183:6–7.) Even OU4, which is the slowest-moving part of the river, transmits large quantities of solids to Green Bay. In Dr. Wolfe's

view, OU4 has a "trapping efficiency" of 22%, meaning that some 78% of the suspended solids simply pass straight through without depositing. By contrast, OU1 has a trapping efficiency of only 7%. It is much slower and more depositional than OU2 (the portion of the river with an elevation drop tantamount to Niagara Falls), but 93% of solids make their way downstream rather than settling.

The conclusion that OU1 did not retain many PCBs was supported by the testimony of Dr. Connolly, who stated that based on the core samples of OU1 prior to remediation, the PCBs that stayed within OU1 represented only a small fraction of the total: he credibly testified that "the vast majority of the PCBs that entered OU1 would have had to have left OU1 and proceeded downstream." (Tr. 607:19–21.) Connolly conducted a mass balance analysis in an attempt to show how many kilograms of PCBs left OU1. He noted that there were some 6000 kg of PCBs in the sediments of OU1 prior to remediation. If the amount entering OU1 was 113,000 kg (the figure from the Simon team analysis), that meant that some 107,000 kg, or some 95%, left OU1 and flowed down the river. (Tr. 574–75.) This very closely tracks Dr. Wolfe's conclusion that roughly 93% of solids would pass through OU1 without permanently depositing. Ultimately, after combining his mass balance analysis with a chemical marker analysis, Connolly concluded that OU1 sources were responsible for far more of the PCBs in OU4 than OU2 sources.

Dr. Magar's analysis of Glatfelter's discharges is also unsupportable. The government and the downstream Defendants have highlighted a number of problems with his analysis, but a key one is his assumption about the relationship between clarifier efficiency (solids removal) and PCB removal. Dr. Magar conceded on cross-examination that he had assumed the ratio would be one-to-one; in other words, that if a clarifier removed 50% of solids, it would also remove 50% of PCBs. If that did *not* turn out to be true, he admitted that the extrapolation he was making would not hold up. (Tr. 1685.)

Dr. Magar is not a wastewater treatment or paper-

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
**(Cite as: 2013 WL 1858597 (E.D.Wis.))**

making expert, and he established no basis for his assumption that PCBs would be removed at the same rate as solids. Although such an assumption appears reasonable on its face, throughout the trial it was made clear that all solids are not equal when it comes to PCB adsorption. As a general principle, larger solids have more mass than smaller solids, but less surface area as a *percentage* of that mass. To use a more concrete example, even though smaller grapes have less mass and volume, they have a higher percentage of skin (surface area) than larger ones.

**\*34** PCBs adsorb, or attach, to the surface area of solids. Given that smaller solids—what industry people call "fines"—have relatively greater surface areas as a percentage of mass, smaller solids also attract more PCBs as a percentage of mass. This means that 1 kg of tiny solids will have higher concentrations of PCBs than 1 kg of larger solids. Dr. John Cameron, a professor of chemical and paper engineering at Western Michigan University, explained that "because the fines have a higher surface-to-mass ratio, they're going to absorb more PCBs and they're going to have a higher concentration of PCBs than the heavier, larger particles that have a lower surface-to-mass ratio. So therefore in the fines you're going to see a higher concentration of PCBs than you are within a larger particle." (Tr. 2517:20–25.)

