UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
DMJ ASSOCIATES, L.L.C.,                          :
                                                 :
                    Plaintiff,                   :
                                                 :
        -against-                                :
                                                 :
CARL A. CAPASSO, *et al*,                        :
                                                 :
                    Defendants,                  :
                                                 :
---------------------------------------------------------- X    **MEMORANDUM AND ORDER**
                                                 :              97-CV-7285 (DLI)(RML)
EXXON MOBIL CORPORATION and                      :
QUANTA RESOURCES CORPORATION,                    :
                                                 :
     Defendants/Third-Party Plaintiffs,          :
                                                 :
        -against-                                :
                                                 :
ACE WASTE OIL, INC., *et al*,                    :
                                                 :
        Third-Party Defendants.                  :
---------------------------------------------------------- X

**DORA L. IRIZARRY, Chief Judge:**

In the underlying first-party action, plaintiff DMJ Associates, L.L.C. ("DMJ") brought an environmental cleanup cost recovery claim against various defendants, including Exxon Mobil Corporation ("Exxon Mobil") and Quanta Resources Corporation ("Quanta"), under § 107 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9607, *inter alia*. Exxon Mobil and Quanta, collectively the third-party plaintiffs ("TPPs"), entered into a settlement agreement with DMJ in which the TPPs agreed to pay certain monies to DMJ for its response costs and to remediate conditions at the facility operated by Quanta ("Quanta Facility"). The TPPs then asserted claims in a third-party action against Revere Copper Products, Inc. ("RCPI") and other third-party defendants ("TPDs")

in a third amended third-party complaint for response costs and contribution under CERCLA §§ 107 and 113 alleging that RCPI and other TPDs transported hazardous materials for disposal or treatment to the Quanta Facility during the period beginning in 1972 and extending through 1981. (Third Amended Third-Party Complaint ("TATPC") at ¶¶ 2, 12, Dkt. Entry No. 1149.)

On October 27, 1982, RCPI's corporate predecessors filed for bankruptcy in the U.S. Bankruptcy Court for the Southern District of New York ("BCSDNY"). On May 19, 2014, RCPI filed a motion for a pre-motion conference to seek permission to file the instant motion and, alternatively, request that the matter be referred to the Bankruptcy Court. (*See* RCPI Motion for Pre-Motion Conference, Dkt. Entry No. 1532.) On August 11, 2014, this Court denied both RCPI's motion for a pre-motion conference and its request to refer the case to Bankruptcy Court. (*See* August 11, 2014 Order, Dkt. Entry No. 1543.) In that decision, this Court held that "the TPPs' CERCLA claims did not constitute valid bankruptcy claims, and, thus, the Bankruptcy Court did not discharge these claims in its Confirmation Order." (*Id*. at 3.) RCPI filed the instant motion for summary judgment based on discharge in bankruptcy arguing "that the CERCLA claims asserted by [the TPPs] arose out of contamination attributable to the activities of" Quanta and its predecessors, which predated RCPI's corporate predecessors filing for bankruptcy. (*See* RCPI Motion for Pre-Motion Conference.)

For the reasons set forth below, RCPI's motion for summary judgment based on discharge in bankruptcy is denied.

## BACKGROUND

Familiarity with the facts of the underlying first party action is presumed for purposes of this decision.

I.      **Corporate History of RCPI**

RCPI, in its first corporate iteration, "was formed in 1928 by the consolidation of six copper and brass fabricating companies." (Declaration of Allen G. Reiter[1] ("Reiter Decl."), Exhibit 11, Revere's Disclosure Statement at 6, Dkt. Entry No. 1573-4.) The firm produced, manufactured, and sold "nonferrous metals and metal products" in highly competitive national markets. (*Id*)

Prior to the 1982 commencement of bankruptcy proceedings, RCPI's predecessor, Revere Copper Products, Inc., was a Maryland corporation, incorporated in 1980 as a subsidiary of Revere Copper & Brass Incorporated. (Declaration of Kevin Cleary[2] ("Cleary Decl.") at ¶ 2, Dkt. Entry No. 1572-1.) RCPI is a Delaware corporation formed in 1987 that, through a series of corporate reorganizations and other transactions, became the corporate successor by merger to the old Revere Copper Products, Inc. ("Old RCPI"). (Cleary Decl. at ¶¶ 4-7.)