Thus, smaller particles are relatively more attractive to PCBs than larger ones. That fact would not matter if a clarifying system treated all solids alike. As Dr. Cameron testified, "the basic assumption [of Dr. Magar] is that the PCB content in the sludge [sent to the landfill] is the same as that of the solids being discharged." (Tr. 2517:3–4.) That is, if a clarifier removed small solids and larger solids at the same rate, it would be reasonable to conclude that the sludge in the landfill had the same PCB characteristics as the solids that were not removed by the clarifier and were sent into OU1, and thus it would be reasonable to use the solids in the landfill as a proxy. But both Dr. Cameron and Mr. Braithwaite credibly testified that clarifiers do not work in such a fashion. Instead, clarifiers allow the heavier, *larger* solids to settle while leaving the finer particles suspended in the wastewater. A clarifier is

a still, or "quiescent" settling vessel or tank that allows particles to settle. (Tr. 2518–19.) The heavier particles naturally settle to the bottom, and of course these are the particles with the *lowest* concentration of PCBs because they have smaller relative surface areas. The finer particles, by contrast, are less likely to settle and are thus more likely to be discharged. Thus, a clarifying system actually discharges the solids with the *highest* concentrations of PCBs while sending the lower-concentration solids to the landfill. (Tr. 731.) And this effect is actually magnified as the efficiency of the clarifier increases: "Because the clarifier will remove the higher density, larger particles but discharge more of the fines, as it becomes more efficient one would expect to see a higher concentration of PCBs discharged as the efficiency increases." (Tr. 2521:4–7.) Thus, it is likely that Glatfelter's clarifiers had little or no mediating impact on its PCB discharges. Accordingly, Dr. Magar's attempt to use the PCB concentrations of sludge in the Arrowhead landfill as a proxy for PCBs discharged to OU1 was not persuasive.

Instead, it is likely that reliance on PCBs in landfill sludge significantly—or even dramatically—understated Glatfelter's discharges. On cross-examination, Dr. Magar was asked about a 1977 letter from the Appleton-based Institute of Paper Chemistry to Bergstrom indicating that some 80% of the PCBs were contained in the "fines," even though the fines constituted only 10% of the solids. (Tr. 1686–87.) Magar conceded that he had been aware of that information but had not included it in his analysis. If 80% or so of PCBs had indeed been in the fine solids, which were probably not captured by Glatfelter's clarifying systems (particularly earlier in the PCB era), then the 50,000 kg of PCBs Dr. Magar found in the landfill sludge is really only the tip of the iceberg in terms of Glatfelter's actual discharge. It would thus not be surprising to find, as the other estimates bear out, that Glatfelter's actual discharge was in the neighborhood of 125,000 to 150,000 kg, or even more.

**\*35** In sum, the weight of the evidence showed that solids in OU1 did not deposit there in large quantities but instead moved through the six miles of OU1 and passed

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
(Cite as: 2013 WL 1858597 (E.D.Wis.))

into the much faster current of OU2, from which they made their way into OU4, where they either deposited or ended up in Green Bay. In other words, the absence of high concentrations of PCBs in lower OU1 is not due primarily to dissolving or "petering out," it is because the PCBs were attached to finer particles that would only deposit in a slower moving area such as OU4. Moreover, Dr. Magar's estimate of Glatfelter's discharges was undermined by his unsupported reliance on landfill sludge as a proxy for PCB discharges. For all of these reasons, the court finds Dr. Magar's conclusions unpersuasive and concludes that the OU1 Defendants are, in fact, a significant cause of the harm in OU4.[FN11] And of course the same "necessary cause" considerations discussed in Section IV B–6 apply with equal force here. The OU1 Defendants' argument was that their discharges did not reach OU4 in sufficient concentrations to meet the 1.0 ppm threshold, but they proffered no evidence that their discharges would not have been enough to constitute a necessary (if insufficient) cause of much of the harm in OU4.