On October 27, 1982, Old RCPI and Revere Copper & Brass Incorporated ("Old Revere") filed for bankruptcy protection in the BDSDNY under Chapter 11 of the U.S. Bankruptcy Code. (Declaration of Thomas L. Kennedy[3] ("Kennedy Decl."), Exhibit B, Voluntary Petition for Relief Under Chapter 11, Title 11, United States Code ("Revere Bankruptcy Petition"), Dkt. Entry No. 1572.) On July 29, 1985, the BDSDNY confirmed Old

---

[1]      Allen G. Reiter is a member of Arent Fox LLP and serves as counsel for Quanta. (Reiter Decl. at ¶ 1.)

[2]      Kevin Cleary was employed by Revere Copper & Brass Incorporated in various human resources capacities from 1975 to 1987 and again from 1989 to 2011. (Cleary Decl. at ¶ 1.)

[3]      Thomas L. Kennedy is an attorney for RCPI and a senior counsel at the law firm Bond, Schoeneck & King, PLLC. (Kennedy Decl. at ¶ 1.)

RCPI and Old Revere's amended joint plan of reorganization. (Response to Third-Party Plaintiffs' Statement of Additional Material Facts at ¶ 4, Dkt. Entry No. 1574.)

## II. Relationship Between Old RCPI and Old Revere with the TPPs

On July 29, 1980, Quanta purchased the assets of Portland Holding Corporation ("Portland Holding"), which previously had operated under the name Newton Refining Company ("Newton Refining"). (Declaration of Thomas R. Smith[4] ("Smith Decl."), Exhibit 14, Operations Analysis, Dkt. Entry No. 1571-4.) Newton Refining was founded by Russell W. Mahler ("Mahler") in 1957 and its business "consisted of recycling liquid oil wastes into fuel oil and lubricating oil." (*Id.*) Newton Refining operated multiple re-refining facilities in Syracuse, New York and Long Island City, New York, among other cities. (*Id.*) "In May, 1976, Mahler sold Newton Refining and its subsidiary companies to Ag-Met, Inc., which owned the company until January, 1979." (*Id.*) "In 1979 Ag-Met resold certain of the assets to Mahler," who established Portland Holding prior to its asset sale to Quanta. (*Id.*)

Pursuant to an asset purchase agreement dated April 25, 1980, Quanta was authorized to purchase certain assets of companies owned and operated by Mahler, including Portland Holding, Hudson Oil Refining Corporation, Edgewater Terminals, Northeast Oil of Syracuse, Casco Equipment Corporation, Polar Industries, and Oil Transfer Corporation (collectively, "the Mahler Companies"). (Smith Decl., Exhibit 4, Deposition of Eugene Prashker[5] ("Prashker Dep.") at 33:8-34:1, Dkt. Entry No. 1571-3.) When Quanta acquired the Long Island City re-refining facility as part of the Mahler Companies' asset purchase, Quanta was aware that the

---

[4] Thomas R. Smith is an attorney for RCPI and a member of the law firm of Bond, Shoeneck & King, PLLC. (Smith Decl. at ¶ 1.)

[5] Eugene Prashker served as a director on the Board of Directors for Quanta as of April 25, 1980. (Prashker Dep. at 34:12-17.)

4

property was subject to a consent order by the New York State Department of Environmental Conservation ("NYSDEC") compelling it to clean up the waste petroleum products at the property site. (Smith Decl., Exhibit 5, Prashker Dep. at 82:9-14, Dkt. Entry No. 1571-3.) Subsequent to the asset purchase, Quanta negotiated its own consent order with NYSDEC. (*Id.* at 83:1-3.)