### VI. Injunctive Relief

[5] Having concluded that the harm in OU4 is not capable of being divided, the court must consider whether the relief the government seeks is appropriate. The Fifth Claim for Relief seeks "a judgment in favor of the United States and against each of the UAO [Unilateral Administrative Order] Recipients, that each UAO Recipient is required to comply with all provisions of the UAO applicable to such UAO Recipient, other than the provisions of UAO Section XIX (Reimbursement of Response Costs)." (ECF No. 30 at 32.) The parties agree that enforcement of a UAO is a kind of injunction. Before a court may award permanent injunctive relief, a party must demonstrate (1) it has succeeded on the merits; (2) no adequate remedy at law exists; (3) the moving party will suffer irreparable harm without injunctive relief; (4) the irreparable harm suffered without injunctive relief outweighs the irreparable harm the nonprevailing party will suffer if the injunction is granted; and (5) the injunction will not harm the public interest. _Old Republic Ins. Co. v. Employers Reinsurance Corp._, 144 F.3d 1077, 1081 (7th Cir.1998). _See also Monsanto Co. v. Geertson Seed Farms_, ——— U.S. ———

—, 130 S.Ct. 2743, 2756, 177 L.Ed.2d 461 (2010).

[6] The UAO cited the health risks (by then well-established) posed by PCBs due to their consumption by fish, which are then consumed by humans despite posted warnings. (Ex. 1127 at 15–16.) The government's witness, Dr. Michelle Watters, holds both a Ph.D. in environmental engineering as well as an M.D. and a Masters Degree in public health. She testified credibly that PCBs in the river have a "completed exposure pathway" from sediments to humans (Tr. 30:3), and consumption of PCBs leads not only to higher rates of cancer, but also certain developmental, reproductive, immunologic and endocrine problems. (Tr. 19:4–7.) She noted that PCBs can cross the placenta and impact the development of fetuses and can also be ingested by infants through breast milk; PCBs are particularly harmful at these sensitive developmental ages. (Tr. 19–20.) Ultimately, she agreed with other assessments that PCBs in the Lower Fox River posed a public health hazard. Dr. Watters also concluded that consumption warnings were not an effective means of controlling the risk because many people did not know about or simply ignored the warnings because fishing was an inexpensive way of obtaining significant amounts of protein-containing food. (Tr. 34–35.)

*36 Dr. Watters was persuasive and convincing on both the general nature of PCB contamination as well as the continuing danger that they pose. Some of the Defendants suggest that many of the PCBs have now been cleaned out of the river due to their efforts to-date, and that mitigates the danger and reduces the need for injunctive relief. Although that might lessen the urgency in some small way, it does not materially change the fact that PCBs continue to cause health problems and continue to be washed into Green Bay, where they will never be able to be removed from the ecosystem. In short, the government has demonstrated that an injunction would be in the public interest and that there is no adequate remedy at law.

The OU1 Defendants also argue that there is no reason to order them to comply with the UAO given that

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
(Cite as: 2013 WL 1858597 (E.D.Wis.))

NCR will be ordered to continue complying and NCR has the means to do so. They also suggest that if long-time adversaries are forced to work together, the project could become hamstrung by disputes and lack of coordination. But these hypothetical concerns do not suffice to undermine the need for injunctive relief. And under these Defendants' view, any PRP in a joint liability case could point the finger at all of the other PRPs and ask "why not them?" This, of course, would create a situation in which the government could never enforce a UAO because no *single* PRP is ever essential to the cleanup if others can be made to perform the work. In short, the fact that one PRP is currently performing the work does not mean that the others cannot be enjoined to do so as well. For these reasons, the court concludes that the government has adequately shown the need for injunctive relief.

**VII. Evidentiary Issues**

Following the trial, the parties raised and briefed a substantial number of evidentiary objections ranging from hearsay and authenticity to relevance, as well as the question of whether demonstrative exhibits should be admitted as "substantive" evidence. Countless evidentiary objections were simply stated, in spreadsheet form, without briefing. Given the number of exhibits, witnesses and depositions, it is perhaps not surprising that there would be a number of objections. Even so, having reviewed the post-trial briefing, the court is satisfied that, for the most part, the objections are not material to the findings and conclusions set forth above. Most importantly, the court has not relied upon any evidence whose authenticity has been called into question, with the exception of the Heinritz letter which I have assumed (without deciding) to be authentic. Objections on relevance grounds are themselves of questionable relevance, given that (as discussed further below) this was a bench trial. More fundamentally, in this context, hearsay and other more technical objections speak more to the weight to be given to the evidence than to its admissibility. But the key point is that the court's conclusions above have not depended on any evidence to which there has been a salient objection, which means that most of the objections are rendered moot or, at most, that they speak to the weight, rather than the admis-