Old RCPI and Old Revere were customers of the Mahler Companies insofar as they employed Mahler Companies to transport their waste oils for disposal to a processing facility in Syracuse, New York. (RCPI's Rule 56.1 Statement at ¶ 4, Dkt. Entry No. 1571-1.) Some of those wastes were transshipped from the Syracuse facility to the Quanta Facility. (*Id.*)

### III. Quanta Bankruptcy

In June of 1980, Straubing & Rubin, an engineering firm, prepared a report detailing some of the environmental deficiencies at the Quanta Facility. (Smith Decl., Deposition of Kenneth Mansfield[6] ("Mansfield Dep.") at 221:5-225:16, Dkt. Entry No. 1571-3.) From May 7, 1982 through December 1, 1982, the City of New York Department of Environmental Protection ("NYCDEP") took emergency response actions to remove contaminated petroleum waste products containing polychlorinated biphenyls ("PCBs") and other hazardous materials from the Quanta Facility. (Smith Decl., Exhibit 18, Quanta Resources City on Scene Coordinator's Report to the Commissioner, Dkt. Entry No. 1571-4.) In a letter dated August 2, 1982, addressed to Quanta, the New York City Department of Health declared the Quanta Facility to be a public nuisance due to the "unsafe and illegal manner" in which hazardous waste oil and sludge is stored. (Smith Decl., Exhibit 24, Dkt. Entry No. 1571-4.) In another letter dated August 24, 1982, addressed to the Commissioner of the NYSDEC, the Commissioner of the NYCDEP

---

[6] Kenneth Mansfield "was employed by the Mahler Companies in 1974, and remained employed by the Mahler Companies until the sale to Quanta Resources Corporations in July 1980. Following the sale, Mr. Mansfield continued to be employed by Quanta Resources Corporation until 1981." (Smith Decl. at ¶ 12.)

5

deemed the Quanta property site an abandoned and "inactive hazardous waste disposal site" fraught with corroded waste oil storage tanks. (Smith Decl., Exhibit 26, Dkt. Entry No. 1571-4.)

On November 12, 1980, Quanta entered into an administrative consent order ("AOC") with the NYSDEC that granted Quanta temporary authority over the Quanta Facility. (Smith Decl., Exhibit 29, Dkt. Entry No. 1571-4.) With the discovery of significant amounts of PCBs and other hazardous waste materials at the Quanta Facility, Quanta concluded in the summer of 1981 that operation of its waste oil re-refinery would be unprofitable. (*Id.*) Therefore, on October 6, 1981, Quanta filed a petition for Chapter 11 bankruptcy. (*Id.*) On November 12, 1981, Quanta's Chapter 11 bankruptcy petition was converted to a liquidation pursuant to Chapter 7 of the U.S. Bankruptcy Code. (*Id.*)

## IV. Old Revere and Old RCPI Bankruptcy

As noted above, Old Revere, Old RCPI and certain other subsidiaries and affiliates ("the Old Revere Companies") each filed petitions for bankruptcy protection on October 27, 1982. (Kennedy Decl. at ¶ 2.) These bankruptcy petitions were ordered consolidated and jointly administered by the BDSDNY on October 27, 1982. (*Id.* at ¶ 8.) On May 10, 1985, the Old Revere Companies provided creditors and equity shareholders with notice of a hearing on approval of the Old Revere Companies' disclosure statement and of the hearing on confirmation of the reorganization plan. (*Id.* at ¶ 12.) On July 29, 1985, the BDSDNY approved the plan for reorganization and signed the Order Confirming the Plan ("Confirmation Order"). (*Id.* at ¶ 14.) The Confirmation Order was officially entered on July 30, 1985. (*Id.*)

On October 10, 2013, RCPI, as the corporate successor to the Old Revere Companies, sought to reopen the bankruptcy proceedings before the BDSDNY asserting that the TPPs' claims against it were discharged pursuant to the 1985 Confirmation Order. (RCPI Motion for

Pre-Motion Conference at 2.) On May 6, 2014, the BDSDNY denied RCPI's motion to reopen the underlying bankruptcy proceedings. (Declaration of Allen G. Reiter, Exhibit 3, Order Denying Revere's Motion to Reopen the Bankruptcy Cases, Dkt. Entry No. 1532-2.) RCPI now moves for summary judgment before this Court again arguing that the TPPs claims against it constitute pre-petition claims that were discharged pursuant to the 1985 Confirmation Order.