sibility, of the evidence in question. *Cotton Patch Cafe, Inc. v. Micros Systems, Inc.,* 2012 WL 5986773, *9 (D.Md.2012) (finding evidentiary objections moot because "The Court would reach the same summary judgment decision with or without the evidence at issue."); *Lake v. First Nat. Ins. Co. of America,* 2010 WL 4807059 at *7 n. 4 (N.D.Cal.2010). The one exception is the motion to strike the testimony of Mr. Braithwaite.

**A. Motion to Strike Testimony of James Braithwaite**

*37 [7] The central objection made by the non-NCR Defendants involves Mr. Braithwaite's reliance on the 2000 Amendola Report. They argue that Braithwaite simply adopted certain discharge estimates from that report without having any idea how they were calculated. As such, because he did not do his own discharge analysis and because Mr. Amendola himself did not testify, NCR was improperly using Braithwaite as a "mouthpiece" for the opinions of another expert.

The government does not join in this objection, presumably because Amendola is the government's own expert: it cannot very well object to another party's reliance on its own figures, particularly when it is the party prosecuting this action. One problem with the motion to strike is that the basic reasonableness of Amendola's conclusions is one of the foundational premises of this entire action. We may assume that Amendola, being a government-retained expert, had no financial incentive to shift blame from one party to another or to otherwise produce anything but good faith and unbiased estimates. Certainly no one has argued anything contrary to that assumption. Thus Amendola's estimates have guided the remedial action and have been repeatedly relied on for more than a decade by the government itself. Thus, it is hardly surprising that Braithwaite chose to start his analysis by relying in certain key respects on estimates that had already been produced by an unbiased source.

Additionally, we must remember that this was a trial to the Court, not a jury trial. The Federal Rules of Evidence arose out of doubts about the ability of lay jurors to sort through evidence and understand its limitations. *See*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
(Cite as: 2013 WL 1858597 (E.D.Wis.))

Kenneth S. Broun et al., McCormick on Evidence § 60 (6th ed. 2006). When the factfinder is the judge, and when all the arguments about the limitations of a given piece of evidence are laid out and explored at some length, there seems little reason to exclude entirely a piece of evidence unless its inadmissibility is obvious. *Id.* ("Judges possess professional experience in valuing evidence, greatly lessening the need for exclusionary rules.") The judge is thus perfectly capable of using evidence in a more nuanced way than simply giving it a thumps-up or thumbs-down.

Proud complains that the summaries did not meet the test for admissibility of summaries in the Federal Rules of Evidence.... Such a complaint has a hollow ring in a bench trial. A district judge can be trusted in general, and in this particular instance, to give evidence its proper weight without regard to the technical rules of evidence ... which insofar as they relate to matters of probative force rather than to privilege are designed primarily for the control of juries.

*Greycas, Inc. v. Proud*, 826 F.2d 1560, 1567–68 (7th Cir.1987).

Even ignoring these background concerns, however, it is evident that Braithwaite was entitled to rely on the Amendola report because it was the kind of data on which experts in his field would reasonably rely. Fed.R.Evid. 703. Braithwaite gave uncontroverted testimony that experts in his field do traditionally rely on government reports and regulatory investigations, and as an expert his opinion about what is ordinarily relied on in his profession is entitled to weight. (Tr. 901:5–15.) He admitted that he had never before used an opposing party's expert report, but the Amendola report is not akin to the typical expert report—it is instead part of an extensive fact-finding effort the government undertook more than a decade before this litigation commenced. And even if there is something unusual about using an opposing party's expert report, that fact does not suggest impropriety.