## DISCUSSION

### I. Summary Judgment Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations omitted). A fact is "material" within the meaning of Rule 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. To determine whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam) and *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989)). "[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The moving party bears the burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrates the absence of a genuine issue of fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted). Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted) (internal citation omitted). The nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in [its] favor." *Anderson*, 477 U.S. at 256. The nonmoving party may not "rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the nonmoving party's pleading." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532-33 (2d Cir. 1993) (internal citations and quotations omitted). "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (quoting *Matsushita*, 475 U.S. at 587).

## II. The TPPs Claims Were Not Discharged in Bankruptcy

"[T]he existence of a valid bankruptcy claim depends on (1) whether the claimant possessed a right to payment, and (2) whether that right arose before the filing of the petition." *Pension Benefit Guaranty Corporation v. Oneida Ltd.*, 562 F.3d 154, 157 (2d Cir. 2009) (internal

8

quotation marks and citation omitted). In order to make such determinations, the courts must look to "the substantive non-bankruptcy law that gives rise to the debtor's obligation." *Id*.

> A claim will be deemed pre-petition when it arises out of a relationship recognized in, for example the law of contracts or torts. A claim exists only if before the filing of the bankruptcy petition, the relationship between the debtor and the creditor contained all of the elements necessary to give rise to a legal obligation . . . under the relevant non-bankruptcy law.

*In re Duplan Corp.*, 212 F.3d 144, 152 (2d Cir. 2000).

"CERCLA claims arise for purposes of bankruptcy at the earliest on the date that CERCLA became effective, December 11, 1980." *Id*. at 151. Indeed, the court in *In re Chateaugay Corp.* held that, "where there is no legal relationship defined at the time of petition, that is, where the statute imposing the liability has not been enacted, it would be impossible to find even the remotest right to payment." *In re Chateaugay Corp.*, 154 B.R. 416, 419 (S.D.N.Y. 1993).

Here, CERCLA had been enacted prior to the confirmation of Old RCPI's bankruptcy on July 30, 1985. However, Section 113(f) of CERCLA, under which the TPPs brought this action against RCPI, had not yet been enacted at the time of the hazardous waste releases or even before the 1985 Confirmation Order. Furthermore, the statutory scope of section 107(a) of CERCLA had not yet permitted suit by private parties to recover cleanup costs from other private parties. Such suit first was made possible in 2007 by the Supreme Court in *United States v. Atlantic Research Corp.*, which provided that a potentially responsible party ("PRP") could pursue a § 107 claim for recovery of cleanup costs against another PRP. 551 U.S. 128, 139-141 (2007). Although RCPI contends that CERCLA § 107(a) bears the same statutory language as the date of its enactment and permitted private parties to pursue contribution claims thereunder at the statute's inception in 1980, the TPPs still were precluded from seeking contribution claims against Old RCPI under § 107 until the Supreme Court issued its 2007 decision in *Atlantic*

*Research*. As the Honorable Robert M. Levy, U.S.M.J., correctly noted in his Report and Recommendation issued on July 6, 2015, denying TPD's summary judgment motion as to Count 1 of the TATPC:

> Prior to December 2004, when the U.S. Supreme Court decided *Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157 (2004), every federal appellate court to address the interplay of §§ 107 and 113–including the Second Circuit–held that a PRP could *not* bring a § 107(a) cost recovery action against another PRP.

(Report and Recommendation ("R & R") at 13, Dkt. Entry No. 1564, adopted on Mar. 31, 2016, Dkt. Entry No. 1608.) However, *Cooper Industries* merely stood for the proposition that a private party that had not been sued under CERCLA § 106 or § 107(a) cannot obtain contribution under CERCLA § 113(f)(1) from other potentially liable parties. 543 U.S. at 168. *Cooper Industries* also declined to consider whether a private PRP could recover response costs against another private PRP under CERCLA § 107(a)(4)(B). *Id*. at 170-71.