**\*38** There remains the question of whether

Braithwaite improperly acted as the "mouthpiece" for another expert. In *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, a hydrogeologist conceded that he was not an expert in mathematical models of groundwater flow, yet he essentially adopted such modeling, which was done by other employees of his consulting firm, into his conclusions. 285 F.3d 609 (7th Cir.2002). After these other employees were barred from testifying due to their late disclosure, the district judge granted summary judgment on the grounds that the hydrogeologist had no independent expertise upon which to verify the reliability of the models he relied upon. "A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty." 285 F.3d at 614.

*Dura* lies at one end of a spectrum of possible scenarios.[FN12] In that case, Dura Automotive attempted to use an expert in one specialty to offer expertise about another specialty. Although experts in the other specialty had contributed to his conclusions, they were unable to testify due to late disclosure. Here, by contrast, Mr. Braithwaite is an acknowledged expert in environmental engineering, wastewater treatment and contaminated sites who "grew up in the business" (his father was also an environmental engineer) and now has more than 40 years' experience in the field. (Tr. 691–92.) The report he relied on was well within his area of expertise—in fact, it involved the exact same questions (PCB discharges by PRPs) that he was asked to answer in this action, without any objection on the basis of his qualification to do so. Thus, this is not a case of one expert trying to "smuggle" another's expertise into a case, as with a surgeon who purports to testify about the negligence of a radiologist. 285 F.3d at 613. Instead, it is simply a case in which one expert relies on the conclusions of another expert in his own field. Given that the two experts share the same area of expertise, the testifying expert is qualified to render judgment about the conclusions of the non-testifying expert, which is exactly what Braithwaite did here.

The limitations of Mr. Braithwaite's testimony have been explored at great length in both the trial and the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
**(Cite as: 2013 WL 1858597 (E.D.Wis.))**

post-trial briefing. The court has considered these arguments and factored them in when considering what weight to give his testimony. Striking an expert's testimony is a drastic remedy, particularly in a bench trial, and I conclude that there is no reason to do so here. Accordingly, the motion will be denied.

It should also be noted, however, that even if the motion to strike Braithwaite's testimony was granted, the result would be the same. Mr. Braithwaite's testimony was offered by NCR to prove its divisibility defense. Recall it is the defendants' burden to prove the harm is divisible. Given the court's rejection of Dr. Magar's opinion as to the PCBs discharged in OU1, the divisibility defense would still fail even absent Braithwaite's testimony.

**B. NCR's Motion to Exclude Testimony and Admit Demonstrative Exhibits**

**\*39** [8] NCR first asks that the testimony of government witness Dr. Singer be excluded because she did not perform her sediment trend analysis ("STA") herself. NCR cites the _Dura_ case, _supra,_ for the principle that one expert cannot serve as the "mouthpiece" for a nontestifying expert. 285 F.3d at 614–15. But Dr. Singer was an expert in the general area of expertise in which sediment trend analysis is used, namely geology (the field in which she has a Ph.D.). She was familiar with the use of STA from previous experience and understood each step of the process, as well as the computer software. NCR's view would require a testifying expert to be not just an expert in her field, but an expert in every tool used in her field. Just as a surgeon does not have to know the details of how a underline surgical laser is made in order to testify about how it is _used,_ a geologist does not need to understand in great detail each tool she uses in her work. The court was satisfied by Dr. Singer's testimony that she was able to use STA without necessarily having independent and detailed knowledge of STA's inner workings.

Additionally, although the testimony of Dr. Singer was useful and persuasive in demonstrating the complexity of the sediment movement process, the complexity argument is not crucial to my finding of indivisibility. As

such, even were I to exclude her testimony, the outcome would not change. Accordingly, the motion will be denied.