In *United States v. Atlantic Research*, the Supreme Court held that § 107(a) allows for the recovery of remediation costs "without any establishment of liability to a third party" where the party seeking recovery has incurred the costs directly. 551 U.S. 128, 139 (2007). Furthermore, *Atlantic Research* found that "[a PRP's] costs incurred voluntarily are recoverable only by way of § 107(a)(4)(B)." *Id*. at 139 n. 6. As was born out in the R & R's exhaustive case law and statutory analysis, the issue of the voluntariness of a PRP's direct cost incurrence as a determinant in whether a party may proceed under § 107(a) or § 113(f) remains a contested issue that the Supreme Court has not yet definitively decided.

RCPI relies on *In re Chateaugay*, 944 F.2d 997 (2d Cir. 1991), to support its contention that the TPPs' CERCLA claims constitute pre-petition claims since they arose out of pre-petition releases or threatened releases of hazardous waste materials, notwithstanding that the response

costs were not incurred until after the bankruptcy. (RCPI Memorandum of Law in Support of Summary Judgment Based Upon Discharge in Bankruptcy ("RCPI Mem. of Law") at 9, Dkt. Entry No. 1572-3.) This reliance is misplaced. *Chateaugay* is factually distinguishable from the instant matter. As the TPPs correctly note, in *Chateaugay*, the U.S. Environmental Protection Agency ("EPA") already had incurred remediation costs and sought reimbursement at the time of the bankruptcy's confirmation. (TPPs' Memorandum of Law in Opposition to RCPI's Motion for Summary Judgment ("TPPs' Mem. of Law") at 20, Dkt. Entry No. 1573-7; 944 F.2d at 999-1001.) Moreover, in *Chateaugay*, the EPA acknowledged that, although it incurred response costs for remediation at a certain number of sites, it was unaware of the full scope of its environmental claims. 944 F.2d at 999. Here, the TPPs lacked knowledge as to the existence of any claim whatsoever at the time RCPI filed for bankruptcy protection. Furthermore, CERCLA § 107(a) as interpreted by courts at both the time of RCPI's bankruptcy filing and years later did not afford the TPPs an opportunity to pursue any contribution claims. *See United Technologies Corp. v. Browning-Ferris Industries*, 33 F.3d 96, 99 (1st Cir. 1994) (defining contribution as "a claim by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make") (internal quotation marks and citation omitted); *Consolidated Edison Co. of New York, Inc. v. UGI Utilities, Inc.*, 423 F.3d 90, 94 (2d Cir. 2005) (finding that while Section 107(a) permitted certain sued private parties to sue other parties to recover response costs incurred voluntarily, it did not grant to parties against whom liability has been imposed any express right to sue other parties for contribution). In the instant matter, the TPPs did not voluntarily incur response costs, but rather were sued by DMJ under CERCLA Section 107(a). In this capacity, the TPPs were not accorded the statutory authority to

sue any PRPs under Section 107(a) until the Supreme Court rendered its decision in *Atlantic Research*.

Notwithstanding RCPI's contention that the occurrence and discovery of the environmental contamination prior to the filing of the bankruptcy petition discharges any claims against it, the issue remains as to whether there were any legally assertable non-bankruptcy claims against RCPI at the time of the petition's filing. Under *Duplan*, there were no such claims because the relationship between Old RCPI and the TPPs did not contain all of the elements necessary to give rise to a legal obligation. 212 F.3d at 152. The elements necessary to give rise to such a legal obligation arose when the Supreme Court decided *Atlantic Research*. Accordingly, the CERCLA § 107 and § 113 claims against RCPI do not constitute pre-petition claims.

### III. Adequate Notice of Bankruptcy Petition Filing

Because the claims against RCPI are not dischargeable in bankruptcy, it is not necessary for the Court to address the issue of whether the TPPs received adequate notice of the Old Revere Companies' bankruptcy filing. Accordingly, the issue of receipt of adequate notice is moot.

### CONCLUSION

Accordingly, RCPI's motion for summary judgment based on discharge in bankruptcy is denied.

SO ORDERED.

Dated: Brooklyn, New York
September 22, 2016

/s/
DORA L. IRIZARRY
Chief Judge