NCR also moves to strike the testimony of Dr. John Cameron to the extent he attempted to rebut the testimony of Mr. Braithwaite. As I noted during the trial, however, there would seem to be little prejudice arising from Cameron's testimony because it reflected concerns, detailed at length above, that had been made by other witnesses and through cross-examination. (Tr. 2534.) And, because the court did not rely on Cameron's criticisms of Braithwaite, it is clear that no prejudice has resulted from such testimony.

Finally, NCR asks that its demonstrative exhibits be admitted as "substantive" evidence. As suggested earlier, the distinction between substantive and demonstrative evidence is a fine one that probably need not be made in the course of a bench trial. Even so, the court has not relied on any of the demonstratives other than for their demonstrative purpose (e.g. charts, tables, etc.), and they have not been treated by the parties as substantive evidence. Accordingly, the request to admit them as substantive evidence will be denied.

**C. Defendants' Motion to Strike Declarations**

A debate has arisen about the admissibility of the administrative record documenting the selection of the remedy. The government believes it has already been stipulated and agreed that the entire record will be admitted and may be used as evidence for any purpose. Some or all of the Defendants disagree, believing instead that the record was admitted solely for use in determining the propriety of the remedy, which this court did in a November 2012 decision. (ECF No. 666.) Some of these parties have raised objections based on the authenticity of certain documents, and the government filed three post-trial declarations in an effort to satisfy these concerns. As with much of the other disputed evidence, however, materials from the administrative record did not play a material role in my conclusions regarding divisibility and apportionment. In concluding that injunctive relief was warranted,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
(Cite as: 2013 WL 1858597 (E.D.Wis.))

the court relied primarily on the testimony of Dr. Watters, not materials from the administrative record. Accordingly, the objections to the declarations are rendered moot.

### VIII. Motion to Reconsider Decision and Order Upholding the Remedy

*40 Finally, P.H. Glatfelter and Menasha have filed a motion seeking reconsideration of my grant of summary judgment to the government on the question of the propriety of the remedy. They assert that a genuine issue of material fact exists as to whether the EPA and Wisconsin Department of Natural Resources executed a proper Superfund Cooperative Agreement delegating authority to the state to become the "lead agency" in the remedy selection process.

Under CERCLA, the remedy is to be selected by the "lead agency," which also has responsibility for developing the investigation and feasibility study. 40 C.F.R. § 300.430(d)-(f). Under the implementing regulations, known as the National Oil and Hazardous Substance Contingency Plan, or more commonly just NCP, the "lead agency" may be the EPA itself, another federal agency, or (as relevant here) "a state (or political subdivision of a state) operating pursuant to a contract or cooperative agreement executed pursuant to section 104(d)(1) of CERCLA, or designated pursuant to a Superfund Memorandum of Agreement (SMOA) entered into pursuant to subpart F of the NCP ..." 40 C.F.R. § 300.5. Such agreements are governed by Subpart F of the NCP, 40 C.F.R. §§ 300.500 to 300.525, as well as Subpart O, 40 C.F.R. § 35.6105, which is entitled "State-lead remedial Cooperative Agreements."

That section sets forth the requirements an applicant must submit to the EPA, which include an application, narrative statements describing the project's goals, and other certifications involving procurement, maintenance of a drug-free workplace, and the like. One of the requirements is the submission of a statement designating "a lead site project manager among appropriate State offices. This statement must demonstrate that the lead State agency has conducted coordinated planning of response

activities with other State agencies. The statement must identify the name and position of those individuals who will be responsible for coordinating the State offices." 40 C.F.R. § 35.6105(a)(2)(iii).

The state's application named Mark Giesfeldt, the Director of the Bureau of Remediation and Redevelopment (part of the state DNR) as the project manager. (ECF No. 620–2 at 2.) The actual agency that acted as the lead agency, however, was the Bureau of Water Resources Management, also a part of the Wisconsin DNR. For this and a few other related reasons, Glatfelter and Menasha assert that there was an improper delegation of authority to the appropriate state agency.

The United States and Wisconsin argue, however, that the regulations the Defendants cite do not govern "authority" to devise and create a remedial plan but merely the *funding* of that process. The regulations define a "cooperative agreement" as "A legal instrument EPA uses to transfer money, property, services, or anything of value to a recipient to accomplish a public purpose in which substantial EPA involvement is anticipated during the performance of the project." 40 C.F.R. § 35.6015. Throughout the entire process the EPA must approve the state agency's conclusions, and in fact all of the relevant documents we have seen in this action were issued under the auspices of both the DNR and the EPA. Thus, the particulars about whose name was on the original application are irrelevant because there was never a "delegation" of authority in the first place.

*41 Glatfelter and Menasha argue, however, that the process matters and that they are entitled to demonstrate that the process was flawed because the paper trail does not perfectly add up; the fact that the EPA later signed off on the relevant documents and remedial actions cannot paper over any of these procedural flaws. But nowhere do these Defendants cite authority for their premise, which is that the statutes and regulations governing cooperative agreements create some sort of mandatory method for delegating authority rather than just a mechanism for issuing a grant to fund a state-led process. The premise, in

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
**(Cite as: 2013 WL 1858597 (E.D.Wis.))**

other words, is that if the cooperative agreement procedures aren't followed, then the entire remedy created by the governments cannot be imposed. There is nothing within the statutes, regulations or precedent, however, that would suggest that the Wisconsin DNR was acting *ultra vires* and that its actions in developing the remedy should somehow be thrown out. In fact, given that government bureaucracies and their employees change all the time, it would be surprising if an entire remedial process—a major administrative undertaking—could be thrown out merely because employees of one state agency subdivision did much of the work rather than those of another subdivision.

In sum, the court is satisfied that if there was any flaw in the governments' paperwork, that flaw would only pose an issue between the two governments and would not undermine the legitimacy of the remedy chosen. As such, it would not create a right on behalf of a third party to challenge the process on that basis. The motion for reconsideration will therefore be denied.

### IX. Conclusion and Order

The United States and State of Wisconsin have sought an injunction and declaratory judgment finding that the defendants, except as otherwise agreed, are jointly and severally liable for the harm resulting from PCB contamination in the Lower Fox River downstream from their respective facilities and ordering that they comply with the remedial measures set forth in the Unilateral Administrative Order. For the reasons given above, I conclude that they are entitled to the relief they seek. A separate order will be entered accordingly. In addition, the following actions are taken in this matter:

The joint motion [719] to terminate the previous preliminary injunction is **GRANTED.**

The motion [734] to reconsider is **DENIED.**

The evidentiary motions [744, 747] are **DENIED.**

The motion to strike [783] is **DENIED.**

**FN1.** The government also sought rulings of joint and several liability with respect to OU2, OU3 and OU5. Joint and several liability for those operable units was not contested, except to the extent the arguments the parties made with respect to OU4 might also apply to those operable units.

**FN2.** These initial estimates are relied upon only to show context, not to determine allocation of PCB concentrations in OU4.

**FN3.** For simplicity the United States and the State of Wisconsin will be referred to simply as "the government."

**FN4.** NCR has apparently chosen to focus on Mr. Butler's analysis and his 20% apportionment figure as the centerpiece of its apportionment case. Thus, while Mr. Simon's analysis is useful to the extent it bolsters Butler's conclusions, neither NCR nor I have given extended treatment to it. The same holds true for Dr. Connolly's conclusion that NCR is only responsible for a 6–9% share of OU4 harm.

**FN5.** Under the Toxic Substances Control Act (TCSA), 15 U.S.C. § 2601 et seq, waste areas exceeding 50 ppm of PCBs must be disposed of under certain strict guidelines. The current remedy includes several areas, sometimes called hotspots, that exceed the 50 ppm threshold and thus require extra care and expense to remediate. Although it is likely that some of these areas are TSCA areas due to the discharges of other parties, TSCA dredging was a small part of the overall remedy. Moreover, although there would be some added expense due to these areas' TSCA status, the areas would in all likelihood need to be dredged anyway. The added TSCA expense

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
(Cite as: 2013 WL 1858597 (E.D.Wis.))

was not explained in any detail, and in any event would not suffice to render the entire operable unit divisible.

FN6. This is true not only in a relative sense but in an absolute sense as well. With a large enough discharge, a hypothetical discharger could be deemed a sufficient cause of the harm even if other parties contributed much more than it did. (This is possibly true in this case, particularly in OU4B.) Conversely, a small discharge could be deemed an insufficient cause even if the discharger was responsible for more than any other discharger.

FN7. NCR argues that this loss rate does not account for treatment in ACPC's "honey tanks," or clarifiers. In actuality, the testimony on that point was unclear. Klass cited documents from the Wisconsin DNR indicating that solids loss estimates from the 1970's (calculated because they incurred municipal sewer fees) were estimates *after* treatment at ACPC. (Ex. 8869; Tr. 1947–1951.) And, as noted further below, removal of some solids from effluent does not remove PCBs at the same rate as the solids are removed, because PCBs on the smaller particles, which are not removed by settling tanks, actually exist in higher concentrations. Thus, in my view NCR has not adequately shown that ACPC's treatment processes would have materially altered the emulsion loss rate.

FN8. Some of this analysis could be applied with equal force to the second question in the divisibility analysis. Thus, even if the harm were *theoretically* capable of being divided, I would conclude for the reasons stated herein that NCR has not shown a reasonable factual basis for apportioning the harm.

FN9. NCR makes much of the fact that the gov-

ernment's principal witness, Richard Fox, accepted the premise that if NCR were the only discharger, the costs of remediation would naturally be lower. (Tr. 333:22.) In fact, during the preliminary injunction phase, the same witness had agreed that the costs involved would be "dramatically lower" if NCR had been the only discharger. (Tr. 334:3–8; ECF No. 365 Tr. 125:1–4.) But what NCR glosses over is that Mr. Fox was being asked to opine about a river in which NCR was responsible for only 6 to 9% of the PCBs (based on Dr. Connolly's estimate).

If NCR truly discharged only 6 to 9% of the PCBs that settled in OU4, Fox's concession would likely make this an easy case. The mass of PCBs caused by NCR would be so low that it would overcome the problems set forth above because we could expect such small loads would not produce the need for *any* remedy in many areas of OU4. But for the reasons given above, I cannot conclude that Dr. Connolly's very low estimates are reliable, and even NCR has relied on Butler's conclusion that it should be deemed responsible for 20%.

FN10. In many ways this is not a question of whether to impose joint and several liability but of whether these Defendants are liable at all.

FN11. The OU1 Defendants did not attempt to show that the harm was divisible under NCR's "sufficient cause" approach, even though some of them would have had a better chance than NCR at proving divisibility. The reason, presumably, is that if they cannot succeed in showing *zero* liability, their fallback preference would be joint and several liability, given this Court's rulings in the contribution action. That is, they would rather all be jointly liable and have NCR pay for everything than be severally liable and have to pay, say, 25 percent.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)
**(Cite as: 2013 WL 1858597 (E.D.Wis.))**

> FN12. *Dura* had a strong dissent that makes the point that the expert's conclusions were not actually challenged by CTS' experts during any *Daubert* proceedings. There was thus no evidence that the expert hydrogeologist would not have commonly relied upon the computer model choices of the experts who were barred from testifying. Here, these concerns are salient because no one has suggested (certainly not the Plaintiffs) that the Amendola report is not something that an expert would commonly rely upon, and Braithwaite testified that it was.

E.D.Wis.,2013.
U.S. v. NCR Corp.
--- F.Supp.2d ----, 2013 WL 1858597 (E.D.Wis.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.